**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| ) | |
| THE HUMANE SOCIETY OF THE UNITED ) | Case No. 1:16-CV-724 |
| STATES, ANIMAL PROTECTION OF NEW | |
| MEXICO, JEAN OSSORIO, and PETER ) | |
| OSSORIO | |
| ) | |
| Plaintiffs, | |
| ) | |
| v. | |
| ) | |
| PAUL M. KIENZLE III, WILLIAM | **COMPLAINT FOR** |
| MONTOYA, ROBERT ESPINOZA SR., ) | **DECLARATORY AND** |
| RALPH RAMOS, BOB RICKLEFS, | **INJUNCTIVE RELIEF** |
| ELIZABETH ATKINSON RYAN, and ) | |
| THOMAS SALOPEK, in their official | |
| capacities as Commissioners of the New ) | |
| Mexico State Game Commission; and | |
| ALEXANDRA SANDOVAL, in her official ) | |
| capacity as Director of the New Mexico | |
| Department of Game and Fish, ) | |
| | |
| Defendants. ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This is an action under the Endangered Species Act, ("ESA"), 16 U.S.C. § 1531 *et seq.*, against the Commissioners of the New Mexico State Game Commission (collectively, the "Commissioners") and the Director of the New Mexico Department of Game and Fish (the "Director") (collectively "Defendants"). Defendants, seeking to increase opportunity for recreational killing of cougars in the state – despite an admitted lack of any reliable scientific estimate of New Mexico's cougar population size – have adopted regulations (NMAC § 19.31.11, the "Cougar Rule") which authorize the use of deadly leg-hold traps and snares to

1

catch cougars on private and state trust lands across New Mexico. Defendants' actions will cause injury, death, and unnecessary suffering to federally protected Mexican wolves and jaguars caused by the cougar traps that will be placed throughout the endangered animals' habitat.

2.     Mexican wolves (*Canis lupus baileyi*) are among the rarest and most imperiled animals in the United States. They are presently listed as an endangered subspecies of wolf under the ESA. Despite a federal reintroduction program and the efforts of volunteers and advocates, they remain on the brink of extinction. As of February 2016, the U.S. Fish and Wildlife Service estimated that a mere *ninety-seven* Mexican wolves remained in the wild in the United States. Human-caused injury and mortality – the original reason for the Mexican wolf's extirpation from the wild – remains a principal threat to individuals and, because of the small population size and extremely limited gene pool, the subspecies as a whole.

3.     Jaguars (*Panthera onca*) – the largest cat species native to the Western Hemisphere – are listed as endangered. As with Mexican wolves, human-caused factors like poaching and trapping have driven jaguars to the brink of extinction. The U.S. Fish and Wildlife Service has designated areas in the mountains of southwestern New Mexico as critical habitat that is "essential to the conservation of the species" worldwide. 16 U.S.C. § 1532(5)(A).

4.     Authorizing cougar trapping and snaring across broad new swaths of public and private land – much of which overlaps with key Mexican wolf and jaguar habitat – will cause illegal takes of these federally protected animals by traps and snares set for cougars. The indiscriminate nature of leg-hold traps and snares means that traps and snares set for cougars will inevitably catch Mexican wolves and jaguars, which are similar in size and weight to cougars.

5.     Trapping presents a particularly dangerous risk to Mexican wolves. There have already been at least thirty-seven documented instances of Mexican wolves being caught in traps

2

– including several mortalities and severe injuries – since the federal reintroduction program began. These incidents were caused by traps set for smaller furbearers like coyotes and raccoons. The Cougar Rule will cause a dramatic increase in incidents like these because traps used for cougars are much more likely to take Mexican wolves than the traps used for smaller furbearers.

6.      By authorizing cougar trapping and opening a cougar trapping season in these areas, Defendants will cause the death, injury, and harassment of Mexican wolves and jaguars, in violation of the ESA and its implementing regulations.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) (ESA citizen suit provision) and 28 U.S.C. § 1331 (federal question).

8.      As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g), Plaintiffs provided all Defendants and the Secretary of the Interior written notice of their intent to sue for the violations described in this complaint on March 17, 2016. More than sixty days have passed since Plaintiffs furnished such notice, which is attached as Exhibit A.

9.      Defendants responded to Plaintiffs' intent to sue, but refused to stay implementation of the Cougar Rule.

10.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g).

## PARTIES

11.     Plaintiff The Humane Society of the United States ("HSUS") is the nation's largest animal protection organization, headquartered in Washington, D.C., with many members and constituents in New Mexico. Since its establishment in 1954, HSUS has worked to combat animal abuse and exploitation and promote animal welfare. To this end, HSUS strives to protect and improve the management of threatened and endangered species throughout the country and

to eliminate inhumane methods of hunting and trapping. In particular, HSUS' Wildlife Abuse Campaign works extensively to advocate against cruel hunting and trapping techniques including leg-hold traps and to promote the conservation of native carnivores – including wolves, bears, cougars, and jaguars – through research, public outreach and education, advocacy, and litigation.

12.      As part of these efforts, on August 26, 2015 HSUS submitted detailed comments on behalf of itself and its members to the New Mexico Fish and Game Commission opposing the Cougar Rule on the grounds that it was not supported by sound science and that expanding cougar trapping will cause injury and death to non-target animals.

13.      HSUS members and staff rely on cougars, Mexican wolves, and jaguars for recreational, aesthetic, and professional purposes. HSUS members regularly visit wild areas in New Mexico to recreate by themselves and with their companion animals, and to observe wildlife. They are distressed when animals are subjected to what they believe is cruel and unnecessary suffering in leg-hold traps and snares, and they are deterred from recreating in wild lands when traps that present a threat to their companion animals are present. Furthermore, they will not be able to view cougars, jaguars and Mexican wolves in New Mexico if these species are not properly protected from threats to their individual and collective survival.

14.      Additionally, HSUS has been forced to divert time and other institutional resources researching and advocating for protection of cougars, as well as protection of wolves and jaguars that are adversely affected by the Department's failure to protect these animals as required under the ESA. Because of the Department's adoption of the Cougar Rule, HSUS has been forced to redirect programmatic resources and finances to combat the Defendants' illegal activity affecting Mexican wolves and jaguars – resources and finances that would be used on

other wildlife protection projects if it were not for the Defendants' illegal activities challenged here.

15.     Plaintiff Animal Protection of New Mexico ("APNM") is the premier animal protection organization in New Mexico, advocating for animals in New Mexico by effecting systemic change and working towards the humane treatment of all animals since 1979. APNM accomplishes its goals through education and outreach as well as campaigns for change, including active support of legislative and regulatory action to address and prevent animal cruelty.

16.     APNM has also worked extensively to advocate for the reintroduction of Mexican gray wolves into New Mexico and the Southwestern United States by petitioning the U.S. Fish & Wildlife Service and the Department. Additionally, APNM conducts public outreach on the Mexican gray wolf reintroduction and engages members of the public to contact federal and state agencies and to attend rallies and public meetings in support of wolf recovery.

17.     APNM has long fought for the protection of New Mexico's native wildlife through legislative advocacy and public education and outreach. Over the last two decades, APNM has worked with the New Mexico public and state officials to promote compassion toward and conservation of New Mexico cougars, including advocating for responsible, science-based stewardship by the Department. Through its "Coexistence with Wildlife" programs, APNM has worked with agencies and landowners to promote and utilize humane solutions to human-wildlife conflicts, including beaver damage mitigation and public safety in cougar territory (the "Cougar Smart New Mexico" program). APNM and its members have also actively campaigned against killing contests and the trapping and poisoning of wildlife on public lands in New Mexico.

18.     APNM submitted comments to the Commission opposing the Cougar Rule, and attended Commission meetings in order to deliver oral testimony opposing the Cougar Rule. On two occasions -- at the June 13, 2015 and August 27, 2015 Game Commission meetings -- APNM staff submitted oral comments in opposition to the Cougar Rule. In its written comments, APNM identified discrepancies and deficiencies in the scientific support offered for the Cougar Rule.

19.     Numerous APNM members and supporters also submitted written comments and oral testimony opposing the Cougar Rule in their individual capacities. APNM members regularly visit wild areas in New Mexico to recreate by themselves and with their companion animals, and to observe wildlife. They are distressed when animals are subjected to what they believe is cruel and unnecessary suffering in leg-hold traps and snares, and they are deterred from recreating in wild lands when traps that present a threat to their companion animals are present. Furthermore, they will not be able to view cougars, jaguars and Mexican wolves in New Mexico if these species are not properly protected from threats to their individual and collective survival.

20.     APNM has been forced to spend time, money, and other institutional resources researching and advocating for protection of Mexican wolves and jaguars, including those that are adversely affected by the Department's failure to protect these animals as required under the ESA. APNM would have put these resources – including staff time and finances – toward other ongoing projects to protect animals in New Mexico if it were not for the Defendants' illegal activities challenged here.

21.     Plaintiff Jean Ossorio is a retired elementary school teacher and has been a New Mexico resident for twenty years. She currently resides in Doña Ana County with her husband,

plaintiff Peter Ossorio. She is an active hiker and camper and spends significant time hiking and camping in New Mexico wild lands, including the territory of the Mexican wolf, in order to observe Mexican wolves and their sign. She has spent 433 nights camping in Mexican wolf home ranges since 1998, and has seen 45 Mexican wolves in the wild.

22.     Ms. Ossorio has been a passionate volunteer advocate for Mexican wolves for over twenty years. She belongs to groups that advocate for wolves and has personally been involved in Mexican wolf outreach and education activities. Her involvement has included delivering a keynote speech on Mexican wolves at a 2007 fund raising gala for Forest Guardians; monitoring a potential wilderness area in the Peloncillo Mountains for the New Mexico Wilderness Alliance; contributing money toward the captive breeding and eventual release of Mexican wolves; and giving more than thirty presentations on Mexican wolves to audiences ranging from New Mexico elementary school students to the El Paso Zoo.

23.     Ms. Ossorio has also been deeply and personally involved with the federal Mexican wolf recovery program, volunteering as a pen sitter in 2013 for captive wolves identified as the Coronado pack of Mexican wolves for reintroduction into the wild; attending virtually every state and federal public meeting pertaining to Mexican wolf recovery from 1998 to the present; and submitting comments on state and federal actions and environmental assessments pertaining to Mexican wolves.

24.     Ms. Ossorio served as a member of the Southwest Distinct Population Segment Gray Wolf Recovery Team's stakeholder panel between October 2003 and January 2005 and was one of five conservation members on Governor Richardson's Catron County Mexican wolf task force in July 2005. Through her unpaid service on these teams, Ms. Ossorio became familiar

with the scientific literature on Mexican wolf recovery and reinforced her appreciation for the precarious genetic status of the species.

25.     Ms. Ossorio has incurred substantial personal expense and has never generated personal profit from the above-described activities. All honoraria she has received for presentations on Mexican wolves have been either declined or subsequently donated to Mexican wolf recovery organizations.

26.     Ms. Ossorio is vitally invested in the health and survival of Mexican wolves, both individually and as a species. She is gravely concerned that the expansion of cougar trapping authorized by the Commission will cause the death and injury of Mexican wolves that are caught in snares and leg-hold traps set for cougars. This will harm her deep and personal interest in viewing and listening to Mexican wolves in the wild during her frequent and ongoing visits to their habitat, and will render her expenditures and investment in Mexican wolf recovery meaningless and worthless.

27.     Plaintiff Peter Ossorio is a U.S. Army veteran and retired Assistant U.S. Attorney who has been a New Mexico resident for twenty years. He currently resides in Doña Ana County with his wife, Ms. Ossorio. Like his wife, he is an active hiker and camper and spends significant time hiking and camping in New Mexico wild lands, including the territory of the Mexican wolf, in order to observe Mexican wolves and their sign. Mr. and Ms. Ossorio celebrated their 50th wedding anniversary with a trip to Mexican wolf territory in June 2015.

28.     Mr. Ossorio, like his wife, belongs to several organizations that advocate for wolf recovery and has personally been involved in advocacy for Mexican wolves for over eighteen years. His involvement has included monitoring potential Mexican wolf habitat; donating to and visiting the Endangered Wolf Center in Eureka, MO (the primary captive breeding facility for

reintroduced Mexican wolves); attending (with Ms. Ossorio) most state and federal public hearings pertaining to Mexican wolves; and (with Ms. Ossorio) submitting written comments on state and federal actions and environmental assessments related to Mexican wolves.

29.     Mr. Ossorio has made approximately 74 backpacking, hiking, and camping trips to the Blue Ridge Wolf Recovery Area ("BRWRA") since 1998, primarily because of the presence of Mexican wolves there. He has camped more than 361 total nights within the Mexican wolves' range and has observed many Mexican wolves in the wild including, most memorably, seeing at close range the now-destroyed Francisco Pack in October 2000, with Ms. Ossorio. Mr. and Ms. Ossorio's most recent trip to the BRWRA was from June 10-13, 2016, and they intend to continue making regular trips this year and in the future.

30.     Mr. Ossorio served two tours in the U.S. Army during the Vietnam War, where he fought in the Tet Offensive of 1968 and the Laotian Invasion of 1971. He was nearly killed in a mortar strike during his first tour; during his second tour, he came under mortar, rocket, and artillery attacks but was not injured. Since his service in Vietnam, Mr. Ossorio has actively sought and experienced the calming and healing impact of natural landscapes like the BRWRA, where he feels reassuringly connected to the natural world.

31.     Mr. Ossorio is vitally invested in the health and survival of Mexican wolves, both individually and as a species. He is gravely concerned that the expansion of cougar trapping authorized by the Commission will cause the death and injury of Mexican wolves by snares and leg-hold traps set for cougars. This will harm his deep and personal interest in viewing and listening to Mexican wolves in the wild during his frequent and ongoing visits to their habitat, prevent him from experiencing the restorative psychological effects of his time in Mexican wolf

territory, and will render his expenditures and investment in Mexican wolf recovery meaningless and worthless.

32.     The New Mexico State Game Commission ("Commission"), whose individual members are named in their official capacity as defendants herein, is a statutorily-created commission of the State of New Mexico. Under New Mexico law, the Commission is tasked with promulgating regulations setting quotas and specifying the allowable means and manner of hunting and trapping game species in the state. NMSA § 17-1-14, 26.

33.     Defendant Paul M. Kienzle, III is named in his official capacity as the Chairman of the Commission. As Chairman, Mr. Kienzle is a properly named state official with responsibility for the actions challenged in this complaint.

34.     Defendant William "Bill" Montoya is named in his official capacity as the Vice-Chairman of the Commission. As Vice-Chairman, Mr. Montoya is a properly named state official with responsibility for the actions challenged in this complaint.

35.     Defendant Robert Espinoza, Sr. is named in his official capacity as a Commissioner of the Commission. As Commissioner, Mr. Espinoza is a properly named state official with responsibility for the actions challenged in this complaint.

36.     Defendant Ralph Ramos is named in his official capacity as a Commissioner of the Commission. As Commissioner, Mr. Ramos is a properly named state official with responsibility for the actions challenged in this complaint.

37.     Defendant Bob Ricklefs is named in his official capacity as a Commissioner of the Commission. As Commissioner, Mr. Ricklefs is a properly named state official with responsibility for the actions challenged in this complaint.

38.     Defendant Elizabeth Atkinson Ryan is named in her official capacity as a Commissioner of the Commission. As Commissioner, Ms. Ryan is a properly named state official with responsibility for the actions challenged in this complaint.

39.     Defendant Thomas Salopek is named in his official capacity as a Commissioner of the Commission. As Commissioner, Mr. Salopek is a properly named state official with responsibility for the actions challenged in this complaint.

40.     The New Mexico Department of Game and Fish ("Department"), whose director is named in her official capacity as a defendant herein, is a statutorily-created department of the State of New Mexico. Under New Mexico statute, the Department is charged with implementing and enforcing the fish and game regulations promulgated by the Commission. This mandate includes the issuance of hunting and trapping permits, monitoring of game populations, conducting hunter education programs, investigation and prosecution of violations of the Fish and Game Code and its implementing regulations, and closure of hunting seasons when quotas have been reached in a particular management area. The Director of the Department is also empowered to close hunting and trapping seasons on an emergency basis at her discretion. NMAC § 19.31.11.8(B).

41.     Defendant Alexandra Sandoval is the Director of the Department. As Director, Ms. Sandoval is a properly named state official with responsibility for the actions challenged in this complaint.

## LEGAL BACKGROUND

### *The Endangered Species Act*

42.     The Endangered Species Act ("ESA") is the "'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (1995) (quoting *TVA v. Hill*, 437

U.S.153, 180 (1978)). Its fundamental purpose is to conserve endangered and threatened species and the ecosystems upon which they depend for survival and recovery. 16 U.S.C. § 1531(b).

43.     Central to the ESA's program of conservation is the principle that "preventive action to protect species be taken sooner rather than later." *Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 1271, 1274 (D.N.M. 2005) (internal citations omitted), *vacated on other grounds by Ctr. for Biological Diversity v. Kempthorne*, 2007 WL 6477262 (D.N.M. 2007).

44.     This principle is built into Section 9 of the ESA, under which it is "unlawful for any person" to "take [any] endangered species within the United States" or for "any person" to "cause to be committed" any such take. 16 U.S.C. § 1538(a)(1)(B), (G). Section 9's prohibitions generally extend to threatened species, 50 C.F.R. § 17.31(a), and to violations of U.S. Fish and Wildlife Service ("USFWS") regulations regarding threatened or endangered species. 16 U.S.C. § 1538(a)(1)(G).

45.     "Take" under the ESA is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, *trap*, capture, collect, or attempt to engage in any such conduct." *Id.* § 1532(19) (emphasis added). Consistent with the purposes of the ESA, this Court and courts around the country have interpreted "take" to be "as broad as possible" and "to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1174 (D.N.M. 2000) (quoting *Babbitt v. Sweet Home Chapter,* 515 U.S. at 704).

46.     The ESA contemplates, by its plain terms, liability of state government agencies and their officers for violations of the Act. 16 U.S.C. §§ 1532(13) (defining "person" to include "any officer, employee, agent, department, or instrumentality of . . . any State, municipality, or political subdivision of the State" and "any State, municipality, or political subdivision of a

State"); 1540(g)(1)(A) (citizen suit available against any "person, including . . . any other governmental instrumentality or agency").

47.     A government entity causes a take to be committed in violation of Section 9 of the ESA when it authorizes or permits activity resulting in that take. It is well established that this is the case even when a third-party actor is the proximate agent of the take. *See, e.g., Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997).

48.     To obtain injunctive relief for a violation of Section 9 of the ESA, 16 U.S.C. § 1540(g)(1)(A), a plaintiff does not need to demonstrate that a take has *already* occurred. Rather, plaintiffs need only establish "by a preponderance of the evidence" that the challenged action is "reasonably certain to imminently harm, kill, or wound the listed species." *Animal Welfare Inst. v. Beech Ridge Energy LLC*, 665 F. Supp. 2d 540, 563 (D. Md. 2009)

### *Mexican Wolf Regulation under the ESA*

49.     The Mexican wolf (*Canis lupus baileyi*) is native to New Mexico, was originally recognized as a subspecies of gray wolf (*Canis lupus)* in 1929, and has been listed as an endangered subspecies independently of the gray wolf since 2015. U.S. FISH AND WILDLIFE SERVICE, Final Rule: Endangered Status for the Mexican Wolf, 80 FR 2488, 2489 (Jan. 16, 2015) (the "2015 Listing Rule"). It is also listed as an endangered species under New Mexico law. NMAC § 19.33.6. The Mexican wolf is characterized by its smaller size and patchy black, brown, and cinnamon coloration compared to other North American gray wolves. *Id.* at 2490.

50.     USFWS originally listed the gray wolf, including the Mexican wolf subspecies, as endangered in 1972 (under the ESA's predecessor statute), at which time no Mexican wolves existed in the wild anywhere in the United States. *Id.* In 1977, with the goal of saving the Mexican wolf from extinction, USFWS and Mexico began a cooperative captive-breeding program that began with the capture, in Mexico, of the last seven Mexican wolves known to exist

in the wild. *Id.* at 2492. Following a captive-breeding program, USFWS began reintroducing Mexican wolves to the wild in 1998. *Id.* at 2491; see also U.S. FISH AND WILDLIFE SERVICE, Final Rule Establishing Mexican Wolf Experimental Population Area, 63 FR 1752, 2489 (Jan. 12, 1998).

51.     Section 10(j) of the ESA governs the reintroduction of experimental populations of threatened or endangered species – like the Mexican wolf – into portions of their historic ranges. 16 U.S.C. § 1539(j)(2)(A); 50 C.F.R. § 17.81(a).

52.     Each member of an experimental population is "treated as a threatened species" for the purposes of the ESA's prohibition on take. 16 U.S.C. § 1539(j)(2)(C). While Section 10(j) allows USFWS the flexibility to regulate experimental populations on a case-by-case basis, 50 C.F.R. § 17.82, 16 U.S.C. § 1533(d), the ESA requires that experimental populations nevertheless be managed to "further the conservation of [the] species." *See* 16 U.S.C. § 1539(j)(2)(A); 50 C.F.R. § 17.81(b).

53.     Each experimental population is managed pursuant to a specific, individual Section 10(j) rule, which must contain a geographic boundary defining the experimental population area, and may contain other regulations regarding the population. 16 U.S.C. § 1539(j)(3).

54.     Reintroduced Mexican wolves are a fragile experimental population that is genetically and legally distinct from the broader population of North American gray wolves. Accordingly, USFWS has promulgated a special rule, pursuant to its authority under Section 10(j), to protect them. This rule was last revised in January 2015. U.S. FISH AND WILDLIFE SERVICE, Final Rule, Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf, 80 FR 2512 (Jan. 16, 2015) (codified at 50 C.F.R. 17.84(k)) (the "Revised

14

10(j) Rule").

55.     USFWS initially designated an area of central Arizona, New Mexico, and

northwest Texas as the Mexican Wolf Experimental Population Area ("MWEPA") because of

the abundance of suitable forested habitat and presence within the core of the Mexican wolf's

historical range. *Id*. USFWS subsequently expanded the boundaries of the MWEPA in 2015

(following a five-year review that ended in 2012), extending it to cover all of New Mexico south

of Interstate 10 – roughly two-thirds of the state. *See* Revised 10(j) Rule.

56.     The Revised 10(j) Rule also strictly prohibits the take of members of the

experimental population of Mexican wolves *within* the MWEPA, identifying such activities as

violations of Section 9, with few exceptions. 50 C.F.R. § 17.84(k)(5). It specifies that "[t]aking a

Mexican wolf with a trap, snare, or other type of capture device within occupied Mexican wolf

range is prohibited . . . and will not be considered unintentional take, unless due care was

exercised to avoid injury or death to a wolf." 50 C.F.R. § 17.84(k)(5)(iii).

57.     The "due care to avoid injury or death to a wolf" exception is narrow and does not

apply in this case. *Id.*

58.     USFWS has acknowledged that Mexican wolves travel *outside* of the MWEPA,

and any such wolves are not subject to the 10(j) Rule (or the "due care" exception), but are

treated as endangered (as opposed to threatened) and receive the full protections afforded

endangered species under Section 9 of the ESA. See Revised 10(j) Rule; 16 U.S.C. §

1539(a)(1)(B) (Section 9 take prohibition).

59.     Any trapping of Mexican wolves found outside of the MWEPA is a violation of

Section 9 of the ESA.[1]

---

[1] Limited exceptions exist for federal government actions unrelated to this lawsuit.

### *Jaguars Under the ESA*

60.     Jaguars (*Panthera onca*) are the largest cat species in the Western Hemisphere, and are native to New Mexico. They have been listed as federally endangered since 1972, *see* U.S. FISH AND WILDLIFE SERVICE, Final Rule: Endangered Status for the Jaguar, 37 FR 6476 (Mar. 30, 1972), and are also specially protected by New Mexico state law. *See* N.M.S.A. §§ 17-2-10(10) (additional penalties for legal violations involving jaguar); 17-2-4.1 (specifying that if jaguars are federally delisted, they will remain protected under state law) (1978).

61.     In 2014, USFWS exercised its authority under Section 4 of the ESA to designate critical habitat for jaguars in the United States. U.S. FISH AND WILDLIFE SERVICE, Final Rule: Designation of Critical Habitat for Jaguar, 79 FR 12572 (Mar. 5, 2014) (codified at 50 C.F.R. § 17.11(h), 95(a)) (the "Jaguar Rule"). The Jaguar Rule recognized that, although jaguar sightings in the United States (the northernmost portion of the jaguar's range) are uncommon, certain habitat in the U.S. is nevertheless "essential to the conservation of the jaguar" because it provides connectivity to Mexican populations, allows for range expansion, and provides territory that can promote and help in maintaining genetic diversity. Jaguar Rule, 79 FR at 12574; *see also* 16 U.S.C. § 1532(5)(A) (defining critical habitat as areas "essential to the conservation of the species").

62.     Two distinct areas in Hidalgo County, New Mexico (one in the Peloncillo Mountains bordering Arizona, and one in the San Luis Mountains bordering Mexico) were designated as critical habitat in the Jaguar Rule. Jaguar Rule, 50 CFR § 17.95(a).

63.     As an endangered species, any take of a jaguar – regardless of intent, or amount of care exercised to avoid take – is prohibited under Section 9 of the ESA. 16 U.S.C. § 1539(a)(1)(B).

***The Cougar Rule***

64.     The Department admits there is no reliable estimate of the state's cougar population at this time. Despite this lack of sound scientific evidence upon which to establish hunting quotas, the Department and the Commission have nevertheless historically authorized recreational hunting with firearms – but not trapping – of cougars in New Mexico.

65.     This year, pursuant to its revision of state fish and game regulations, the Commission authorized – for the first time since 1971 – recreational trapping and snaring for cougars on state trust land and private deeded lands throughout the state.  The season begins on November 1, 2016. The stated intent of the Cougar Rule is to increase opportunities for recreational trapping and killing of cougars.

66.     The introduction of recreational cougar trapping and expansion of bag limits across the state could result in a nearly threefold increase in the number of cougars taken compared to the average annual harvest over the past decade.

67.     The Cougar Rule will result in significantly more trapping and snaring activity in Mexican wolf and jaguar range.

68.     The Cougar Rule authorizes the use of steel-jawed leg-hold (or "foothold") traps, which operate using a spring-loaded trigger mechanism that closes two metal jaws around the leg of an animal that steps in the "pan" in the middle of the trap, preventing the animal from escaping.

69.     The Cougar Rule also authorizes the use of foot snares, which operate using a metal arm holding a coiled spring that throws a looped metal cable around an animal's leg or foot and cinches the cable tightly, causing great pain and preventing the animal from escaping.

70.     The Cougar Rule and the other regulations it incorporates by reference do not require that special precautions of any kind be taken when setting traps for cougar in jaguar or

Mexican wolf territory. Rather, the Cougar Rule merely refers to the already existing furbearer rules and regulations, which were promulgated before cougar trapping and snaring were legal in New Mexico without special permits, and does not add to them or otherwise impose heightened requirements when setting traps or snares for cougar.

71.     The Cougar Rule represents a massive expansion in the geographical area where cougars may be trapped in the state.

72.     It is now legal to set traps and snares for cougar on all state trust lands – which total approximately nine million acres spread across every county in New Mexico.

73.     It is now legal to set traps and snares for cougar on all privately deeded land in the state, on one's own land or with the landowner's permission.

74.     The Cougar Rule also makes it easier for private landowners to trap or allow others to trap on their land. Previously, after cougars were designated a protected game species in 1971, cougar trapping on private land was forbidden without special written permission from the Director – which was typically only sought or granted in cases where specific cougars were preying on livestock or otherwise causing property damage. Now, any individual with a trapping license may set traps for cougar on his or her own land, or on another owner's land with written permission, without applying for and receiving a special permit.

75.     The Cougar Rule divides the state into twenty-seven Cougar Management Zones and allocates annual harvest quotas on a zone-by-zone basis, with a total statewide quota of 749 cougars annually.

76.     Under the Cougar Rule, trapping is an allowable method of capture in every Cougar Management Zone, and snaring is an allowable method of capture in all but one Cougar

Management Zone (Zone L). The Cougar Rule does not establish separate quotas for hunting and trapping; mortality from all activities count toward the same quota.

<u>**FACTS GIVING RISE TO PLAINTIFFS' CLAIMS**</u>

***The Cougar Rule Threatens Mexican Wolves***

77.     While cougar trapping was almost completely prohibited in New Mexico prior to the Commission's adoption of the Cougar Rule, it is now authorized for the first time throughout large portions of the state.

78.     Much of the new land open to cougar trapping overlaps with the MWEPA, including the current and projected range of the Mexican wolf in New Mexico. Much of the land classified by the Department as prime cougar habitat within New Mexico also lies within key Mexican wolf habitat within the MWEPA.

79.      In fact, approximately fifty-six percent of the allocated cougar quota overlaps with the boundaries of the MWEPA, and the Commission plans to manage over half of the Cougar Management Zones within the MWEPA for "stable to decreasing" cougar populations – the management category allowing for the highest level of hunting and trapping.

80.     Accordingly, virtually the entire Mexican wolf population – both as it exists in the present, and where it is projected to expand throughout the MWEPA according to USFWS' reintroduction plan – will be exposed to cougar traps and snares because of the Cougar Rule.

81.     Leg-hold traps of the size and type used for trapping cougars are highly likely to also trap Mexican wolves because of similarities in size, weight, and physiology between the species. Indeed, companies that sell leg-hold traps often advertise models that are meant to trap *both* cougars and wolves.

82.     Given the state of current trapping technology, it would be *impossible* to modify a leg-hold trap or snare to make it selective enough to trap cougars but not trap Mexican wolves.

83.     The Cougar Rule allows for the use of traps and snares that are likely to trap a Mexican wolf and from which a Mexican wolf would not be able to immediately pull free and escape.

84.     The Cougar Rule does not require that cougar trappers modify their traps, chains, drags, stakes, or cables in a manner that would provide a reasonable expectation that any Mexican wolf caught in such a trap would be prevented from either breaking the chain or escaping with the trap on the wolf.

85.     The Cougar Rule allows for the use of traps that have jaw spreads that would capture a Mexican wolf, and that a Mexican wolf would not span when stepping on the trap.

86.     It would be impossible to take precautions sufficient to avoid death or injury to Mexican wolves while setting traps for cougar.

87.     As a result, the Cougar Rule will cause the death, injury, and harassment of Mexican wolves by allowing trappers to set cougar traps and snares – which pose an unavoidable risk of capturing a non-target Mexican wolf – throughout the MWEPA and the Mexican wolves' current range.

88.     Monthly reports from the Mexican Wolf Reintroduction Project and other sources have recorded numerous accounts of Mexican wolves ranging either outside the MWEPA or very close to its northernmost border. The Cougar Rule will also cause the death, injury, and harassment of Mexican wolves that range outside the MWEPA by exposing them to leghold traps and snares.

89.     There have already been at least thirty-seven documented instances of Mexican wolves being caught in traps – including several mortalities and severe injuries – since reintroduction began in 1998. These incidents were caused by traps set for smaller furbearers like

coyotes and raccoons. The Cougar Rule will cause a dramatic increase in incidents like these because traps used for cougars are much more likely to take Mexican wolves than the traps used for smaller furbearers.

### The Cougar Rule Threatens Jaguars

90.     The federally designated critical habitat for endangered jaguars in New Mexico is entirely contained within Cougar Management Zone L ("Zone L").

91.     It is likely that several jaguars move through this area every year and several may have taken up permanent residence there.

92.     Although the Cougar Rule bans the use of foot snares in Zone L – ostensibly to protect jaguars – it does *not* ban the use of leg-hold traps for taking cougars in Zone L, where a quota of 19 cougars has been allocated annually through 2020.

93.     Substantial portions of designated jaguar critical habitat are held privately or by the New Mexico State Land Trust, and thus will be open to cougar trapping using leg-hold traps under the Cougar Rule.

94.     Consequently, jaguars in New Mexico will be exposed to leg-hold traps set for cougars.

95.     As with Mexican wolves, leg-hold traps of the size and type used for trapping cougars are highly likely to also trap jaguars because of similarities in size, weight, and physiology between the species.

96.     The Cougar Rule does not impose any restrictions that would protect jaguar from the threat of cougar traps in Zone L.

97.     As a result, the Cougar Rule will cause the death, injury, and harassment of jaguars by allowing trappers to set cougar traps -- which pose an unavoidable risk of capturing a non-target jaguar –- throughout jaguar critical habitat in Zone L.

## CLAIMS FOR RELIEF

### *First Claim for Relief (Illegal Take of Mexican Wolves Within the MWEPA)*

98.     The allegations of the preceding paragraphs are incorporated by reference as if repeated and set forth in full herein.

99.     Separate from its take prohibitions, ESA Section 9 provides that "it is unlawful for any person [to] violate any regulation pertaining to any endangered species or any threatened species . . . and promulgated by the Secretary pursuant to the authority provided by this chapter." 16 U.S.C. § 1538(a)(1)G). The Revised 10(j) Rule is a regulation pertaining to an endangered species promulgated pursuant to authority provided by the ESA. *See* 50 C.F.R. § 17.82. Therefore, any person who violates the provisions of the Revised 10(j) Rule violates Section 9(a)(1)(G) of the ESA.

100.     Under ESA Section 9 and the Revised 10(j) Rule it is also unlawful for "any person" to "cause to be committed" a violation of the ESA or the Revised 10(j) Rule. 16 U.S.C. § 1538(a)(1)(G), (g); 50 C.F.R. § 17.84(g). Therefore, it is unlawful for any person to cause to be committed a prohibited take of Mexican wolves, or a violation of any regulation regarding Mexican wolves.

101.     The Revised 10(j) Rule prohibits intentional or willful take of Mexican wolves as well as take that is avoidable, intentional, or exhibiting a lack of due care.

102.     As stated above, it is impossible to exercise "due care" to avoid taking Mexican wolves within the meaning of the Revised 10(j) Rule when trapping cougars.

103.     The Cougar Rule adopted by the Commission, by authorizing the illegal take of Mexican wolves, will cause multiple violations of the ESA and the Revised 10(j) Rule.

104.     Defendants will cause the unlawful take of Mexican wolves to be committed by

authorizing cougar trapping and snaring within the MWEPA through the Cougar Rule and subsequent licensing and implementation, in violation of the Revised 10(j) Rule and Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(G), (g).

105.     Defendants' failure to comply with the ESA has injured and continues to injure the Plaintiffs.

### Second Claim for Relief (Illegal Take of Mexican Wolves Outside the MWEPA)

106.     The allegations of the preceding paragraphs are incorporated by reference as if repeated and set forth in full herein.

107.     Section 9 of the ESA provides that it is strictly unlawful to commit or cause to be committed any take of an endangered species. 16 U.S.C. § 1538(a)(1)(B), (G).

108.     Mexican wolves located outside the MWEPA are treated as endangered species and are not subject to the exceptions regarding take contained in the Revised 10(j) Rule.

109.     Defendants will cause the unlawful take of Mexican wolves to be committed by authorizing cougar trapping and snaring outside the MWEPA through the Cougar Rule and subsequent licensing and implementation, in violation of Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(G).

110.     Defendants' failure to comply with the ESA has injured and continues to injure the Plaintiffs.

### Third Claim for Relief (Illegal Take of Jaguar)

111.     The allegations of the preceding paragraphs are incorporated by reference as if repeated and set forth in full herein.

112.     Section 9 of the ESA provides that it is strictly unlawful for "any person" to commit or cause to be committed any take of an endangered species. 16 U.S.C. § 1538(a)(1)(B), (g).

113.    The Cougar Rule adopted by the Commission, by authorizing the illegal take of jaguars, will cause multiple violations of the ESA.

114.    Defendants will cause the unlawful take of jaguars to be committed by authorizing cougar trapping within federally designated jaguar critical habitat through the Cougar Rule and subsequent licensing and implementation, in violation of Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(G), (g).

115.    Defendants' failure to comply with the ESA has injured and continues to injure the Plaintiffs.

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs request that this Court enter judgment providing the following relief:

1.    Issue a declaratory judgment that the Defendants are in violation of the ESA for each claim as alleged herein;

2.    Issue an injunction barring the Defendants from implementing those parts of the Cougar Rule that authorize cougar trapping or snaring, and specifically preventing the Director from authorizing the opening of a cougar trapping and snaring season;

3.    Award Plaintiffs the costs of this action, including their reasonable attorneys' fees; and

4.    Grant Plaintiffs such additional relief as the Court deems just and proper.

Respectfully submitted this 27th day of June, 2016,


　　/s/*Samuel C. Wolf*　　　　　　
Samuel C. Wolf (NM Bar #127246)
Jones, Snead, Wertheim & Clifford, P.A.
1800 Old Pecos Trail
Santa Fe, NM 87505
Telephone:  505-982-0011
Facsimile:  505-989-6288
sam@thejonesfirm.com


Bruce A. Wagman
Schiff Hardin LLP
One Market, Spear Tower, 32nd Fl.
San Francisco, CA  94105
Telephone:  415-901-8700
Facsimile:  415-901-8701
bwagman@schiffhardin.com
To be admitted *pro hac vice*


Nicholas Arrivo
The Humane Society of the United States
2100 L St NW
Washington DC 20037
Telephone:  202-676-2339
Facsimile:  202-676-2357
narrivo@humanesociety.org
To be admitted *pro hac vice*


*ATTORNEYS FOR PLAINTIFFS*

## Certification

I certify that non-member attorneys Bruce A. Wagman and Nicholas Arrivo are members in good standing of the bar of the State of California.


                                 __/s/*Samuel C. Wolf*_____

                                 Samuel C. Wolf (NM Bar #127246)

                         Jones, Snead, Wertheim & Clifford, P.A.

                                   1800 Old Pecos Trail

                                      Santa Fe, NM 87505

                               Telephone:  505-982-0011

                               Facsimile:  505-989-6288

                                 sam@thejonesfirm.com

SF\321906093.1

26