# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ANIMAL PROTECTION OF NEW MEXICO, JEAN OSSORIO, and PETER OSSORIO, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| PAUL M. KIENZLE III, WILLIAM MONTOYA, ROBERT ESPINOZA SR., RALPH RAMOS, BOB RICKLEFS, ELIZABETH ATKINSON RYAN, and THOMAS SALOPEK, in their official capacities as Commissioners of the New Mexico State Game Commission; and ALEXANDRA SANDOVAL, in her official capacity as Director of the New Mexico Department of Game and Fish, | ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

Case No. 2:16-cv-00724-LAM-SMV

DECLARATION OF
PETER M. OSSORIO

I, Peter M. Ossorio, declare as follows:

1.      I am a resident of New Mexico and live just outside of Las Cruces, in Doña Ana County.  I have lived in New Mexico for twenty years.

2.      My education includes a B.A. degree from Washington University in St. Louis, and a J.D. degree from the University of Missouri-Kansas City School of Law.  I also am a graduate from the U.S. Army Command and General Staff College (nonresident).  I maintain active membership in the State Bar of New Mexico.

3.      I served on active duty as a Regular Army Field Artillery Officer from 1965-1980 and in the Army Reserves as a logistics officer from 1980 until I retired in 1993.  After serving as a judicial law clerk from 1983-1985 and as an assistant county prosecutor from 1985 through

1986, from 1987 until 1995 I served as an Assistant U.S. Attorney in Kansas City, Missouri.
From 1995 until I retired in 2004, I served in the same capacity in the Las Cruces Branch Office
of the District of New Mexico.

      4.      I am an active hiker and advocate for gray wolves and, specifically, the Mexican
wolves currently considered an experimental, nonessential population by the U.S. Fish and
Wildlife Service.  I belong to groups that advocate for wolves and have personally been involved
in wolf advocacy for over eighteen years.

      5.      For about two years, my wife and I volunteered to travel to remote parts of the
New Mexico where we monitored wilderness areas in the Peloncillo Mountains to document
locations that might be considered for potential wilderness designation.

      6.      I served in the U.S. military in Vietnam and participated in the landmark Tet
Offensive of 1968 and the Laotian Invasion in 1971.  I came close to being killed in a mortar
attack during my first tour.  During my second tour, I came under mortar, rocket, and artillery
attacks, but was not injured.  After Vietnam, I have experienced – and actively sought – the
calming and healing effect of withdrawing to quiet, intact landscapes where nature is in balance
and humans have minimal impact.  I consider the ability to spend time in such areas as a vital
part of my quality of life.

      7.      My wife and I have been interested in canids and their role in the wild since 1973.
We financially support several groups and institutions involved in the captive breeding and
eventual release into the wild of endangered canids, including the Mexican gray wolf.  Since
1973 we have supported the Endangered Wolf Center (formerly Wild Canid Survival and
Research Center), in Eureka, Missouri.  This facility has bred more Mexican wolves in captivity
than any other captive breeding facility.  Currently every Mexican wolf in the wild can trace
some of its genetic inheritance to a wolf from the EWC. We have personally visited the facility
several times over the years and have met with the conservation staff several times.  In 2015 my
wife gave a presentation on Mexican wolves at the Center.

8.    After my wife and I moved to Las Cruces in 1995, we began closely following the progress of the program reintroducing Mexican wolves whose breeding we had long supported and in whose survival in the wild we have a strong interest.

9.    Within six months of the first releases of Mexican wolves into the Blue Range Wolf Recovery Area (BRWRA) in Arizona in March 1998, my wife and I drove through a large portion of the recovery area in both New Mexico and Arizona.  We camped and studied the habitat into which the wolves were being reintroduced.  Knowing that Mexican wolves would soon return to their historic place in the ecosystems of the Southwest contributed greatly to our enjoyment of the trip.

10.    Since 1998 I have made at least 73 trips in the Blue Range Wolf Recovery Area (BRWRA), hiking, camping, and backpacking with my wife, daughter, and friends.  I have focused on visiting the BRWRA, largely because of the presence of the wolves.  Large carnivores fulfilling their critical role in balancing nature is important to me.  If the likelihood of seeing or hearing Mexican wolves was reduced, I would be harmed by the loss of that opportunity.  If there was a chance I might see a Mexican wolf caught in a trap, my appreciation of the wilderness would be greatly reduced, if not eliminated.

11.    Since retiring from federal service in 2004, I have been able to increase the number of times a year that I join my wife in looking for wildlife in general and for Mexican wolves in particular.  Typically we make at least one trip during each of the four seasons.  I never tire of the challenge and intend to visit our public lands as long as there is even the remotest possibility of seeing or hearing wolves.

12.     I have camped over 372 nights within the Mexican wolf's range during all seasons, and I intend to continue to do so for as long as possible.

13.    During these trips, I have been fortunate enough to observe many Mexican wolves in the wild.  My most memorable, unforgettable and magical experience took place in October 2000, when we saw the now destroyed Francisco Pack at a distance of about 200 meters.  It is hard for me to describe, in words, my feeling of connection to the natural world as the

Francisco Pack silently and single-mindedly went on their way – while completely ignoring the humans watching them.

14.     In addition to sightings of wolves, we more frequently hear them howl or find their scat or tracks.  As much as we enjoy split second views of the animals themselves, just finding their sign is a reassuring confirmation that they are on the landscape.  If that possibility were reduced, I would be directly harmed by that fact.

15.     I intend to continue visiting and tent camping in the BRWRA and attempting to observe Mexican wolves in their natural habitat for as long as I am able.  In June 2015, my wife and I spent our 50th wedding anniversary in wolf country.  In October we took out friends from Washington D.C. who were enchanted to just be in the wolves' back yard.  We made our winter trip from December 27, 2015 through January 4, 2016. Our most recent trip was July 28 through August 1, 2016 and we are already planning our next trips – Jean with friends later this month and both of us in October.

16.     Since retiring from federal service in 2004, I have attended most of the significant public meetings relating to Mexican wolf recovery. These included several quarterly meetings of the Mexican Wolf Adaptive Management Oversight Committee, USFWS open houses, meetings on the three-year and five-year reviews of the program, and meetings of the New Mexico and Arizona Game Commissions where Mexican wolves were on the agenda.  I always travel at my own expense and am never reimbursed by any organization.  As recently as August 29, 2015, we traveled over 550 miles to be heard at a New Mexico State Game Commission meeting in Santa Fe.  I have made public comments at USFWS hearings in Pinetop, Arizona and Albuquerque, New Mexico, and I signed up to comment (without being called upon) at the most recent hearing on the current federal Mexican wolf management rule in Truth or Consequences, New Mexico. Participating in these meetings represented significant expenditures of personal funds and time.

17.     My wife and I submitted public comments on every major action related to Mexican wolves under the National Environmental Policy Act (NEPA) since 1998, including the three- and five-year reviews of the project in 2001 and 2005, respectively, and the selection of

potential New Mexico release sites for Mexican wolves in 2006.  We also submitted comments on Standard Operating Procedure 13.0 on Control of Mexican Wolves and on a proposed moratorium on Mexican wolf releases in 2006.  More recently, I devoted approximately 75 hours to analyzing and commenting upon the 2010 Conservation Assessment and the 2013 and 2014 versions of the Draft Environmental Impact Statement and the accompanying 10(a)(1)(A) take permit and proposed revised Mexican wolf management rule.

18.     The New Mexico Department of Game and Fish's new Bear and Cougar Rule ("Cougar Rule") greatly increases the chance that Mexican wolves will be caught in traps set for cougars.  This Rule significantly harms me by reducing the likelihood that wolves will survive in the wild and that they will ever recover, and it reduces the likelihood that I will continue to be able to have the opportunity to view and hear wolves in the wild.  The knowledge that a trapping season that will harm Mexican wolves will begin the next time Jean and I plan on camping together fills me with outrage and trepidation.

19.     The Cougar Rule also harms my interest in wolves surviving in the wild by making new delegations of authority that may lead to the killing of wolves.  By authorizing actions that will increase the killing of Mexican wolves, the Cougar Rule will harm my ability in the future to view wolves, or wolf sign, in the wild during my frequent visits to their habitat.

20.     The Cougar Rule further harms my interest in recreating in Mexican wolf habitat, where I have spent 372 nights camping since 1998. My anticipation of the future visits I have already planned has been greatly diminished as a result of the Rule. Additionally, I am discouraged about finalizing our additional plans to visit Mexican wolf habitat in October because I will not be able to enjoy the land with the knowledge that Mexican wolves are in danger and that I might encounter the horrifying sight of a leg-hold trap or snare on my visit.

21.     The Cougar Rule further harms me by creating yet another major impediment to Mexican wolf recovery, in which I am vitally interested.

22.     The Cougar Rule will cause harm to my aesthetic, recreational, spiritual, and other interests in viewing wolves and wolf sign on the landscapes on which I hike and camp.

The relief sought in this action would redress, or alleviate, some or all of these injuries. I believe that if the requested relief is granted, there is a much greater chance that wolves will recover in the southwestern United States, their numbers will increase, and that I may enjoy more opportunities to view and hear wolves in the wild.

23. Now in my seventh decade, I do not worry much that someday I will no longer be able to sleep on the ground in the cold and crawl in and out of a tent several times a night. My wife and I intend to look for wolves while we have eyesight and – when we can no longer spot them in the dusk – listen for their musical howls. But I do worry that – because of multiple threats, including the Cougar Rule – I may live long enough that the "wild" population of Mexican wolves will become a genetically doomed vestige of a population that might have grown and thrived if the Cougar Rule had not been implemented.

Pursuant to the laws of the United States and the state of New Mexico, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 21 , 2016, in Doña Ana County, New Mexico.

Peter M. Ossorio

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ANIMAL PROTECTION OF NEW MEXICO, JEAN OSSORIO, and PETER OSSORIO,<br><br>       Plaintiffs,<br><br>v.<br><br>PAUL M. KIENZLE III, WILLIAM MONTOYA, ROBERT ESPINOZA SR., RALPH RAMOS, BOB RICKLEFS, ELIZABETH ATKINSON RYAN, and THOMAS SALOPEK, in their official capacities as Commissioners of the New Mexico State Game Commission; and ALEXANDRA SANDOVAL, in her official capacity as Director of the New Mexico Department of Game and Fish,<br><br>       Defendants. | Case No. 2:16-cv-00724-LAM-SMV<br><br>DECLARATION OF<br>JEAN C. OSSORIO |

I, Jean C. Ossorio, declare as follows:

1.      I am a resident of New Mexico and reside just outside of Las Cruces, in Doña Ana County.  I have lived in New Mexico for twenty years.

2.      I am a retired elementary school teacher with a Bachelor of Arts degree and a Master of Arts in Education degree from Washington University, St. Louis, Missouri.

3.      I am an active hiker and advocate for gray wolves and, specifically, the Mexican wolves currently considered an experimental, nonessential population by the U.S. Fish and Wildlife Service.  I belong to groups that advocate for wolves and have personally been involved in wolf advocacy for over twenty years.  I was the keynote speaker at WildEarth Guardians' (then known as Forest Guardians) annual gala in 2007, giving a talk on Mexican gray wolves

entitled "Lobos Gone Wild."  I participated in monitoring a potential wilderness area in the Peloncillo Mountains, for the New Mexico Wilderness Alliance.

4.      I have financially supported the captive breeding and eventual release into the wild of endangered canids (members of the dog family, or *Canidae*) since 1973, through contributions to the Endangered Wolf Center (formerly, the Wild Canid Survival and Research Center), in Eureka, Missouri.

5.      When my husband and I moved to Las Cruces in late 1995, we were excited to be living close to the proposed reintroduction area for the Mexican wolf, the Blue Range Wolf Recovery Area (hereafter BRWRA), comprising the Gila National Forest in New Mexico and the Apache National Forest in Arizona.  Proximity to the reintroduction sites allowed us to follow closely the progress of the program involving this species, whose breeding we had long supported and in whose survival in the wild we have a strong interest.

6.      From earliest childhood I have camped, hiked, and enjoyed studying nature with family and friends, first in Missouri, and later, throughout many portions of the American West. Since the reintroduction of Mexican wolves began in 1998, I have focused most of these activities in the Gila National Forest in New Mexico and the Apache National Forest in Arizona, largely because of the presence of the wolves.  The existence of large carnivores to fulfill their critical role in the regulation of ecosystems is of paramount importance to me, greatly enhancing the scientific, educational, and spiritual value to me of being in wild areas.

7.      Within six months following the first releases of Mexican wolves into the BRWRA in Arizona in March 1998, my husband and I made a trip by vehicle through a large portion of the recovery area in the two states, camping and studying the habitat into which the wolves were being reintroduced.  The knowledge that Mexican wolves would soon return to their historic place in the ecosystems of the Southwest contributed greatly to the aesthetic value of the trip.

8.      Since 1998 I have spent over 441 days camping in the BRWRA, hiking, backpacking, horseback riding, tracking animals and taking photographs either alone or with

family, friends, or other individuals.  In the course of these trips I have observed 45 Mexican wolves in the wild.  In 2004, while camping alone near Lake Sierra Blanca, also in the Apache National Forest, I listened to the Hawk's Nest pack of wolves and a lone wolf howling to one another for over two hours from ridges a mile away.  The feeling of wholeness and connection to the natural world was overwhelming.

9.      I have frequently documented my trips in search of Mexican wolves or signs of their presence through photography.  Being able to document these viewings through photography has also allowed me to support my advocacy and has provided great aesthetic value to me.

10.      I most recently visited occupied wolf range between July 28 and August 1, 2016. I anticipate spending a minimum of 25 additional days in currently occupied wolf range, attempting to view or hear Mexican wolves or see signs of their presence, by the end of 2016.

11.      I have shown reintroduced Mexican wolf tracks and sign, and occasionally Mexican wolves themselves, to a variety of individuals including members and employees of numerous conservation organizations, as well as personal friends.

12.      Between 2007 and the present I have given at least thirty PowerPoint presentations on Mexican wolf reintroduction and recovery.  Because of the widespread interest in wolves, I've reached audiences ranging from third through fifth grade public school students and middle school age Sunday School children to general, mostly adult audiences such as at the El Paso Zoo and the Las Cruces SERTOMA Club and a wide variety of conservation organizations in venues from Silver City, New Mexico, to Gilbert, Arizona.  I have been invited back three times to the Southwest Wings Birding and Nature Festival in Sierra Vista, Arizona, and to Wolf Discovery Day at the White Mountain Nature Center in Lakeside, Arizona, since my first presentations at each location in 2012.

13.      In 2015 I had the privilege of presenting at the Endangered Wolf Center in Eureka, MO, the captive breeding facility that the first Mexican wolf recovery coordinator, David R. Parsons, called "a cornerstone of the Mexican gray wolf program."

14.     I have never accepted for my personal benefit honoraria or travel expenses for presentations.  When conservation groups insist on paying honoraria, I always donate the money directly back to the local chapter for educational outreach.

15.     My husband and I served as volunteer pen sitters for the Coronado Pack of Mexican gray wolves from May 9th to 19th, 2013, while the pair was in a pre-release pen in the Apache National Forest, Arizona.  Our duties included making daily observations of the condition and behavior of the wolves from a blind near the pen, reporting on our observations to the Interagency Field Team, monitoring the radio collar frequencies of nearby wolves, repairing area closure signs when necessary, making sure members of the public did not violate the closure, and assisting members of the Interagency Field Team with feeding and watering the wolves when asked to do so.  We traveled to the pen area and provided all food and other provisions at our own expense.

16.     Since 1998 I have attended virtually every significant public meeting relating to Mexican wolf recovery.  These included quarterly meetings of the Mexican Wolf Adaptive Management Oversight Committee; United States Fish and Wildlife Service ("USFWS" or "Service") open houses, meetings, and hearings on translocation of wolves from Arizona into New Mexico; meetings on the three-year and five-year reviews of the program; and meetings of the New Mexico and Arizona Game Commissions where Mexican wolves were on the agenda.  I actively participated in the four NEPA hearings on the 2015 revised federal management rule for the Mexican gray wolf, including two in Pinetop, Arizona, one in Albuquerque, New Mexico, and one in Truth or Consequences, New Mexico.  Attendance at these meetings represented significant expenditures of personal funds and time.

17.     I submitted public comments, either individually or jointly with my husband, Peter Ossorio, on every major action related to Mexican wolves under the National Environmental Policy Act (NEPA) since 1998, including the three- and five-year reviews of the project in 2001 and 2005, respectively, the environmental analysis of the proposal to translocate Mexican wolves into the Gila Wilderness in 2000, and the selection of potential New Mexico

release sites for Mexican wolves in 2006. I also submitted comments on Standard Operating Procedure 13.0 on Control of Mexican Wolves and on a proposed moratorium on Mexican wolf initial releases in 2006, although such public comment was not actually solicited under NEPA. My husband and I submitted comments on the separate listing rule, the draft and final environmental impact statements, and the 2015 record of decision and final revised section 10(j) management rule for the Mexican gray wolf. Most recently, I submitted comments on the 2015 plan for proposed new releases.

18.    Between October 2003 and January 2005, I attended five meetings of the Southwest Distinct Population Segment Gray Wolf Recovery Team (emphasis Mexican Gray Wolf, *Canis lupus baileyi*) as a member of the stakeholder panel of the team. I personally paid for five trips from Las Cruces to Albuquerque and spent hours between meetings studying scientific reports in order to further the prospects of Mexican wolf restoration to the wild through creation of a new recovery plan.

19.    Serving on the 2003 recovery team gave me an appreciation for the precarious genetic status of the wild population, as well as for the importance of establishing additional sub-populations of Mexican gray wolves as soon as possible.

20.    In July 2005, I was one of five conservation members of Governor Richardson's Catron County Mexican wolf task force, attending two meetings in Reserve, New Mexico, and spending time between meetings reviewing a compensation plan put forward by the New Mexico Department of Agriculture representative on the task force. My participation on the task force was also at my own expense.

21.    The New Mexico Game and Fish Commission's new Bear and Cougar Rule ("Cougar Rule") greatly increases the chance that Mexican wolves will be caught in traps set for cougars. This Rule significantly harms me by reducing the likelihood that wolves will ever recover or even survive in the wild, and reduces the likelihood that I will continue to be able to have the opportunity to view and hear wolves in the wild. The knowledge that a trapping season

that will threaten the safety of wild Mexican wolves will begin in just a few months fills me with frustration and dismay.

22.     The Cougar Rule also harms my interest in wolves surviving in the wild by making new delegations of authority that may lead to the killing of wolves.  By authorizing actions that will lead to the increased killing of Mexican wolves, the Cougar Rule will harm my ability in the future to view wolves, or wolf sign, in the wild during my frequent visits to their habitat.

23.     The Cougar Rule further harms my interest in recreating in Mexican wolf habitat, where I have spent 441 nights camping since 1998. The fact that Mexican wolves are in danger and I might encounter the horrifying sight of a wolf caught in a leg hold trap or snare and be prohibited from taking action to relieve its suffering angers and appalls me, but will not stop me from making future trips.  But knowing that at any moment I may find a wolf dead or injured not by natural and unavoidable causes but by an arbitrary and unnecessary rule will certainly diminish the joy I take in those trips.

24.     The Cougar Rule further harms me by creating yet another major impediment to Mexican wolf recovery, in which I am vitally interested.

25.     The Cougar Rule will cause harm to my aesthetic, recreational, spiritual, and other interests in viewing wolves and wolf sign on the landscapes on which I hike and camp. The relief sought in this action would redress, or alleviate, some or all of these injuries.  I believe that if the requested relief is granted, there is a much greater chance that wolves will recover in the southwestern United States, their numbers will increase, and I may enjoy more opportunities to view and hear wolves in the wild.

26.     All of these injuries to my interests in Mexican gray wolves, their presence on the landscape, and their recovery will reduce my ability to see, hear, and enjoy Mexican gray wolves in the wild.

27.     I personally have a specific, concrete interest in protecting and restoring the Mexican wolf to the Southwest and in promoting the success of the current reintroduction as a

means to that end. I remain deeply involved in the campaign to ensure success of Mexican wolf recovery.

Pursuant to the laws of the United States and the state of New Mexico, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August *21*, 2016, in Doña Ana County, New Mexico.

Jean C. Ossorio

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THE HUMANE SOCIETY OF THE UNITED )
STATES, ANIMAL PROTECTION OF NEW )
MEXICO, JEAN OSSORIO, and PETER )
OSSORIO, )
                )
           Plaintiffs, )
                )
      v. )
                )
PAUL M. KIENZLE III, WILLIAM )
MONTOYA, ROBERT ESPINOZA SR., )
RALPH RAMOS, BOB RICKLEFS, )
ELIZABETH ATKINSON RYAN, and )
THOMAS SALOPEK, in their official )
capacities as Commissioners of the New )
Mexico State Game Commission; and )
ALEXANDRA SANDOVAL, in her official )
capacity as Director of the New Mexico )
Department of Game and Fish, )
                )
           Defendants. )

Case No. 2:16-cv-00724-LAM-SMV

DECLARATION OF
NICOLE PAQUETTE

I, Nicole Paquette, declare as follows:

1.      I am the Vice President of Wildlife Protection for The Humane Society of the United States ("The HSUS"), where I have been employed since 2010. Prior to joining The HSUS, I served as Senior Vice President and General Counsel for Born Free USA/Animal Protection Institute from 1999 through 2009. I am a graduate of San Francisco State University and Vermont Law School.

2.      In my role of Vice President of Wildlife Protection for The HSUS, I am responsible for managing and overseeing the organization's wildlife protection work. I am responsible for a multi-million dollar budget, and supervise 26 employees.

3.      Native carnivore protection has historically been, and remains, a core program area for The HSUS' Wildlife Protection department. Since 1954, The HSUS has worked to protect some of America's most iconic native carnivores, including mountain lions, wolves, black bears, grizzly bears, bobcats, and lynx through public education, training, and policy advocacy.

4.      In the past two years alone, The HSUS has been instrumental in the ongoing protection of federally endangered gray wolves and Canada lynx, as well as defending the Endangered Species Act itself from hostile amendments in 2014-16. We have also garnered additional protection for bears. Recently we prohibited the hound hunting of black bears in California, and defeated attempts to open up a spring bear hunt and allow the use of baits to kill bears in Colorado – which would have repealed part of a ballot measure we had previously passed. We worked along with coalition partners to stop a proposed bear hunt in Florida, sparing as many as 400 bears. We are additionally working at the grassroots, state, and federal level to ensure the survival and continued protection of the Greater Yellowstone Ecosystem grizzly bear population. In addition, we work to protect bobcats. We have worked to end the trapping of bobcats in California and halted a proposed bobcat hunting and trapping season after a long fought grassroots and legal campaign in New Hampshire.

5.      Big cat protection is also a core program area for The HSUS' Wildlife Protection department. The HSUS successfully petitioned the U.S. Fish and Wildlife Service for strengthened protections for African lions in 2015, and has similar petitions for tigers and leopards pending before the agency. We also work to protect captive big cats from the cruel pet trade by working state by state to restrict the private possession of cougars, lions, and tigers. In addition this past year we fought back expansion of cougar hunting in the West. In Colorado we

stopped a controversial proposal that would have killed up to 50% of the cougars in certain areas of the state, and also persuaded the agency to pull from consideration a citizen petition that would have allowed electronic calls to be used by trophy hunters in order to lure in and shoot cougars at close range. In Washington, we successfully stopped a proposal that would have raised cougar hunting quotas by up to 100% in areas of the state also inhabited by wolves. In response, the agency issued an emergency rule to restore cougar harvest rates to the prior, lower level. In Nebraska – a key state which provides a corridor for cougars to be able to connect to eastern ecosystems, which promotes their survival and health – we worked to ensure that the there was no hunting season of cougars in 2015.

6.      Building on The HSUS' institutional strength and experience in carnivore and big cat protection, cougar protection has become a program area of increasing importance to The HSUS and is now one of the Wildlife Protection department's core wildlife program areas.

7.      The HSUS' cougar protection programs have included a successful challenge to a Washington proposal to increase cougar hunting quotas, successful participation in public rulemaking processes in Colorado (as described above in paragraph 5), and the research and drafting of a soon-to-be published white paper on cougar trophy hunting in the United States.

8.      Because the Cougar Rule represents one of the most serious and egregious threat to cougars in the United States, The HSUS has been forced to prioritize opposing the "Cougar Rule" at issue in this litigation – even though it is illegal under both federal and state law – over other cougar protection initiatives. Were it not for the urgent threat posed by the Cougar Rule – which, unlike the other state cougar regulations challenged by The HSUS, violates federal law and allows for widespread trapping and snaring – The HSUS would devote additional resources

expended on the Cougar Rule to other specific projects, including projects to establish additional legal protections for cougars at the state level in other Western states.

9.      The HSUS has spent a substantial amount of its limited, cougar-specific funding opposing the Cougar Rule on programs and projects completely unrelated to the current litigation. Even prior to the filing of this lawsuit, The HSUS expended tens of thousands of dollars on polling and professional services from professionals such as wildlife and biological experts in support of The HSUS' opposition to the Cougar Rule prior to its adoption.

10.     The HSUS has also spent a substantial amount of its limited staff time on opposing the illegal Cougar Rule since it was proposed. The Commission's adoption of the Cougar Rule has forced The HSUS to divert funds that would have been allocated to other programs and forced The HSUS to utilize its scarce resources on efforts to prevent the enactment of the Cougar Rule.

11.     Were it not for the Cougar Rule, The HSUS would have directed these resources toward other projects to further the goals of its cougar protection program, as envisioned when it initially sought to expand the program area before the Cougar Rule was adopted. Instead, the actions of the Defendants have compelled the HSUS to devote scarce time and resources to preventing an illegal and dangerous trapping season that should not have been adopted in the first place.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2016, in Montgomery County, Maryland.

Nicole Paquette

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ANIMAL PROTECTION OF NEW MEXICO, JEAN OSSORIO, and PETER OSSORIO, ) ) ) ) | Case No. 2:16-cv-00724-LAM-SMV |
| Plaintiffs, ) ) | |
| v. ) ) | DECLARATION OF PHIL CARTER |
| PAUL M. KIENZLE III, WILLIAM MONTOYA, ROBERT ESPINOZA SR., RALPH RAMOS, BOB RICKLEFS, ELIZABETH ATKINSON RYAN, and THOMAS SALOPEK, in their official capacities as Commissioners of the New Mexico State Game Commission; and ALEXANDRA SANDOVAL, in her official capacity as Director of the New Mexico Department of Game and Fish, ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

I, Phil Carter, declare as follows:

1.      I am the Campaigns Manager for Animal Protection of New Mexico ("APNM"). I have worked for APNM for 6 years. My work for APNM has addressed a wide range of domestic and wild animal protection issues through legislative and regulatory processes, grassroots campaigns, and education.

2.      I am familiar with both the operations of APNM during the time I have been employed there and the history of the organization's work. I am also personally familiar with many APNM members and have interacted with them in the course of my duties, including my work related to the "Cougar Rule" which is the subject of this litigation.

3.      For more than two decades, APNM has engaged in public education and policy advocacy to protect New Mexico's native carnivore populations.

4.      In fact, cougar protection is a core program area for APNM. APNM has operated "Coexistence with Wildlife" programs since 2005, which work with public agencies and landowners to promote and encourage the use of humane, non-lethal solutions to human-wildlife conflict.

5.      Through the "Cougar Smart New Mexico" program, initiated in 2010, APNM has sought to educate landowners and officials about best practices for minimizing human-wildlife conflict, ensuring public safety, and humanely handling so-called "problem" cougars.

6.      In 2010, APNM partnered with New Mexico Department of Game & Fish, the United States Forest Service, New Mexico State Parks, and Bernalillo County Open Space to develop official Cougar Smart New Mexico materials, including trailhead informational posters, informational fliers, and educational tags with carabiners. The posters and fliers have been posted at trailheads and public spaces across the state and the educational tags have been distributed to children and families in school groups and public events since 2010. In 2012, APNM partnered with New Mexico State Parks to design a metal sign version of its trailhead poster to be displayed at Clayton Lakes State Park in New Mexico.

7.      In October 2010, APNM presented as part of the Cougars! event in Santa Fe, NM along with WildEarth Guardians to promote advocacy for cougars.

8.      In 2011 and 2012, APNM issued press releases on available cougar coexistence measures in response to dry conditions and sightings of cougars in cities.

9.      In 2013, APNM gave a presentation at Cerrillos Hills State Park in Cerrillos, NM to promote the coexistence campaigns of Cougar Smart New Mexico.

10.    In addition to its public outreach work, APNM frequently and regularly participates in rulemaking processes and advocacy before state legislative and regulatory bodies regarding cougars.

11.    For example, in a campaign from 2005 through 2010, APNM worked with a coalition of advocates and conservation groups to obtain improved legal protections for mother cougars and their cubs – the most vulnerable members of the population. As a result of this campaign, it is now illegal to kill mother cougars or their dependent kittens.

12.    Since 2011, APNM has been a part of the Trap Free New Mexico coalition to oppose the use of traps, snares, and poison on public lands.

13.    APNM served as a coordinating organization for the People Forum on Public Lands Trapping, held in Albuquerque, NM in September 2011. The Forum included presentations before a panel composed of stakeholders in public land trapping. After the Forum, the panel of the People's Forum for Public Lands Trapping issued an official report on their findings as part of the Forum event and further research.

14.    In Spring 2012, APNM joined representatives from WildEarth Guardians, The Rio Grande Chapter of the Sierra Club, and Born Free USA in administering a series of presentations on trapping in the New Mexico cities of Grants, Farmington, Española, Portales, Roswell, Silver City, Los Lunas, and Taos.

15.    In 2010, APNM testified, organized its membership, and generated media in opposition to the changes in the state Bear & Cougar Rule proposed by New Mexico Department of Game & Fish that increased overall hunting quotas for cougars and extended the Bear & Cougar Rule rulemaking period from two to four years.

16.     In the Spring of 2015, Animal Protection Voters, which is the 501c4 organization associated with APNM, lobbied to prevent passage of House Bill 586, which sought to remove game species protections for cougars, during the 2015 New Mexico State Legislative Session.

17.     APNM also regularly submits comments on proposed New Mexico State Game Commission rules for cougar hunting. It has done so during every comment period since 2006, up to and including the current Cougar Rule. APNM's comments on the Cougar Rule pointed out the scientific inadequacies of the Cougar Rule and objected to the cruel and indiscriminate nature of traps and snares.

18.     Several current APNM members also submitted comments opposing the Cougar Rule, on similar grounds.

19.     I personally attended two Commission meetings on June 13, 2015 and August 27, 2015 in order to offer oral testimony opposing the Cougar Rule's authorization of trapping and snaring of cougars. My testimony pointed out the scientific inadequacies of the Cougar Rule and objected to the cruel and indiscriminate nature of traps and snares.

20.     Several APNM members attended these meetings as well, in order to express their opposition to the Cougar Rule.

21.     In addition to participating in the public hearing and comment process, APNM worked through other avenues to oppose the Cougar Rule before it was approved by the Commission. These efforts included: commissioning a poll of New Mexicans in order to measure public opinion regarding cougar trapping; gathering more than 6,000 signatures on a petition opposing cougar trapping in New Mexico; drafting formal letters to Governor Martinez and the Game Commission expressing legal concerns with the Cougar Rule; and drafting Letters to the Editor regarding the negative impacts of, and public opposition to, the Cougar Rule.

22.    Since reintroduction to New Mexico began in 1998, APNM has supported the Mexican wolf reintroduction program and worked through policy and grassroots channels to support it.

23.    APNM has also sent staff members to attend, and encouraged supporters to attend, rallies and public meetings in support of the reintroduction program. Specifically, APNM staff and members have attended: Lobo Lover Rally, Albuquerque, August 2010, UNM Wolf Awareness Day, Albuquerque, March 2011, Save the Lobo Rally, Albuquerque, October 2013, New Mexico Game Commission meeting, Truth or Consequences, August 2014 and Rally for the Mexican Gray Wolves, Santa Fe, May 2015.

24.    APNM has spent a substantial amount of its limited funding on opposing the illegal Cougar Rule since it was proposed. Even prior to the filing of this lawsuit, APNM expended funds on polling, professional services from attorneys and biological experts, travel costs associated with attending public hearings, hiring of paid grassroots organizers, videography, advertising, website development and maintenance, and postage.

25.    APNM has been forced to divert significant resources to gathering information about the Cougar Rule, the impact of trapping on cougars, the impact of trapping on Mexican wolves and other endangered species, because of the State Game Commission's proposal and adoption of the Cougar Rule. These are resources APNM would have otherwise devoted to other programs.

26.    APNM has also spent a substantial amount of its limited staff time on opposing the Cougar Rule since it was proposed. Because APNM is a small organization, the opportunity cost associated with this expenditure of staff time is especially great.

27.     Because the Cougar Rule represents the most dire threat to cougars in New Mexico today, APNM has been forced to prioritize opposing the Cougar Rule to the detriment of other program areas.

28.     Were it not for the Cougar Rule, APNM would have directed these resources toward other projects to further the objectives of its native carnivore protection programming.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2016, in Santa Fe, New Mexico.

Phil Carter

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THE HUMANE SOCIETY OF THE UNITED )
STATES, ANIMAL PROTECTION OF NEW )
MEXICO, JEAN OSSORIO, and PETER )
OSSORIO, )
                 )
         Plaintiffs, )
                 )
     v. )
                 )
PAUL M. KIENZLE III, WILLIAM )
MONTOYA, ROBERT ESPINOZA SR., )
RALPH RAMOS, BOB RICKLEFS, )
ELIZABETH ATKINSON RYAN, and )
THOMAS SALOPEK, in their official )
capacities as Commissioners of the New )
Mexico State Game Commission; and )
ALEXANDRA SANDOVAL, in her official )
capacity as Director of the New Mexico )
Department of Game and Fish, )
                 )
         Defendants. )
                 )

Case No. 2:16-cv-00724-LAM-SMV

DECLARATION OF
TERESA DUBOIS

I, Teresa Mills Dubois, declare as follows:

1.       I reside in Los Alamos County, New Mexico.  I have lived in New Mexico for virtually my entire life.

2.       I was a reading coach for elementary (second and third grades) students in Los Alamos Township for sixteen years. I retired this year, effective August 1.

3.       I am a current member of both The Humane Society of the United States and Animal Protection of New Mexico.

4.       I have been actively involved in the use of Search and Rescue dogs to locate and rescue individuals (lost, injured, or killed) throughout New Mexico since 1986.

5.      In 1986 I founded Mountain Canine Corps (MCC), a nonprofit New Mexico Search and Rescue group, incorporated under federal law as a 501(c)(3) nonprofit.  MCC can be found on the worldwide web at www.mc2sar.org.  I have held several offices in connection with my MCC membership, including President and Vice President.

6.      MCC's mission is to train and field search dogs and personnel to help locate missing persons.  Our motto is the motto of the SAR community--"that others may live."  We respond to search missions 24 hours a day, 7 days a week, 365 days a year.

7.      As part of the Search and Rescue community in New Mexico, we are called out for searches, often along with numerous other teams, through the Incident Command System. The New Mexico State Police initiates all Search and Rescue missions in the state and then engages MCC.

8.      MCC has approximately twenty-five certified members.  Membership in MCC is exclusively limited to individuals who have proven their qualifications with Search and Rescue dogs.

9.      Certified Search and Rescue dog handlers go through a state certification process (the PACE test) in order to qualify as Search and Rescue dog handlers or field support personnel for Search and Rescue.

10.     MCC has a separate certification process (including field testing and a technical portion) for Search and Rescue personnel, and dog handlers must recertify every three years to maintain MCC certification.

11.     MCC deploys on search missions in all kinds of weather, over all kinds of terrain, and, more often than not, in the middle of the night.  We focus primarily on training for and participating in SAR missions in the wilderness setting.

12.     There are different types of Search and Rescue dogs trained to respond to specific situations, and in order to meet the challenges of the varied missions we may face, we have tracking/trailing, air scent dogs, and scent-generic air scent trained dogs. While we spend the majority of our mission time looking for live subjects, we also have cadaver locating dogs, who assist in recovery situations.

13.     MCC membership and deployment requires a variety of training outside of dog and scent theory training, which is crucial for our members in order for us to contribute to missions in a safe and meaningful way.  MCC members also train in areas such as navigation, map and compass, wilderness medicine, crime scene preservation, amateur radio, man tracking, and veterinary care.

14.     I have personally trained over 100 individuals and their dogs in the techniques of Search and Rescue.  Training requires twice weekly meetings with a trainer/mentor and the prospective Search and Rescue dog and dog owner/handler, for up to two-and-one-half years of training.

15.     Our team has 15 licensed HAM radio operators, 5 certified Wilderness First Responders, and numerous Wilderness Advanced First Aid certificated members.

16.     As part of our Search and Rescue work, when someone is missing, we are deployed to any area throughout the state, regardless of the jurisdiction or ownership of the land.

17.     The core of our work is, of course, with our Search and Rescue dogs.  Our dogs are highly trained and sensitized to the work they do, work that saves human lives on a regular basis, lives that might otherwise not be saved.

18.     It takes approximately two-and-one-half years to train a dog and the dog's handler to become a certified Search and Rescue team.  Given the input of time and money for this

certification, it is generally agreed that a Search and Rescue dog's market value is approximately $10,000 or more.

19.     If a Search and Rescue dog were ever caught in a trap or snare, that dog would thereafter be unable to be certified to perform Search and Rescue activities. The loss of a Search and Rescue dog would be a severe loss to MCC, to the Search and Rescue community, and to the state, in addition to the loss of the market value of that dog.

20.     Loss of a Search and Rescue dog would not be compensable by any amount of money, given the vital nature of their work, and the limited number of Search and Rescue dogs available to go on missions.

21.     On a typical Search and Rescue mission, three or four dogs go out with their handlers and support personnel. There are only about fifty certified Search and Rescue dogs in New Mexico.

22.     On January 1, 2014, my personal dog was caught in a trap in Los Alamos Township, while I was walking my dog with friends. There were three Search and Rescue dogs with my group the day that my dog was caught in the trap.

23.     The experience was a terrifying one and opened my eyes to the dangers of traps, and to their potential for harm to MCC's Search and Rescue canines, especially because I could not at first figure out how to get her out of the trap. The Search and Rescue dogs who we were with could just as easily have been the victims of the trap that day, which could have ended their careers. Luckily, my dog was not severely injured.

24.     The experience with my dog getting caught in the trap makes me concerned about the same thing happening to MCC's Search and Rescue dogs. The potential for Search and

Rescue dogs getting caught in traps will certainly increase with the advent of the new rule allowing trapping for cougars in a wider range of New Mexico wilderness than before.

25.     This risk makes me fearful that a Search and Rescue dog will be caught in a trap or snare set for cougars once the season begins, like my dog was in January 2014. The death or injury of a Search and Rescue dog in a cougar trap would not only represent the loss of a major investment of time and money, but also would impair the ability of MCC to carry out its function and harm those individuals whom Search and Rescue dogs are deployed to save.

26.     If the new Cougar Rule did not allow trapping and snaring of cougars, that would significantly alleviate the risk of the tragic loss of a Search and Rescue dog from the limited pool of such dogs in New Mexico.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2016, in Los Alamos County, New Mexico.

Teresa Mills Dubois

Teresa Mills Dubois

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ANIMAL PROTECTION OF NEW MEXICO, JEAN OSSORIO, and PETER OSSORIO, <br><br> Plaintiffs, <br><br> v. <br><br> PAUL M. KIENZLE III, WILLIAM MONTOYA, ROBERT ESPINOZA SR., RALPH RAMOS, BOB RICKLEFS, ELIZABETH ATKINSON RYAN, and THOMAS SALOPEK, in their official capacities as Commissioners of the New Mexico State Game Commission; and ALEXANDRA SANDOVAL, in her official capacity as Director of the New Mexico Department of Game and Fish, <br><br> Defendants. | Case No. 2:16-cv-00724-LAM-SMV <br><br> DECLARATION OF <br> WENDY KEEFOVER |

I, Wendy Keefover, declare as follows:

1.      I am a member of The Humane Society of the United States. Since 2014, I have also been employed by The Humane Society of the United States as its Native Carnivore Protection Manager. Prior to my employment with The Humane Society of the United States, I worked as a legal assistant and *pro bono* coordinator at the Land and Water Fund of the Rockies from 1995 to 1998, and as Director of the Carnivore Protection Program for WildEarth Guardians from March 1998 through November 2013. I also served as a board member for WildEarth Guardians (then called "Sinapu") from 1994 through 1998.

2.      My deep and personal connection to wildlife and wild lands – both as an advocate and a recreational observer – is what led me to change my career path away from legal services to become a professional wildlife advocate in 1998, and to pursue graduate studies focusing on conservation and animal protection issues beginning in 1998.

3.      I have been actively involved in wildlife protection advocacy for most of my adult life, both in a volunteer capacity and through my professional pursuits.

4.      I feel particularly connected to native carnivores, such as cougars, Mexican wolves, bears, and jaguars. I have studied their tragic history of persecution in the American West and dedicated my life to contributing to their recovery, survival, and well-being. Accordingly, my advocacy work has focused largely on native carnivores and especially cougars and wolves, including Mexican wolves.

5.      In 1995, I volunteered as a signature gatherer for Amendment 14, a ballot initiative that sought to ban the use of traps and poisons on Colorado public lands.

6.      In 1997, I led coalition effort, along with The Humane Society of the United States, that sought to end "contest hunts" in Colorado before the Colorado Wildlife Commission.

7.      In 1999, I co-founded AGRO: A National Coalition to End Aerial Gunning of Wildlife, to monitor the federal government's aerial gunning predator control program. My work with the group included putting aerial gunning information online for media, decision makers, and the public; and starting a mailing list that has since become the *Western Carnivore Conservation List*, which connects carnivore advocates across the West to this day.

8.      From 2001 to 2010, I led a campaign to improve management practices for cougars in Colorado. My work included researching and drafting public comments, oral presentations before the Colorado Wildlife Commission, and organizing meetings with

stakeholders including hunters, landowners, and conservation groups to conserve and protect native carnivores. Largely as a result of this work, Colorado has improved its protections for mother cougars and their dependent kittens.

9.      From 2005 to 2010, I led similar efforts – in partnership with Animal Protection of New Mexico – in New Mexico. In addition to grassroots organizing and advocacy before the New Mexico Fish and Game Commission, I traveled throughout the state in 2006 on a week-long speaking tour in Santa Fe, Los Alamos, Taos, Albuquerque, Grants, Ruidoso, Las Cruces, Silver City and made radio appearances in order to raise awareness among New Mexicans of the need for better legal protections for cougars. As in Colorado, this campaign resulted in New Mexico improving its protections for mother cougars and their dependent kittens.

10.     Since then, I have given other cougar talks in New Mexico in conjunction with Animal Protection of New Mexico.

11.     In 2008, I helped achieve several additional positive outcomes for cougars in New Mexico, including stopping a "preventative" cougar trapping and snaring program that had cost the New Mexico Department of Fish and Game nearly one million dollars because of a no-bid contract wherein the state was paying out $2,000 per cougar killed over several years in the NMDGF's game management unit 30.

12.     In order to achieve positive outcomes for New Mexico cougars, I testified before the New Mexico State Game Commission on cougar issues in Alamogordo, Albuquerque, and Ruidoso.

13.     Between 2009 and 2012, I worked with the Trap Free New Mexico coalition to oppose indiscriminate trapping and poisoning of wildlife in New Mexico. My efforts included coordinating kick-off events in Santa Fe, Albuquerque, Grants, Española, Portales, Roswell,

Silver City and Los Lunas to educate and mobilize citizens, and organizing a high-profile citizens' hearing in Albuquerque that was attended by 140 people, including legislators and media.

14.     In 2011, I presented a talk at the 10th Mountain Lion Workshop in Bozeman, MT titled "Mountain Lion Policy Process in Three States: an Advocate's Viewpoint." In it I analyzed and compared cougar management practices in Colorado, New Mexico, and Montana, drawing from my personal and professional experience advocating on behalf of cougars in each state.

15.     In 2012 I successfully worked to prevent management authorities from executing a mother female Mexican wolf in New Mexico, at a time when there were only one of four breeding pairs in the wild.

16.     In 2015, I drafted and submitted comments regarding the "Cougar Rule" that is the subject of this litigation on behalf of The Humane Society of the United States.

17.     I have published many journal articles, book chapters, white papers, public comment letters and editorials about cougars and wolves.

18.     The same deep sense of connection that has motivated my advocacy and professional work on behalf of native carnivores also drives me to recreate in the areas where they exist during my free time. I frequently hike, camp, and cross-country ski in wild areas throughout the Rocky Mountains, primarily for the purpose of enjoying, observing, and photographing wild areas, wildlife, and the signs of wildlife on the landscape. In addition to being a native Coloradoan, I have lived in Arizona and Montana, and visited Wyoming, Idaho, Nevada, California, Washington, Oregon Alaska, Utah, and New Mexico for these reasons. This year alone, I have visited Washington, Montana, Wyoming and Alaska.

19.     I frequently travel to New Mexico in order to appreciate and recreate in its unique landscapes and observe the native wildlife that I have worked so hard to protect. When I worked for WildEarth Guardians, between 2008 and 2013, I visited New Mexico at least two times per year, and sometimes many more times. I have camped in Chaco Canyon, the Santa Fe National Forest and near the Bosque del Apache Wildlife Preserve. I have hiked in those and numerous other wild places in New Mexico. In 2007, I stayed with my friend and colleague in Winston, New Mexico for seven days, where we hiked on the Gila National Forest and surrounding areas daily.

20.     In total, I have visited New Mexico dozens of times. I plan to visit New Mexico again in the next year to recreate in wilderness, to eat New Mexican cuisine, and to shop for wedding rings.

21.     During my frequent visits to wild areas in New Mexico, I take great aesthetic and recreational pleasure in observing and photographing native wildlife and signs of wildlife – especially native carnivores like Mexican wolves and cougars -- in their natural, unspoiled habitat. Their presence fills me with a sense of purpose, connectedness, and well-being.

22.     While I have not had the opportunity to glimpse a wild cougar, I have been in their presence since I was a child who grew up hiking, backpacking, camping and cross-country skiing in Colorado. I have photographed their paw prints and scat in New Mexico and other states.

23.     I have been lucky enough to personally observe other native carnivores and big cats in the wild. I have seen lynx and bobcats in Colorado, while I was present on two lynx release programs by the Colorado Division of Wildlife. I saw a jaguarondi crossing the road in the State of Chiapas, Republic of Mexico, and looked for jaguars in the Cockscomb Jaguar

Preserve in Belize. I have seen gray wolves in Yellowstone National Park on numerous occasions, but because there are so few Mexican wolves remaining in the wild—less than 100 wild members—I have thus far been unable to personally observe one, although I have visited their home range in New Mexico and Arizona on the Gila National Forest.

24.    By authorizing cougar trapping on millions of acres of land in New Mexico, the Cougar Rule harms my deep and personal recreational and aesthetic interest in the native carnivores of New Mexico. I am less likely to see a Mexican wolf or cougar, or the signs of their presence in the ecosystem, due to the injuries and deaths that will be inflicted by traps and snares. Additionally, I dread the possibility that I would encounter a cougar or Mexican wolf caught in a trap or snare, or even see a trap or snare, during a visit.

25.    The Cougar Rule also harms my interests by undermining and rendering worthless the protections for New Mexico's mother cougars and kittens that I worked hard to implement from 2005 to 2010. Because trapping and snaring is indiscriminate, it poses a risk to mothers and kittens that conventional hunting does not. I am sickened at the thought of a mother with dependent cubs, or the cubs themselves, being caught in a trap or snare, which is virtually inevitable once the trapping season begins.

26.    The harms to my recreational and aesthetic interest in New Mexico's cougars and Mexican wolves caused by the Cougar Rule would be alleviated if a trapping season were not allowed to proceed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2016, in Broomfield, Colorado

_____

Wendy Keefover