IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE HUMANE SOCIETY OF THE
UNITED STATES, ANIMAL PROTECTION
OF NEW MEXICO, JEAN OSSORIO, and
PETER OSSORIO,

        Plaintiffs,

        vs.                             No. CIV-16-0724 LAM-SMV

PAUL M. KIENZLE III, WILLIAM
MONTOYA, ROBERT ESPINOZA SR.,
RALPH RAMOS, BOB RICKLEFS,
ELIZABETH ATKINSON RYAN, and
THOMAS SALOPEK, in their official
capacities as Commissioners of the New
Mexico State Game Commission; and
ALEXANDRA SANDOVAL, in her official
capacity as Director of the New Mexico
Department of Game and Fish,

        Defendants.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** is before the Court on *Defendants' Motion to Dismiss Plaintiffs'*

*Complaint and Memorandum in Support Thereof (Doc. 17)*, filed July 26, 2016.   On

August 23, 2016, Plaintiffs filed *Plaintiffs' Response Opposing Defendants' Motion to Dismiss*

*(Doc. 24)*, and on September 8, 2016 Defendants filed *Reply in Support of Defendants' Motion*

*to Dismiss (Doc. 25)*.   The parties have consented to the undersigned conducting dispositive

proceedings in this matter.  [*Docs. 20* and *21*].  Having considered the motion, response, reply,

record of the case, and relevant law, the Court concludes that the motion shall be **DENIED** as to

Counts One and Two of the Complaint, and shall be **GRANTED** as to Count Three of the Complaint.

## I.  Background

The Humane Society of the United States (hereinafter "HSUS"), Animal Protection of New Mexico (hereinafter "APNM" and, collectively with HSUS, "Plaintiff Organizations"), Peter Ossorio, and Jean Ossorio filed this action against Defendants Kienzle, Montoya, Espinoza, Ramos, Ricklefs, Ryan, and Salopek, in their official capacities as Commissioners of the New Mexico State Game Commission (hereinafter, collectively, "the Commission") and against Defendant Sandoval, in her official capacity as Director of the New Mexico Department of Game and Fish (hereinafter "the Director").   [*Doc. 1* at 10-11, ¶¶ 32-41].  Plaintiffs claim that Defendants' decision to permit cougar hunting in areas of the state of New Mexico that are within reintroduction zones for Mexican gray wolves, as well as within critical habitat area for jaguars,[1] constitutes a violation of the Endangered Species Act, 16 U.S.C. §§ 1531-1544 (hereinafter the "ESA") and federal regulations enacted pursuant thereto.

The ESA was enacted in 1973, and has been described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978).  The ESA provides three protective categories of wildlife species:  "endangered" (16 U.S.C. § 1532(6)), "threatened" (16 U.S.C. § 1532(20)),

---

[1] All of the parties refer to the expansion of the areas in which hunters may trap cougar as the "Cougar Rule" so, for clarity, the Court will, as well.  However, it should be noted that a "Cougar Rule" (*see* N.M. Admin. Code 19.31.11) detailing when, where, and how cougar may lawfully be hunted in this state, was in effect prior to Defendants' conduct of which Plaintiffs complain.  It is actually Defendants' amendment of that rule, which expanded the areas in which cougar may be hunted, that is alleged to be actionable.  *See* 2016 N.M. Reg. Text 419886 ("The State Game Commission at its meeting on 8-27-2015, repealed its rule 19.31.11 NMAC, Bear and Cougar, filed 2-22-2011 and replaced it with 19.31.11 NMAC, Bear and Cougar, effective 4-1-2016").  *See also* "Cougar trapping" (April 11, 2016), http://www.wildlife.state.nm.us/new-hunting-fishing-rules-take-effect-this-month/ (site last visited January 6, 2017).

and "experimental populations," designated as either "essential" or "nonessential," (16 U.S.C. § 1539(j)).[2]

## A.  The Mexican Wolf

The Mexican wolf "is the smallest, southern-most occurring, rarest, and most genetically distinct subspecies of gray wolf in North America."  *See* U.S. Fish and Wildlife Service, Southwest Region, "The Mexican Wolf Recovery Program," General Description, available at https://www.fws.gov/southwest/es/mexicanwolf/natural_history.cfm (site last visited January 6, 2017).  It is considered to be "one of the nation's rarest mammals."  *See* U.S. Fish and Wildlife Service, Southwest Region, News Release dated January 12, 2015, available at https://www.fws.gov/news/ShowNews.cfm?ref=service-finalizes-changes-to-mexican-wolf-experimental-population-rule&_ID=34787 (site last visited January 6, 2017).  The Mexican wolf has been listed as endangered under the ESA since 1976.[3]  It is native to the forested and mountainous terrain of the American Southwest and Mexico, where it once numbered in the thousands.  *See* Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico, 63 Fed. Reg. 1752-01, 1752 (Jan. 12, 1998) (to be codified at 50 C.F.R. pt. 17).  However, eradication efforts taken, in part, for the benefit of domestic livestock, resulted in near extinction of the

---

[2] Certain provisions of the ESA have been discussed extensively in both case law and legal publications. In particular, § 1538, which is the enforcement provision of the Act, and § 1539(j), which describes experimental populations, are frequently referred to simply as "Section 9" and "Section 10(j)" of the ESA, respectively. Therefore, for clarity, this Court will refer to those provisions as § 9 and § 10(j).

[3] The 1976 listing of the Mexican wolf was superseded in 1978 by the listing as endangered of the entire gray wolf species.  *See* Endangered and Threatened Wildlife and Plants; Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf, 80 Fed. Reg. 2512, 2513 (Jan. 7, 2015) (to be codified at 50 C.F.R. pt. 17).  In 2015, following federal delisting of the gray wolf, the Mexican gray wolf was relisted as an endangered subspecies.  *Id.* at 2512.

subspecies.  *See* 63 Fed. Reg. 1752-01 at 1752-1753.  In 1982, the United States and Mexico adopted the Mexican Wolf Recovery Plan, with the goal of ensuring the wolves' survival through a captive breeding program from which a self-sustaining population could be re-established.  *Id.* at 1753.  Five wild Mexican wolves were captured in Mexico to initiate the captive breeding program, and two populations of wolves already in captivity were determined to be pure Mexican wolves, as well.  *Id.*  The wild Mexican wolf was considered extinct in the United States by 1998, when the U.S. Fish and Wildlife Service (hereinafter "FWS") created a rule, pursuant to ESA § 10(j),[4] for the release of an experimental nonessential (ENE) population of Mexican wolves into specifically designated areas of Arizona and New Mexico that were within the historic range of the subspecies.  *See* 63 Fed. Reg. 1752-01 at 1753-1754 and 1763-1772.  Because it is designated as "nonessential,"[5] the Mexican wolf experimental population is not treated by the ESA as "endangered."  *See* § 10(j)(2)(C)(i).  Instead, wolves that have been released into the Mexican Wolf Experimental Population Area (hereinafter "wolf recovery area") are treated "as a species proposed to be listed under [16 U.S.C.] section 1533."[6]

---

[4] ESA § 10(j) defines "experimental populations," authorizes their release, and directs the Secretary [of the Interior or of Commerce (*see* 16 U.S.C. § 1532(16))] to identify such populations by regulation, and to determine whether or not they are "essential to the continued existence of an endangered or a threatened species." § 10(j)(2)(B).  Special rules relating to vertebrate experimental populations are codified at 50 C.F.R. Pt. 17, Subpt. H, § 17.84.

[5] Designation of the Mexican wolf experimental population as "nonessential" may appear to be at odds with the Mexican wolf's extinction in North America in 1998.  However, both Congress and the FWS consider that "an essential population will be a special case and not the general rule."  80 Fed. Reg. 2512 at 2550.  Moreover, when the ENE wolf population was established in 1998, the FWS specifically found that "even if the entire experimental [wolf] population died, this would not appreciably reduce the prospects for future survival of the subspecies in the wild," because "the captive population could produce more surplus wolves and future reintroductions still would be feasible."  *Id.*

[6] "[N]onessential experimental populations located *outside* national wildlife refuge or national park lands are treated as if they are proposed for listing.  This means that Federal agencies are under an obligation to confer, as opposed to consult (required for a listed species), on any actions authorized, funded, or carried out by them that are likely to jeopardize the continued existence of the species.  Nonessential experimental populations located *on* national wildlife refuge or national park lands are treated as threatened, and formal consultation may be required."

*Id.* Thus, designation of an experimental population as "nonessential" allows for greater flexibility in species management. 63 Fed. Reg. 1752-01 at 1752.

The rule that specifically governs the Mexican wolf population in Arizona and New Mexico (hereinafter "special wolf rule") is codified at 50 C.F.R. § 17.84(k).[7] The special wolf rule prohibits "take" of any Mexican wolf in the ENE population, except as specifically provided, and incorporates the ESA's definition of "take," which is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" (16 U.S.C. § 1532(19)), as well.   50 C.F.R. § 17.84(k)(3), (5).   Unlike the ESA § 9 take provision, however, the special wolf rule specifically allows for certain "unintentional" takes of Mexican wolves that occur during "an otherwise lawful activity."   50 C.F.R. § 17.84(k)(7)(viii)(A).[8]   In addition, the 2015 amendment to the special wolf rule added provisions that more fully define "due care" under the rule:

> Taking a Mexican wolf with a trap, snare, or other type of capture device within occupied Mexican wolf range is prohibited (except as authorized in paragraph (k)(7)(iv) of this section) and will not be considered unintentional take, *unless due care was exercised to avoid injury or death to a wolf*. With regard to trapping activities, *due care includes*:

_____

63 Fed. Reg. 1752-01 at 1752 (emphasis added).  Therefore, to the extent that there are national wildlife refuges or national park lands within the wolf recovery area, the ENE wolves will be treated as "threatened" when they are located there. *Id.*

[7] The special wolf rule was amended in 2015 in order to improve the effectiveness of the project by extending the boundaries of the wolf recovery area, modifying some of the wolf management provisions, and issuance of permits that allow otherwise prohibited acts that are "necessary for the establishment and maintenance of experimental populations," as provided in ESA § 10(a)(1)(A).  *See* 80 Fed. Reg. 2512 at 2517.

[8] The special wolf rule defines "unintentional take" as "the take of a Mexican wolf by any person if the take is unintentional and occurs while engaging in an otherwise lawful activity, occurs despite the use of due care, is coincidental to an otherwise lawful activity, and is not done on purpose."  50 C.F.R. § 17.84(k)(3).  Both poisoning and shooting of Mexican wolves are specifically excluded from the definition of "unintentional take." 50 C.F.R. § 17.84(k)(3) and (7)(viii)(A).

(A) Following the regulations, proclamations, recommendations, guidelines, and/or laws within the State or tribal trust lands where the trapping takes place.

(B) Modifying or using appropriately sized traps, chains, drags, and stakes that provide a reasonable expectation that the wolf will be prevented from either breaking the chain or escaping with the trap on the wolf, or using sufficiently small traps (less than or equal to a Victor #2 trap) that allow a reasonable expectation that the wolf will either immediately pull free from the trap or span the jaw spread when stepping on the trap.

50 C.F.R. § 17.84(k)(5)(iii) (emphasis added).

In their Complaint, Plaintiffs contend that violations of wildlife regulations promulgated by the Secretary of the Interior, such as the special wolf rule, also constitute violations of § 9(a)(1)(G) of the ESA. *See* [*Doc. 1* at 22, ¶ 99]. Plaintiffs' first claim is that Defendants will be allowing trapping activities in the recovery area of the ENE Mexican wolf population that will result in takes of Mexican wolves without due care, both because it is impossible to modify a trap that will catch a cougar but not catch a wolf, and because Defendants have not imposed any special trap rules for the cougar hunt. *Id.* at 17-18, ¶¶ 68-70; 19-20, ¶¶ 81-87. Therefore, in Count One of the Complaint, Plaintiffs allege that the Defendants' allowance of cougar hunting within the Mexican wolf recovery area will result in violations of both the special wolf rule and § 9 of the ESA. *Id.* at 22-23, ¶¶ 98-105. In Count Two, Plaintiffs allege that Defendants' allowance of cougar hunting outside of the Mexican wolf recovery area will directly violate § 9 of the ESA, because, when outside the wolf recovery area, Mexican wolves receive the full range of ESA protections and are not subject to the take exceptions in the special wolf rule. *Id.* at 23, ¶¶ 106-110 (stating at ¶ 108 that "Mexican wolves located outside the [wolf recovery area] are treated as endangered species").

**B. The Jaguar**

The jaguar is the largest cat in the Western Hemisphere.[9]  The jaguar's historical range within the United States includes portions of New Mexico.  *See* Endangered and Threatened Wildlife and Plants; Final Rule To Extend Endangered Status for the Jaguar in the United States, 62 Fed. Reg. 39147-01, 39147 (July 22, 1997) (to be codified at 50 C.F.R. pt. 17).  In 1972, the jaguar was listed in the United States as endangered foreign wildlife in Mexico and Central and South America.  *Id*. at 39148.  In the 1970s through the mid-1990s, efforts were made to list the jaguar in the United States.  *Id*. at 39148-49.  However, the jaguar was not listed as endangered under the ESA until 1997.  *Id*. at 39156-57.  At that time, there was "no known resident population of jaguars in the United States, though they still occur[red] in northern Mexico."  *Id*. at 39147.  There are currently no known breeding populations within the United States, though individual jaguars from Mexico may occasionally cross into Texas, New Mexico, and Arizona.[10]  In 2014, the FWS included two small areas in southwest New Mexico as part of a larger, newly designated, jaguar critical habitat.[11]  The Court notes that the designation of the jaguar's critical habitat in New Mexico is currently being challenged in *New Mexico Farm and Livestock Bureau, et al. v. United States Dept. of the Interior, et al.,* No. CIV-15-428 KG/CEG.

Count Three of Plaintiffs' Complaint alleges that Defendants "will cause the unlawful take of jaguars to be committed by authorizing cougar trapping within federally designated

---

[9]*See* JAGUAR (Panthera onca) *Status and Listing,* General Species Information, available at  https://www.fws.gov/southwest/es/arizona/Jaguar.htm (site last visited January 6, 2017).

[10]*See* JAGUAR General Species Information, available at https://www.fws.gov/southwest/es/arizona/Jaguar.htm (site last visited January 6, 2017).

[11] *See* map titled "General Location of Critical Habitat for Jaguar, Units: 5 and 6" at 50 C.F.R. § 17.95-a-Mammals, Jaguar.  *See also*, U.S. Fish and Wildlife Service, Southwest Region, News Release dated March 4, 2014, available at https://www.fws.gov/southwest/es/arizona/Jaguar.htm (site last visited January 6, 2017).

jaguar critical habitat." [*Doc. 1* at 23-24, ¶114].  Plaintiffs further allege that "substantial portions of designated jaguar critical habitat are held privately or by the New Mexico State Land Trust, and thus will be open to cougar trapping using leg-hold traps," which has been authorized by Defendants (*id*. at 21, ¶93), and that "leg-hold traps of the size and type used for trapping cougars are highly likely to also trap jaguars because of similarities in size, weight, and physiology between the species" (*id*. ¶95).

## II.  Analysis

Defendants' motion to dismiss seeks dismissal of all counts of Plaintiffs' Complaint on the ground that Plaintiffs lack standing and, therefore, this Court is without subject-matter jurisdiction over the action.  *See* [*Doc. 17* at 2 and 9-18].  Additionally, Defendants assert that the doctrine of legislative immunity bars Plaintiffs' claims against the individual members of the New Mexico State Game Commission.  *Id*. at 2 and 18-21.  Finally, Defendants contend that Plaintiffs fail to state a claim as a matter of law as to any of their claims and, therefore, that their Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  *Id.* at 2. Specifically, Defendants contend that Plaintiffs fail to state a claim as to Count One because: (1) in the wolf recovery area, "the 'due care' standard applies to the act of trapping, and not to the regulation of trapping;" and (2) because "a trapper can exercise due care when setting traps for cougar, and the Complaint does not contain factual allegations to the contrary."  *Id*. at 2; *see also id.* at 21-24.  With respect to Count Two, Defendants assert that Plaintiffs have not alleged facts that support their claim that trapping outside of the wolf recovery area "has resulted or will imminently result in the illegal take of Mexican wolves."  *Id*. at 2; *see also id.* at 24-25.  With respect to Count Three, Defendants argue that Plaintiffs' claims regarding illegal take of jaguars

are "only conclusory allegations unsupported by the requisite factual allegations."  *Id.* at 2; *see also id.* at 26.

In response, Plaintiffs contend that the allegations of their Complaint sufficiently establish all three elements of Article III standing, which are injury-in-fact, causation, and redressability (*see Doc. 24* at 6), and that they also adequately state facts in support of each of their three claims for relief (*id.* at 15).  Plaintiffs deny that the individual members of the New Mexico State Game Commission are protected by legislative immunity, and contend that those parties' challenged actions "are in the nature of an administrative, rather than legislative, activity."  *Id.* at 25-26.

In reply, Defendants argue that Plaintiffs lack standing to bring their Count One claim because, in the wolf recovery area, unintentional harm that occurs due to trapping where "due care" is exercised does not qualify as a "take."  [*Doc. 25* at 4.].  Defendants further contend that Plaintiffs' Count One claims are "speculative" and "identical to the baseless allegation advanced by plaintiffs in *WildEarth Guardians v. Lane*, 2012 WL 6019306 (D. N.M. Dec. 4, 2012) (unpublished) and rejected by the court due to a paucity of evidence."  *Id.* at 6.  Defendants assert that Plaintiffs lack standing to bring their Count Two claim because they fail to allege facts sufficient to establish actual or imminent injury.  *Id.* at 8 (stating "Plaintiffs do not allege that **any** trapping or snaring of Mexican wolves has **ever** occurred outside the [wolf recovery area].").  Defendants argue that Plaintiffs lack standing as to Count Three because standing under the ESA requires injury-in-fact that is connected to the species at issue, and Plaintiffs fail to make such allegations with respect to jaguars.  *Id.* at 9-11.[12]  Defendants maintain that Plaintiffs'

---

[12] Also in their reply, Defendants point out that Plaintiffs' inclusion of several declarations in support of their standing claims is inconsistent with their argument "that only allegations within the four corners of [the]

claims against members of the New Mexico State Game Commission named as Defendants in their individual capacities are barred by the doctrine of legislative immunity, noting that the act challenged by Plaintiffs is the promulgation of the Cougar Rule, which is a legislative act. *Id.* at 11-12.

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Thus,

> [u]nder Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." *Id.* at 555. *See also Edwards v. Prime Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

*Florida Panthers v. Collier Cnty., Florida*, 2016 WL 1394328, at *13 (M.D. Fla. Apr. 8, 2016) (unpublished).

### A. Plaintiffs' Standing

Defendants argue that Plaintiffs' have failed "to allege facts substantiating a current or imminent injury, and that Defendants' actions are the cause of Plaintiffs' claimed injury," and that Plaintiffs have, therefore, failed to establish their standing to make their claims. [*Doc. 17*

---

complaint may be considered." [*Doc. 25* at 2]. *See also* [*Doc. 24* at 6]. The Court need not determine the effect of Plaintiffs' submission of declarations (*Doc. 24-1* at 1-42) with their response brief, however, because the declarations submitted are not considered by the Court with respect to Defendant's motion to dismiss.

at 13].   Specifically, with respect to Count One of the Complaint, Defendants assert that Plaintiffs "cannot establish that Defendants' enactment of the Cougar Rule will cause the illegal take of Mexican wolves within the [wolf recovery area]."  *Id*. at 14.  With respect to Count Two, Defendants argue that Plaintiffs' allegation "that wolves have traveled outside the [wolf recovery area] does not establish that harm to any such wolves is imminent" and, in any event, "Plaintiffs do not allege that, if the Cougar Rule is invalidated, that action by this Court would redress their injuries."  *Id*. at 15.  With respect to Count Three, Defendants assert that the Ossorios have not alleged "any facts whatsoever relating to jaguars," and thereby fail to establish all three requirements of standing as to the jaguar.  *Id*. at 16.  Finally, Defendants assert both that the Plaintiff Organizations "generally lack associational and organizational standing," and also fail to establish the three elements of standing with respect to jaguars.  *Id*. at 16-17.

Plaintiffs respond that they met their burden "[a]t the motion to dismiss stage . . . by making 'general factual allegations of injury resulting from the defendant's conduct,'" and that "'on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim.'"   [*Doc. 24* at 7] (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  Plaintiffs assert that the Ossorios have standing to assert all three claims because their "aesthetic and recreational harms are 'imminent' as pled" (*id*. at 9), and because they are not required to allege "an injury-in-fact that is connected to the species at issue" (*id*. at 11) (citing *Bennett v. Spear*, 520 U.S. 154, 163-64 (1997)).  Plaintiffs also assert that the Plaintiff Organizations have both standing to sue on behalf of their members (*id*. at 12), as well as "in their organizational capacity," because they have been forced to "devote significant resources" to opposition of Defendants' illegal activity (*id*. at 15).

In reply, Defendants contend that, with regard to their first claim, Plaintiffs mistakenly conflate harm to wolves with unlawful "take" of wolves, and, thus, ignore that trapping of a wolf in the wolf recovery area can be lawful under the ESA and § 10(j). *See* [*Doc. 25* at 2 and 4-8]. Defendants further contend that Plaintiffs lack standing to pursue their second and third claims because they cannot allege the requisite injury, causation, and redressability as to the wolves outside of the wolf recovery area and as to jaguars. *See id.* at 3 and 8-11.

Article III of the United States Constitution limits judicial power to "Cases" and "Controversies," which has been interpreted to require that Plaintiffs have a sufficient personal stake in the outcome of their lawsuits to warrant invocation of federal court jurisdiction. *See Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). A plaintiff pursuing an action in federal court bears the burden of establishing the elements of standing. *Lujan,* 504 U.S. at 560. Those elements have been described by the Tenth Circuit Court of Appeals as "injury in fact, causation, and redressability." *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013) (citation and internal quotation marks omitted).

An injury in fact is "an invasion of a legally protected interest" that is concrete, particularized, either actual or imminent, and not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. A "particularized" injury "must affect the plaintiff in a personal and individual way." *Id.*, n.1. With respect to the claims asserted in this case, it has long been acknowledged that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose[s] of standing." *Id.* at 562-63. *See also, Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010). "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v.*

*Morton*, 405 U.S. 727, 734-35 (1972).  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services,* 528 U.S. 167, 183 (2000) (citations and internal quotation marks omitted).  With respect to wildlife, "[i]t is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist."  *Lujan*, 504 U.S. at 566.  However, *Lujan* specifically rejected an "animal nexus" claim to standing, which it described as "anyone who observes or works with an endangered species, *anywhere in the world*, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection," as crossing the line "into pure speculation and fantasy." *Id*. at 567 (emphasis added) (footnote omitted).  Applying these principles, the Tenth Circuit held that an environmental group's complaint that contained statements to the effect that "its members use the land affected by [challenged mining] permits for various purposes—scientific study, hunting, aesthetic appreciation, sightseeing, and solitude," sufficiently demonstrated the existence of actual injury, which meets the first prong of the standing inquiry.  *Southern Utah Wilderness Alliance*, 620 F.3d at 1234.

### 1.  Jean and Peter Ossorio's Standing With Respect to Mexican Wolf Claims

Defendants argue that none of the Plaintiffs has standing to assert their Mexican wolf claims because the Complaint does not sufficiently allege either imminent injury or that Defendants are the cause of Plaintiffs' "claimed injury."  [*Doc. 17* at 13].  Defendants do not specifically address the Ossorios' standing with respect to the Mexican wolf claims, but assert

that the Ossorios' jaguar claims are invalid for the additional reason that "not one of the Ossorios' allegations relates to jaguars." *Id*. at 16.[13]

In response, Plaintiffs contend that the Ossorios have standing to bring the Mexican wolf claims because those claims contain "precisely the type of allegations of harm that regularly satisfy Article III standing." [*Doc. 24* at 7]. Specifically, Plaintiffs argue that the Ossorios have a deep personal interest in Mexican wolves, which will be harmed if wolves are trapped, and that the Cougar Rule, by allowing more trapping and by allowing trapping that is more likely to harm wolves, reduces the likelihood that the Ossorios will be able to recreationally enjoy the wolves in the wolf recovery area. *Id*. at 8-9. Plaintiffs also contend that Defendants' "intervening cause" argument "misreads the complaint and misstates the law," and that the Complaint does allege a causal relationship between Defendants' conduct and harm to the wolves. *Id*. at 10.

### a.  *Injury-In-Fact*

First, the Court must determine whether the Ossorios have established an injury in fact by addressing whether they allege (a) a concrete and particularized injury, and (b) whether that injury is actual or imminent. In the Complaint, Plaintiff Jean Ossorio alleges that she lives in Doña Ana County, New Mexico and is an active and regular hiker and camper "in New Mexico wild lands, including the territory of the Mexican wolf, in order to observe Mexican wolves and their sign" (*Doc. 1* at 6-7, ¶ 21); that she has publicly advocated for Mexican wolves (*id*. at 7, ¶ 22); that she is "deeply and personally involved with the federal Mexican wolf recovery program, volunteering as a pen sitter in 2013 for captive wolves identified as the Coronado pack of Mexican wolves for reintroduction into the wild;" (*id*. at 7, ¶ 23); that she has attended

---

[13] Plaintiffs' jaguar claims will be discussed separately hereinafter.

"virtually every state and federal public meeting pertaining to Mexican wolf recovery from 1998 to the present;" (*id.*); that she has submitted comments on state and federal actions and environmental assessments pertaining to Mexican wolves (*id.*); and that she is "vitally invested in the health and survival of Mexican wolves," and is "gravely concerned that the expansion of cougar trapping . . . will cause the death and injury of Mexican wolves," which "will harm her deep and personal interest in viewing and listening to Mexican wolves in the wild during her frequent and ongoing visits to their habitat" (*id.* at 8, ¶ 26).  Similarly, Plaintiff Peter Ossorio also alleges that he "is an active hiker and camper" who frequents Mexican wolf territory "to observe Mexican wolves and their sign" (*id.* at 8, ¶ 27); that he "has personally been involved in advocacy for Mexican wolves for over eighteen years" (*id.* at 8, ¶ 28); that he is a Vietnam veteran and "has actively sought and experienced the calming and healing impact of natural landscapes like the [wolf recovery area] (*id.* at 9, ¶ 30); and that he shares his wife's concerns about the expansion of cougar trapping, which he fears will result in death or injury of Mexican wolves, which will thereby "prevent him from experiencing the restorative psychological effects of his time in Mexican wolf territory" (*id.* at 9-10, ¶ 31).

Taking these factual allegations as true, as the Court must on a motion to dismiss, the Court finds that the Ossorios have alleged facts that are sufficient to establish a particularized injury that would affect them in a personal and individual way as to their claims regarding the Mexican wolf.[14]  This finding is based on the Ossorio's assertions in the Complaint that they live in Doña Ana County, New Mexico, spend significant time hiking and camping in the Mexican wolf recovery area in order to observe the wolves and their sign, have been active advocates of

---

[14] As further discussed below, the Ossorios allege no such interest in the jaguar, nor does the Complaint allege that either of them is a member of either Plaintiff Organization.

Mexican wolves for many years, and have recently visited the wolf recovery area, and intend to continue doing so.  *See* [*Doc. 1* at 7-9].  In addition, the Court relies on Ms. Ossorio's assertions that she has been personally involved with captive Mexican wolves and has been active in public efforts to protect the species, including as one of five conservation members on the New Mexico Governor's Catron County Mexican Wolf Task Force in 2005 and giving more than thirty public presentations on Mexican wolves, and on Mr. Ossorio's assertions that he has made approximately 74 trips to the Mexican wolf recovery area since 1998 primarily because of the presence of Mexican wolves there.  *Id.*

Next, the Court considers Defendants' contention that Plaintiffs have failed to sufficiently allege an actual or imminent injury in the Complaint.  *See* [*Doc. 17* at 13 and 15].  With regard to the wolves in the wolf recovery area, Defendants contend that Plaintiffs must allege that a trapper has failed or will fail to exercise due care when trapping in the wolf recovery area in order to establish an imminent injury.  *See id.* at 13.  As to wolves outside of the wolf recovery area, Defendants contend that Plaintiffs do not allege that any trapping or snaring of Mexican wolves has ever occurred outside the wolf recovery area, and that Plaintiffs' allegations that Mexican wolves have traveled outside of the wolf recovery area are too speculative to show that an injury is actual or imminent.  *Id*. at 14-15.

The Court finds that Defendants' contentions are without merit.  In their Complaint, Plaintiffs allege that Defendants' authorization, beginning on November 1, 2016, of recreational cougar trapping on state trust and privately-owned lands within New Mexico, including such lands within the Mexican wolf recovery area, is "a massive expansion [of] the geographical area where cougars may be trapped in the state" (*Doc. 1* at 18, ¶ 71) that "will result in significantly more trapping and snaring activity" in the Mexican wolf recovery area (*id*. at 17, ¶ 67).  Plaintiffs

16

also allege that "virtually the entire Mexican wolf population" (*id.* at 19, ¶ 80) will potentially be exposed to cougar traps, which are "highly likely to also trap Mexican wolves because of similarities in size, weight, and physiology between the species."  *Id.* at 19, ¶ 81.  Moreover, Plaintiffs allege that the Cougar Rule does not require any special precautions to protect Mexican wolves (*id.* at 17-18, ¶ 70), such as modifications of traps, chains, drags, stakes, or cables "in a manner that would provide a reasonable expectation that any Mexican wolf caught in such a trap would be prevented from either breaking the chain or escaping with the trap on the wolf" (*id.* at 20, ¶¶ 83, 84), and that it would be "impossible" for trappers "to take precautions sufficient to avoid death or injury to Mexican wolves while setting traps for cougar" (*id.* at 20, ¶ 86). Plaintiffs allege that "[m]onthly reports from the Mexican Wolf Reintroduction Project and other sources have recorded numerous accounts of Mexican wolves ranging either outside the MWEPA or very close to its northernmost border," so "[t]he Cougar Rule will also cause the death, injury, and harassment of Mexican wolves that range outside the MWEPA by exposing them to leghold traps and snares."  *Id.* at ¶ 88; *see also id.* at 15, ¶ 58 ("[U.S. Fish and Wildlife Service] has acknowledged that Mexican wolves travel *outside* of the MWEPA.").  Finally, Plaintiffs allege that "[t]here have already been at least thirty-seven documented instances of Mexican wolves being caught in traps -- including several mortalities and severe injuries -- since reintroduction began in 1998" (*id.* at ¶ 89), and that "[t]he Cougar Rule will cause a dramatic increase in incidents like these because traps used for cougars are much more likely to take Mexican wolves than the traps used for smaller furbearers" (*id.* at 21, ¶ 89).

Taking Plaintiffs' factual allegations as true, the Court concludes that Plaintiffs have sufficiently alleged that harm to Mexican wolves by cougar traps is imminent both inside and outside the wolf recovery area.  Plaintiffs have alleged that the Cougar Rule expands the

geographical area where cougars may be trapped in the state, that the Cougar Rule will increase trapping and snaring activity in areas where Mexican wolves either currently exist or are able to move to, that cougar traps are likely to also trap Mexican wolves because they are similar in size to cougar, and that the Cougar Rule does not require special precautions to protect Mexican wolves. Therefore, the Court finds that these allegations establish an imminent injury to the Mexican wolf that is not "pure speculation or fantasy." *See Lujan*, 504 U.S. at 567. In addition, the Court finds that the Ossorios have demonstrated that harm to Mexican wolves will produce imminent injury to them, based, again, on their efforts to protect the wolves, their repeated and frequent visits to the wolf recovery area to observe and study the wolves, and their physical involvement with the wolves in the form of feeding and caring for those in captivity. *See id.* at 564 (explaining that injury to a species is insufficient for standing purposes unless a plaintiff also establishes that his or her own harm is also imminent, and stating that plaintiffs must allege facts that show "how damage to the species will produce 'imminent' injury to [them]"). The Court, therefore, concludes that the Ossorios have alleged facts that are sufficient to satisfy the first prong of Article III standing (*i.e.*, injury-in-fact) with respect to the Plaintiffs' First and Second causes of action, alleging harm to Mexican wolves.[15]

### b.    Causation

Next, the Court considers Defendants' contention that Plaintiffs have failed to establish that Defendants' actions are the cause of Plaintiffs' claimed injury. *See* [*Doc. 17* at 13].

---

[15] The Court notes that the parties dispute whether or not the Ossorios have enjoyed the Mexican wolves outside of the wolf recovery area, and that this dispute appears to be based on the parties' competing contentions regarding whether or not the Mexican wolves have left the wolf recovery area, and whether or not there has been trapping or snaring of Mexican wolves outside of the wolf recovery area. *Compare, e.g.,* [*Doc. 17* at 14-15] *with* [*Doc. 24* at 9-10]. Because the Court finds that Plaintiffs have sufficiently alleged in their Complaint that some Mexican wolves have ranged outside of the wolf recovery area, the Court does not reach this issue. Moreover, this factual dispute is better resolved in a summary judgment proceeding and not upon a motion to dismiss.

Defendants claim that Plaintiffs have failed to establish causation within the wolf recovery area because trapping is not considered unlawful in that area unless there is a lack of due care, and Plaintiffs cannot establish that the Cougar Rule will cause a trapper to fail to exercise due care. *Id.* at 14.   With regard to wolves outside the wolf recovery area, Defendants contend that Plaintiffs fail to allege that Defendants have caused any injury to wolves that are outside that area.   *Id.* at 15.   Under the causation prong of Article III standing, the harm alleged must be "fairly traceable to the challenged action of the defendant."   *WildEarth Guardians v. U.S. Environmental Protection Agency*, 759 F.3d 1196, 1205 (10th Cir. 2014) (citing *Laidlaw*, 528 U.S. at 180-81).   Here, Plaintiffs allege that the Commissioner Defendants, in their official capacities, are responsible for "promulgating regulations[,] setting quotas and specifying the allowable means and manner of hunting and trapping game species in [New Mexico]."   [*Doc. 1* at 10 ¶ 32].   Plaintiffs allege that the Director, in her official capacity, is responsible for "implementing and enforcing the fish and game regulations promulgated by the Commission[,]" including "issuance of hunting and trapping permits," investigating and prosecuting game violations, and closing hunting and trapping seasons based on filling of quotas or in an emergency.   *Id.* at 11 ¶ 40.   Plaintiffs also allege that Defendants' enactment of the Cougar Rule will result in significantly more trapping and snaring activity in the Mexican wolf recovery area (*id.* at 17, ¶¶ 65, 67), that Defendants failed to require any special precautions to protect Mexican wolves (*id.* at 17-18, ¶ 70), such as modifications of traps, chains, drags, stakes, or cables "in a manner that would provide a reasonable expectation that any Mexican wolf caught in such a trap would be prevented from either breaking the chain or escaping with the trap on the wolf" (*id.* at 20, ¶¶ 83, 84), and that it would be "impossible" for trappers "to take precautions sufficient to avoid death or injury to Mexican wolves while setting traps for cougar" (*id.* ¶ 86).   Considering

19

these allegations as true for purposes of determining the merits of Defendants' motion to dismiss, the Court concludes that Plaintiffs have adequately pled that imminent harm to the wolves, and therefore to the Ossorios, is "fairly traceable" to Defendants' actions.   Thus, Plaintiffs have satisfied the causation prong of Article III standing, as well.

### c.      Redressability

Finally, Plaintiffs must allege sufficient facts from which it may be determined that "it is likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision" from the Court.  *Laidlaw*, 528 U.S. at 180-81.  Here, Plaintiffs allege that Defendants' permitting of the use of cougar traps and snares on land where Mexican wolves roam will result in hunting and trapping activity that violates provisions of the ESA and its attendant regulations. *See* [*Doc. 1* at 22-23].  Since the ESA provides that Plaintiffs' claims may be brought in the United States district courts, which may enjoin activity that violates its provisions (*see* 16 U.S.C. § 1540(g)), this Court has authority to enjoin Defendants from issuing permits to trap cougars in areas where Mexican wolves are known to roam.  Moreover, because Defendants are the entities who have enacted the Cougar Rule, they can also revoke it.  Therefore, the Court finds that Plaintiffs have adequately pled the third prong of Article III standing--redressability.

### 2.  Plaintiff Organizations' Standing With Respect to Mexican Wolf Claims

In their motion to dismiss, Defendants contend that the Plaintiff Organizations have failed to properly allege associational standing that would allow them to bring claims on behalf of their members because they "have not identified specific members that have standing to sue in their own right."  [*Doc. 17* at 10-11].  Defendants also claim that the Plaintiff Organizations have failed to properly allege "organizational" standing on their own behalf, because these Plaintiffs' alleged organizational purposes are too broad, and their organizational harms are too speculative.

*Id*. at 11-13.  Plaintiffs respond that the Plaintiff Organizations have standing to sue on behalf of their members (*Doc. 24* at 12),[16] and that the issue of organizational harm need not be reached because the Ossorios and the Plaintiff Organizations "possess standing on other grounds, only one of which is necessary for jurisdiction to issue" (*id*. at 14-15).  Plaintiff Organizations additionally contend that they have standing as organizations based on having to redirect resources "to combat the Defendants' illegal activity" that would otherwise be used for "other wildlife protection projects."  *Id*. at 15.

In their Complaint, Plaintiffs allege that Plaintiff HSUS "strives to protect and improve the management of threatened and endangered species throughout the country and to eliminate inhumane methods of hunting and trapping" (*Doc. 1* at 3-4, ¶ 11); that its "members and staff rely on cougars, Mexican wolves, and jaguars for recreational, aesthetic, and professional purposes" (*id*. at 4, ¶ 13); and that, due to Defendants' expansion of cougar hunting, HSUS "has been forced to redirect programmatic resources and finances to combat the Defendants' illegal activity affecting Mexican wolves and jaguars" (*id*. at 4, ¶ 14).  Similarly, Plaintiff APNM alleges that it has "worked extensively to advocate for the reintroduction of Mexican gray wolves into New Mexico and the Southwestern United States" (*id*. at 5, ¶ 16); that its members "regularly visit wild areas in New Mexico to recreate . . . and to observe wildlife," and have "oppos[ed] the Cougar Rule" (*id*. at 6, ¶ 19); and that it "has been forced to spend time, money, and other institutional resources researching and advocating for protection of Mexican wolves and jaguars, including those that are adversely affected by the Department [of Game and Fish]'s failure to protect these animals" (*id*. ¶ 20).

---

[16] As to this argument, Plaintiffs rely heavily on several declarations submitted as exhibits to their response brief.  *See* [*Doc. 24-1* at 1-42].  However, those declarations were not considered by the Court with respect to the motion to dismiss because they contain factual assertions that were not alleged in the Complaint.

Although it is not entirely clear from the Complaint, it appears that the Plaintiff Organizations seek to assert the claims in the Complaint based on both their own interests and the interests of their members.  It is well-established that an organization has standing to bring an action on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181.  Here, the Complaint asserts that:

> HSUS members and staff rely on cougars, Mexican wolves, and jaguars for recreational, aesthetic, and professional purposes. HSUS members regularly visit wild areas in New Mexico to recreate by themselves and with their companion animals, and to observe wildlife. They are distressed when animals are subjected to what they believe is cruel and unnecessary suffering in leg-hold traps and snares, and they are deterred from recreating in wild lands when traps that present a threat to their companion animals are present. Furthermore, they will not be able to view cougars, jaguars and Mexican wolves in New Mexico if these species are not properly protected from threats to their individual and collective survival.

*Doc. 1* at 4, ¶ 13.  With respect to APNM, the Complaint asserts that its members have "actively campaigned against killing contests and the trapping and poisoning of wildlife on public lands in New Mexico (*id*. at 5, ¶ 17), and have submitted written comments and oral testimony opposing the Cougar Rule (*id*. at 6, ¶ 19).[17]  However, the Ossorios are not identified as members of either Plaintiff Organization and, in order for the Plaintiff Organizations to establish organizational standing, they must "make specific allegations establishing that *at least one identified member*

---

[17] Again, Plaintiffs submitted several affidavits from non-party members and employees of the Plaintiff Organizations with their response to the motion to dismiss. *See* [*Doc. 24-1* at 1-42].  The Court declines to consider those affidavits in connection with Defendants' motion to dismiss, since the Complaint itself must state sufficient facts that, when considered to be true, establish subject matter jurisdiction.  Given the Court's decision on standing in this case, along with the dismissal of certain claims without prejudice, it would be premature to consider the motion to dismiss as a motion for summary judgment, since the claims have not yet been fully developed.  The Court expresses no opinion regarding the adequacy of the statements in the affidavits to establish standing for the Plaintiff Organizations.

had suffered or would suffer harm." *Summers*, 555 U.S. at 498 (emphasis added). The Complaint in this case does not specifically identify any member of either Plaintiff Organization, much less any facts establishing that person's individual standing to bring the claims set forth. As such, the Complaint fails to satisfy the standard set forth in *Summers* for organizational standing.

In addition, the Court finds that the Complaint fails to allege sufficient facts to establish the Plaintiff Organizations' standing in their own right. Plaintiffs claim that the Organizations, which are in the business of animal advocacy, have advocated against Defendants' decision to allow cougar hunting, and that they have had to dedicate resources to the opposition of cougar hunting that would otherwise have been available for other projects. *See, e.g.,* [*Doc. 1* at 4-6, ¶¶ 14, 18, 20]. These factual allegations, which are over-broad and vague in any event, fail to sufficiently identify what actual harm will be suffered by the Organizations if this Court does not grant the relief they seek. Moreover, although the relief sought in the Complaint is prospective, the only organizational harm alleged in the Complaint has already occurred, since it consists of the redirection of resources to opposition of Defendants' proposal to expand the cougar hunt.

Nonetheless, this Court has determined that the Ossorios have Article III standing to assert claims related to the Mexican wolf, and "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* 547 U.S. 47, 52 n.2 (2006). Indeed, it is particularly appropriate to decline to require every plaintiff to establish standing where, as here, they are all "represented by the same counsel and jointly raise the same substantive arguments." *Campbell v. Buckley*, 203 F.3d 738, 740 n.1 (10th Cir. 2000) ("[W]e decline to address the standing issue [of the institutional plaintiffs] . . . where, as here, these plaintiffs have not obtained relief

different from that of the plaintiffs who do have standing.") (citations omitted).  *Accord Taylor v. Roswell Independent School District*, 713 F.3d 25, 29 n.1 (10th Cir. 2013) (finding that the case was not moot because at least one student was still enrolled in school and, therefore, "[a]s long as one plaintiff meets the requirements of Article III, the court can adjudicate the issues raised in the complaint") (citations and internal quotation marks omitted).   Therefore, even though Plaintiffs have failed to establish standing as to the Plaintiff Organizations, because Plaintiffs have established standing as to the Ossorios regarding the Mexican wolf claims, the Court will deny Defendants' motion to dismiss as to Counts One and Two.

### 3.  Plaintiffs' Standing With Respect to Jaguar Claim

Defendants contend that none of the Plaintiffs has standing to assert claims based on harm to jaguars.  [*Doc. 17* at 16-18].  Defendants contend that, because Plaintiffs' allegations are so vague, and the existence of jaguars in New Mexico is so speculative, Plaintiffs' jaguar claim does not meet the "actual or imminent injury" standard for standing.  *Id*.  In addition, Defendants contend the Ossorios "do not allege any facts whatsoever relating to jaguars."  *Id*. at 16.

In response, Plaintiffs contend: that their "Complaint alleges that jaguars' range includes areas in southwestern New Mexico, where 'it is likely that several jaguars move through this area every year and several may have taken up permanent residence there,'" (*Doc. 24* at 24, citing *Doc. 1* at 21, ¶¶ 90-91); that FWS has determined that land within New Mexico is "critical habitat" for jaguars;[18] and that Defendants "appeared to recognize the threat posed" to jaguars by prohibiting snaring in jaguar critical habitat.  *Id*.  Plaintiffs also assert that "standing for citizen

---

[18] The Court again notes that the designation of the jaguar's critical habitat in New Mexico is currently being challenged in *New Mexico Farm and Livestock Bureau, et al. v. United States Dept. of the Interior, et al*., No. CIV-15-428 KG/CEG.

suits under the ESA does *not* require an injury-in-fact that is connected to the species at issue." *Id*. at 11.

To demonstrate standing as to their jaguar claim, Plaintiffs must establish a "personal stake" in the outcome of the claim. *See Summers*, 555 U.S. at 493. *See also Davis v. Federal Election Commission*, 554 U.S. 724, 734 (2008) ("plaintiff must demonstrate standing for each claim he seeks to press", quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Thus, Plaintiffs must establish an injury in fact, causation, and redressability with respect to their jaguar claim in Count Three. *See Cressman*, 719 F.3d at 1144. To establish injury-in-fact, Plaintiffs, or at least one of them, must show a concrete, "particularized" injury that affects them "in a personal and individual way." *Lujan*, 504 U.S. at 560, n.1. As with the Plaintiffs' Mexican wolf claim, a desire to use or observe an animal species is a cognizable interest for the purpose of Article III standing. *Id*. at 562-63. However, Plaintiffs have failed to sufficiently allege a desire to observe, study, or spend time near the jaguar. The Ossorios clearly established such desires with respect to the Mexican wolf, but there is no allegation in the Complaint that the Ossorios have such an interest in the jaguar. Aside from general allegations regarding the jaguar species, Plaintiffs' allegations regarding the jaguar are infrequent and superficial. For example, in allegations regarding HSUS members and staff, jaguars are simply included along with cougars and Mexican wolves as a species that those individuals will not be able to view. *See* [*Doc. 1* at 4, ¶ 13]. Similarly, HSUS includes jaguars with wolves and cougars as species to which it has been forced to divert resources due to the Cougar Rule (*id*. at 4-5, ¶ 14), and APNM alleges that jaguars are one of three species that it has had to divert resources to, and that its members will no longer be able to view, due to Defendants' expansion of cougar hunting (*id*. at 6, ¶¶ 19, 20). The Complaint also fails to identify a single member of either Plaintiff

Organization who has a particularized interest in the jaguar, which means that Plaintiff Organizations do not have associational standing to assert claims based on potential harm to jaguars, and the consequent harm to an individual, as their basis. *Summers*, 555 U.S. at 498.

In addition, the Plaintiff Organizations fail to establish a particularized interest on their own behalf. Although redirecting institutional resources to the cause of opposing cougar hunting may ultimately benefit any number of species besides the cougar, as well as the aesthetic, scientific, and recreational pursuits of many of the people who live in or visit New Mexico, it does not demonstrate that the Plaintiff Organizations will suffer an imminent and particularized injury by virtue of "take" of jaguars in the course of legalized cougar hunting. "[A] mere [organizational] 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved'" for standing purposes. *Sierra Club*, 405 U.S. at 738. If such an interest were enough to extend standing to the Plaintiff Organizations, there would be virtually no limit to the number of individuals and organizations with standing to bring actions based on potential harm to species or environments all across the country. Instead, injury in fact "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 734-35. Thus, although a "person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm," that does not mean that "anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Lujan*, 504 U.S. at 566-67.

In their response to Defendants' motion to dismiss, Plaintiffs contend that the Supreme Court case of *Bennett v. Spear*, 520 U.S. 154 (1997), "squarely held that standing for citizen suits under the ESA does *not* require an injury-in-fact that is connected to the species at issue." [*Doc. 24* at 11] (citing *Bennett* at 163-64).   Plaintiffs misinterpret the *Bennett* decision.   In *Bennett*, the petitioners were irrigation districts and ranchers who used water from the Klamath Irrigation Project, which is a series of lakes, rivers, dams, and irrigation canals in California and Oregon.   *Id*. at 158.   The petitioners brought suit under the ESA and the Administrative Procedure Act ("APA"), challenging a FWS biological opinion, which concluded that the Klamath Project was "likely to jeopardize the continued existence" of two species of endangered fish, unless minimum water levels were maintained in Clear Lake and Gerber reservoirs.   *Id*. at 159.   The petitioners alleged that there was no scientific evidence either that the endangered fish populations had declined or that the lake levels imposed by the FWS would have any beneficial effect on the fish.   *Id*. at 159-60.   Petitioners also claimed to use the reservoirs and waterways for "recreational, aesthetic and commercial purposes, as well as for their primary sources of irrigation water."   *Id*. at 160 (citation omitted).

The district court dismissed the complaint on the ground that petitioners lacked standing because "their [alleged interests] do not fall within the zone of interests sought to be protected by ESA."   *Id*. at 160-61 (citation omitted).   The Ninth Circuit affirmed, holding that "only plaintiffs who allege an interest in the *preservation* of endangered species fall within the zone of interests protected by the ESA."   *Id*. at 161 (citation omitted).   The Supreme Court reversed, holding that the ESA's "citizen suit provision," which provides that "any person may commence a civil suit," (ESA § 11(g)), was broad enough to negate the zone of interests test.   *Id*. at 164.   The Court reasoned:

It is true that the plaintiffs here are seeking to prevent application of environmental restrictions rather than to implement them.  But the "any person" formulation applies to all the causes of action authorized by § 1540(g)—not only to actions against private violators of environmental restrictions, and not only to actions against the Secretary asserting under[-]enforcement under § 1533, but also to actions against the Secretary asserting over[-]enforcement under § 1533.  As we shall discuss below, the citizen-suit provision does favor environmentalists in that it covers all private violations of the ESA but not all failures of the Secretary to meet his administrative responsibilities; but there is no textual basis for saying that its expansion of standing requirements applies to environmentalists alone.  The Court of Appeals therefore erred in concluding that petitioners lacked standing under the zone-of-interests test to bring their claims under the ESA's citizen-suit provision.

*Id*. at 166.  Significantly, *Bennett* did not eliminate the requirement, reiterated in later Supreme Court decisions, that Article III standing requires a plaintiff to establish a particularized injury for each claim asserted.  *See, e.g., Summers*, 555 U.S. at 493; *Davis*, 554 U.S. at 733.  *Bennett* also did not hold, as Plaintiffs assert here (*Doc. 24* at 11), that claim- or species-specific standing is no longer required.  Moreover, even if the zone of interests test still applied to ESA claims after *Bennett*, this Court is not suggesting that Plaintiffs' claims are not within the zone of interests of the ESA.  Indeed, as Plaintiffs are asserting claims under the ESA to the effect that Defendants' actions will result in harm to endangered species, their grievances are clearly within that statute's zone of interests.  However, the zone of interest requirement was "[i]n addition to Article III standing requirements," rather than an alternate basis for those requirements.  *See Catron County Board of Commissioners v. U.S. Fish & Wildlife Services*, 75 F.3d 1429, 1434 (10th Cir. 1996).

Applying these principles, the Court finds that Plaintiffs have not stated a viable claim for relief with respect to the jaguar.  The Ossorios have not alleged any interest at all in the jaguar, and the Plaintiff Organizations' jaguar allegations are insufficient, both because no member of either organization with individual standing is identified in their Complaint, and because their

factual allegations regarding potential harm to the jaguar are far too broad and vague to satisfy the standards already addressed with respect to Article III.  Therefore, the Court will dismiss without prejudice Count Three of the Complaint.  *See WildEarth Guardians v. Bidegain*, 555 F. App'x 815, 817 (10th Cir. Mar. 7, 2014) (unpublished) (dismissal for lack of Article III standing should be without prejudice) (citation omitted).

### B.  Legislative Immunity

The Commissioner Defendants have also moved to dismiss Plaintiffs' Complaint on the ground that it is barred by legislative immunity.  *See* [*Doc.* 17 at 18-21].  These Defendants assert that "individuals who are not members of legislative bodies may nonetheless claim [legislative] immunity when they have been delegated legislative powers" (*id.* at 19), and that "[t]here is no question that the Commission was acting in its legislative capacity in establishing the Cougar Rule" (*id.* at 20).  Plaintiffs respond that "the Cougar Rule is . . . an instance of a routine, administrative update to hunting and trapping details" and, therefore, is an "executive or administrative" action (*Doc. 24* at 26) that is not protected by legislative immunity (*id.* at 25). Plaintiffs also assert that, "even if legislative immunity did apply so as to bar suit against the Commissioners in their official capacity [sic], Defendants do not allege that [Defendant] Director Sandoval is entitled to immunity," and, therefore, "this case should proceed against [Defendant Sandoval] even if the Commissioners are dismissed."  *Id*. at 26.  Defendants reply that Plaintiffs' failure to specifically allege that the Commissioner Defendants have some duty to enforce the law means that those Defendants "are entitled to absolute legislative immunity."  [*Doc. 25* at 12] (citation omitted).

In its most basic form, the doctrine of legislative immunity provides "that legislators are absolutely immune from liability for their legislative activities."  *Bogan v. Scott-Harris*,

523 U.S. 44, 48 (1998).   This "privilege" arose from Sixteenth and Seventeenth Century Parliamentary struggles, and was incorporated from the common law into the federal Constitution, via the Speech and Debate Clause of Article I, § 6.  *Id*. at 48-49; *see also Kilbourn v. Thompson*, 103 U.S. 168, 202-04 (1880) (Speech and Debate Clause provides immunity to members of Congress).  In 1951, the Supreme Court in *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951), held that legislative immunity extends to state legislators who were "acting in the sphere of legitimate legislative activity."   The *Tenney* court also held that, whether or not it had the power to do so, Congress did not intend to limit traditional legislative freedoms by creating a cause of action for civil rights violations against persons acting under color of state law.[19]  *Id*. In 1998, the Supreme Court held that absolute immunity from § 1983 suits applies to local legislators, as well, "[b]ecause the common law accorded local legislators the same absolute immunity it accorded legislators at other levels of government, and because the rationales for such immunity are fully applicable to local legislators."  *Bogan*, 523 U.S. at 49.  The Supreme Court in *Bogan* further "recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions."  *Id*. at 55 (citing *Supreme Court of Va. v. Consumers Union of United States, Inc*., 446 U.S.719, 731-34 (1980)).

Thus, legislative immunity is based on important and historic principles, the cornerstone of which is that "[l]egislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good.  One must not expect uncommon courage even in legislators."  *Tenney*, 341 U.S. at 377.  The majority of cases that have addressed the scope of legislative immunity have done so in the context of state or local

---

[19] Although the specific provision at issue in *Tenney* was 8 U.S.C. § 43, it has since been referred to as "§ 1983" (42 U.S.C. § 1983).  *See Bogan*, 523 U.S. at 49.

government liability for civil rights violations.  *See, e.g., Tenney*; *Bogan*; *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978); and *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391 (1979).  Those cases uniformly hold that state and local governmental units, including commissions, departments, and boards, are not legislatively immune to civil rights actions.

On the other hand, individual members of such governmental organizations are immune from personal liability for actions they took that are within the sphere of legislative activity. *Tenney,* 341 U.S. at 376-77.  If individual members of a legislative body enact unconstitutional legislation, "there is no reason why relief against [the legislative body] itself should not adequately vindicate petitioners' interests."  *Lake Country*, 440 U.S. at 405, n.29.  In other words:

> Official immunities (judicial, legislative, absolute, qualified, quasi, and so on) are *personal defenses* designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability under vague and hard-to-foresee constitutional doctrines.  That justification does not apply to suits against units of state or local government, which can tap the public fisc.

*Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006) (citation omitted and emphasis added). Additionally, since claims against individuals in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent," such claims are considered to be against the entity itself, to which personal immunities do not apply. *Monell*, 436 U.S. at 690, n.55; *see also Owen v. City of Independence, Mo*., 445 U.S. 622, 638 n.18 (1980) (official immunities only apply when government officials are sued in their individual capacities).

Here, all of the Defendants have been sued in their official capacities as officials of the State of New Mexico.  Therefore, this Court need not determine whether the conduct that is at

issue in this case is "within the sphere of legitimate legislative activity," as Defendants are not facing personal liability, and the privilege of legislative immunity does not apply.  Moreover, the burden is on the government officials asserting that immunity to show that it is applicable.  *See Forrester v. White*, 484 U.S. 219, 224 (1988) ("[o]fficials who seek exemption from personal liability have the burden of showing that such an exemption is justified"); *see also Borde v. Board of County Commissioners of Luna County, N.M.*, 423 F. App'x 798, 802 (10th Cir. May 18, 2011) (unpublished) (defendant officials must "explain how their participation . . . [in the alleged conduct] qualifies as legislative activity").  Defendants have not explained how the doctrine of legislative immunity prohibits Plaintiffs' claims against them.   Accordingly, Defendants' defense of legislative immunity is denied.

### C.  Rule 12(b)(6) Claims

Finally, Defendants assert that the claims made in Plaintiffs' Complaint cannot withstand scrutiny under Fed. R. Civ. P. 12(b)(6) because: (1) in the wolf recovery area, "the 'due care' standard applies to the act of trapping, and not to the regulation of trapping," and "trapper[s] can exercise 'due care' when setting traps for cougar;" (2) the Complaint fails to allege "that cougar trapping or snaring outside the [wolf recovery area] has resulted or will imminently result in the illegal take of Mexican wolves"; and (3) Plaintiffs' allegations regarding the jaguar are "conclusory" and "unsupported by the requisite factual allegations."  [*Doc. 17* at 2].  Defendants also contend that the "key factual issue" in this case is "not whether a trap would capture or kill a Mexican wolf," but "whether a trapper could exercise 'due care,' as defined by the [special wolf] [r]ule, when setting a cougar trap."  *Id.* at 23.  Plaintiffs respond that Defendants' argument "misreads" the Complaint, in which Plaintiffs allege that "by authorizing cougar trapping and opening a cougar trapping season, Defendants will cause the death, injury, and harassment of

Mexican wolves and jaguars by allowing trappers to set cougar traps and snares – which pose an unavoidable risk of capturing a non-target Mexican wolf – throughout the [wolf recovery area]." [*Doc. 24* at 10] (quoting *Doc. 1* at 3, 20, ¶¶ 6, 87) (internal quotation marks omitted).[20]  Plaintiffs explain that their Complaint "does *not* allege" that Defendants "exhibit[ed] a lack of due care in promulgating the Cougar Rule," but instead, that "government agencies that enact regulations that result in ESA violation [sic] by private individuals . . . have violated the ESA."  *Id*. at 20. Plaintiffs also assert that the "due care"-in-trapping issue presents a mixed question of fact and law that is not properly subject to a motion to dismiss.  *Id*. at 11, n.1.  In their reply, Defendants assert that, since trapping that results in unintentional harm to a wolf can lawfully be conducted under the special wolf rule, such harm does not constitute unlawful take.  [*Doc. 25* at 2].

Rule 12(b)(6) provides for dismissal of claims based on a plaintiff's "failure to state a claim upon which relief can be granted."  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's "complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations."  *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Defendants claim that the special wolf rule (50 C.F.R. § 17.84) does not apply to their conduct.  [*Doc. 17* at 21].  In so asserting, Defendants rely heavily on *WildEarth Guardians v. Lane*, CIV 12-118, 2012 WL 6019306 (D. N.M. Dec. 4, 2012) (unpublished), *reversed in part and remanded sub nom WildEarth Guardians v. Bidegain*, 555 F.

---

[20] Since Count Three of Plaintiffs' Complaint (relating to jaguars) has been dismissed, the Court will not repeat the parties' arguments regarding that claim.  Similarly, since the Court has ruled that the Ossorios have standing to assert the Mexican wolf claims, thereby allowing this matter to proceed as to those claims, the Court need not address the argument by Plaintiff Organizations that they have sufficiently asserted the Mexican wolf claims in their own right, particularly since Plaintiffs rely on declarations submitted with their response to the motion to dismiss that the Court did not consider.

App'x 815 (10th Cir. Mar. 7, 2014) (unpublished).[21]   In *Lane,* the plaintiff sought to end

"furbearer"[22] trapping in the Mexican wolf recovery area, contending that "by authorizing

trapping within occupied wolf range without first exercising due care to avoid taking a Mexican

gray wolf," the defendants violated ESA § 9 (16 U.S.C. § 1538) and the special wolf rule.  *Id*.

at *1.  The district court in *Lane* held that the due care provision of a previous version of the

special wolf rule "does not apply to the regulation or non-regulation of trapping, or to the

promulgation or enforcement of New Mexico's state trapping regulations."    *Lane,*

2012 WL 6019306, at *14.  Not surprisingly, Defendants in the present case characterize the

current Plaintiffs' claims as also asserting a direct violation of the special wolf rule's due care

provision.  *See, e.g*., [*Doc. 17* at 22] ("Plaintiffs appear to allege that Defendants have violated

the [special wolf rule] by 'exhibiting a lack of due care' in promulgating the Cougar Rule")

(referencing *Doc. 1* at 22-23, ¶¶ 101-105).  Once Plaintiffs' claims are characterized as identical

to the ones asserted in *Lane*, Defendants can rely on the *Lane* holding that the special wolf rule

does not apply to regulation of trapping.  Plaintiffs, however, contend that "Defendants contort

the straightforward allegations in the Complaint in an attempt to analogize them to the

distinguishable claims brought before this court in [*Lane*]."   [*Doc. 24* at 15].  Plaintiffs also

assert that their claims are distinguishable from the ones made in *Lane*, because they "are

challenging a brand-new *cougar* trapping scheme that presents new and unprecedented threats to

---

[21] The district court decision will hereinafter be referred to as "*Lane*," and the Circuit Court decision will be referred to as "*Bidegain*."

[22] In New Mexico, "fur-bearing animals" (or, "furbearers") are defined as "muskrat, mink, weasel, beaver, otter, nutria, masked or blackfooted ferret, ringtail cat, raccoon, pine marten, coatimundi, badgers, bobcat and all species of foxes."  N.M. Stat. § 17-5-2 (1978).  It is uncontested that furbearer hunting and trapping were allowed within the wolf recovery area prior to Defendants' expansion of the cougar hunting area since, with limited exceptions, furbearers may be hunted "statewide."  *See* N.M. Admin. Code  § 19.3.2.  Therefore, any wolves that were previously trapped were most likely caught in traps set for furbearers.  Unlike the plaintiff in *Lane*, however, Plaintiffs here do not seek to end furbearer trapping in the wolf recovery area, only cougar trapping.

protected wildlife that exceed the trapping program [challenged in *Lane*]."  *Id.* at 16 (citing *Doc. 1* at 19-21, ¶¶ 77-89).

Plaintiffs' factual allegations in paragraphs 77-89 of the Complaint include: (1) prior to Defendants' adoption of the Cougar Rule, cougar trapping "was almost completely prohibited in New Mexico" (*Doc. 1* at 19, ¶¶ 77); (2) much of the new land now open to cougar trapping includes "key Mexican wolf habitat" (*id.* at 19, ¶ 78); (3) "[l]eg-hold traps of the size and type used for trapping cougars are highly likely to also trap Mexican wolves because of similarities in size, weight, and physiology between the species.  Indeed, companies that sell leg-hold traps often advertise models that are meant to trap *both* cougars and wolves" (*id.* at 19, ¶ 81); (4) "[g]iven the state of current trapping technology, it would be *impossible* to modify a leg-hold trap or snare to make it selective enough to trap cougars but not trap Mexican wolves" (*id.* at 19, ¶ 82); (5) "[t]he Cougar Rule allows for the use of traps and snares that are likely to trap a Mexican wolf and from which a Mexican wolf would not be able to immediately pull free," and does not "require that cougar trappers modify their traps, chains, drags, stakes, or cables in a manner that would provide a reasonable expectation that any Mexican wolf caught in such a trap would be prevented from either breaking the chain or escaping with the trap on the wolf" (*id.* at 20, ¶¶ 83-84); (6) it is not possible to set cougar traps that will avoid causing death or injury to wolves, and allowing cougar trapping in the wolf recovery area "pose[s] an unavoidable risk of capturing a non-target Mexican wolf" (*id.*, ¶¶ 86-87); (7) Mexican wolves are recorded as "ranging either outside the [wolf recovery area] or very close to its northernmost border" (*id*, ¶ 88); and (9) since Mexican wolves began being released into the wolf recovery area in 1998, there have been "at least thirty-seven documented instances" of wolves caught in traps set for furbearers, resulting in "several mortalities and severe injuries," and "traps used for cougars are

much more likely to take Mexican wolves than traps used for smaller furbearers" (*id.* at 20-21, ¶ 89).

This Court must assume that factual allegations in a complaint are true when considering a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Defendants argue that Plaintiffs have pleaded a "bare conclusion that it is impossible for a trapper to exercise 'due care.'" [*Doc. 17* at 23-24]. This Court does not agree. Plaintiffs assert that Defendants' amendment of the Cougar Rule will cause cougar trappers to trap and snare Mexican wolves without due care, because it is impossible to modify cougar traps to avoid harming wolves. *See* [*Doc. 1* at 20, ¶¶ 83-87]. Thus, although the special wolf rule provides that "due care includes . . . [m]odifying or using appropriately sized traps, chains, drags, and stakes that provide a reasonable expectation that the wolf will be prevented from either breaking the chain or escaping with the trap on the wolf, or using sufficiently small traps" (50 C.F.R. § 17.84(k)(5)(iii)(B)), Plaintiffs allege that the Cougar Rule allows trapping with traps that cannot be so modified (*see Doc. 1* at 20).[23] Therefore, Plaintiffs allege that licensing cougar trapping in and adjacent to the wolf recovery area will cause wolves to be subjected to taking that is specifically prohibited by the special wolf rule because cougar traps cannot be used with "due care . . . to avoid injury or death to a wolf" (50 C.F.R. § 17.84(k)(5)(iii)). *See* [*Doc. 1* at 19-20, ¶¶ 81-89]. Taking these allegations as true, the Court concludes that the factual allegations made in Plaintiffs' Complaint are enough to

---

[23] The Cougar Rule (N.M. Admin. Code § 19.31.11.10(O)) does not impose any special restrictions on traps used in the wolf recovery area; instead, it simply refers to existing trapping standards set forth in N.M. Admin. Code §§ 19.32.2.10 and 19.32.2.11.

"nudge[] their claims across the line from conceivable to plausible" (*Twombly*, 550 U.S. at 570), and, therefore, Plaintiffs have sufficiently pleaded their wolf claims to withstand a motion to dismiss.

### III.  Conclusion

For the reasons stated above, the Court **FINDS** that Plaintiffs' "Third Claim for Relief (Illegal Take of Jaguar)" (*Doc. 1* at 23-24, ¶¶ 111-115) should be dismissed because the Complaint fails to sufficiently plead facts that establish Plaintiffs' standing to assert that claim. As to the remaining two claims in the Complaint, the Court **FINDS** that Defendants' motion to dismiss should be denied.

**IT IS THEREFORE ORDERED** that *Defendants' Motion to Dismiss Plaintiffs' Complaint and Memorandum in Support Thereof* (*Doc. 17*) is **GRANTED** with respect to Plaintiff's Third Claim for Relief, and that claim is hereby **DISMISSED**, without prejudice.  The motion is **DENIED** with respect to Plaintiffs' First and Second Claims for Relief.

**IT IS SO ORDERED.**

_Lourdes A. Martinez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**