IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HUMANE SOCIETY OF THE UNITED STATES,
ANIMAL PROTECTION OF NEW MEXICO,
JEAN OSSORIO, and PETER OSSORIO,

      Plaintiffs,

v.                                                                    No. 16-cv-0724 WJ/SMV

PAUL M. KIENZLE III, WILLIAM
MONTOYA, ROBERT ESPINOZA SR.,
RALPH RAMOS, BOB RICKLEFS,
ELIZABETH ATKINSON RYAN, and
THOMAS SALOPEK, in their official
capacities as Commissioners of the New
Mexico State Game Commission; and
ALEXANDRA SANDOVAL, in her official
capacity as Director of the New Mexico
Department of Game and Fish,

      Defendants.

**MEMORANDUM OPINION AND ORDER
DENYING JUDGMENT ON THE PLEADINGS**

THIS MATTER comes before the Court upon the State Defendants' Motion for Judgment on the Pleadings, filed March 7, 2017 (**Doc. 33**), following a hearing and oral argument. Having reviewed the parties' briefs and the applicable law, the Court finds that State Defendants' motion is not well-taken and, therefore, is denied.

**BACKGROUND**

Plaintiffs allege that State Defendants have adopted regulations that authorize trapping of cougars and that by so doing, will cause "take" of Mexican woes and jaguars in violation of the Endangered Species Act, 16 U.S.C. §§1531-1544 ("ESA"), in particular, §9 and §10(j), and its

relevant federal regulations. Plaintiffs seek a Court order enjoining those regulations.[1] State Defendants argue that while the new regulations authorize trapping of cougars by state-licensed trappers (the "Cougar Rule"), they are immune from suit because state law clearly prohibits take of Mexican wolves. *See* N.M.S.A. §17-2-41(C)(1) (prohibiting take of wildlife determined by the state to be endangered; N.M.Admin. Code§19.33.6.8(a)(1)(f) (identifying the gray wolf as endangered.). State Defendants also claim they are entitled to judgment on the pleadings under Fed.R.Civ.P. 12(c) because they cannot be held liable for harm to Mexican wolves at the hands of a third party.

This year, for the first time since 1971, the Department of Game and Fish and the New Mexico State Game Commission, i.e. State Defendants, authorized recreational trapping and snaring for cougars on state trust land and private deeded lands throughout the state. The stated intent of this newly-authorized "Cougar Rule" is to increase opportunities for recreational trapping and killing of cougars. Much of the land open to cougar trapping overlaps with the Mexican Wolf Experimental Population Area ("MWEPA"), and much of the land classified by State Defendants as prime cougar habitat within New Mexico also lies within key Mexican wolf habitat within the MWEPA. Plaintiffs allege the adoption of the Cougar Rule threatens Mexican wolves and that it will cause cougar trappers to trap and snare Mexican wolves without due care because it is impossible to modify cougar traps to avoid harming wolves.

The Complaint asserts three claims, with Counts One and Two alleging claims for relief for illegal take of Mexican wolves and Count III for illegal take of jaguar. Count III has been dismissed by the Court on standing grounds, Doc. 28 at 28-29, so now the only remaining claims for relief are Counts I and II that allege take of Mexican wolves.

---

[1] 16 U.S.C. §1538 is the enforcement provision of the ESA and § 1539(j), which describes experimental populations, are frequently referred to simply as "Section 9" and "Section 10(j)" of the ESA, respectively. *See* Doc. 28 at 3, n.2.

# DISCUSSION

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed" but early enough not to delay trial, a party may move for judgment on the pleadings. A motion under Rule 12(c) is generally treated in the same manner as a Rule 12(b)(6) motion to dismiss. *Mock v. T.G.&Y Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992). In reviewing a motion to dismiss, the Court accepts all well-pleaded factual allegations in the complaint as true and then determines whether the complaint plausibly states a legal claim for relief. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).

## I.     Threshold Arguments

The Court rejects Plaintiffs' threshold arguments. They are worth mentioning for the record, but not worth much discussion.

First, Plaintiffs claim that State Defendants *deny* that the wolf is an endangered species. This is simply a mischaracterization of State Defendants' representations in their Answer which is based on a literal reading of the complaint and the relevant New Mexico administrative code. *See* Doc. 42 at 3, n.1.

Second, Plaintiffs contend that the state's wildlife conservation act does not explicitly include a prohibiting on "trapping," since state statutes and regulations relating to take of endangered species do not expressly include the term "take." Doc. 38 at 8 n.2. However, as State Defendants note, Plaintiffs' interpretation of the term "take" as contrary to the plain meaning of that term, which is clearly set forth in the state statute, and expressly includes harassing, hunting, capturing or killing any wildlife—or an attempt to do so. *See* N.M.S.A. §17-2-38(L).

Third, Plaintiffs contend that State Defendants continue to take the position that trappers will not be held criminally liable if a Mexican gray wolf is accidentally captured. Doc. 38 at 4. State Defendants explain that this informal policy statement constitutes a reasonable exercise of prosecutorial discretion and applies only where the trapping is accidental, that is, non-negligent or consistent with due care. The Court finds this to be a reasonable position, although Plaintiffs would appear to prefer adopting a strict liability theory against trappers which would be legally untenable. These collateral arguments are all without merit and have no relevance to the issue here, which is whether the Cougar Rule violates the ESA and whether State Defendants should be held liable for those violations if they are found to exist.

Fourth, Plaintiffs argue that the Court has already considered State Defendants' arguments in their earlier motion to dismiss when the Court found that "Plaintiffs have adequately pled that imminent harm to the wolves . . . is "fairly traceable" to Defendants' actions." Doc. 28 at 20.[2] This argument can be rejected as well. The Court has considered the injury-in-fact issue within the context of standing, but it has not considered the harm relative to the proximate causation question, which follows a different standard.

## II. Causation in ESA Violations

Proximate cause and foreseeability are required to affix liability for ESA violations, and the Supreme Court has rejected the application of strict liability for ESA violations that are unlimited by causal connection. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 700 (1995) (*"Sweet Home"*) (ESA statute "should be read to incorporate ordinary requirements of proximate causation and foreseeability"), cited in *Aransas Project Project v. Shaw*, 775 F.3d 641, 656–57 (5th Cir. 2014).

---

[2] United States Magistrate Judge Lourdes A. Martinez ruled on that motion by consent of the parties.

In *Aransas Project,* an environmental group sued the directors of the Texas Commission on Environmental Quality ("TCEQ") after some whooping cranes (an endangered species under the ESA) died in estuaries where permits were issued allowing water to be withdrawn from the rivers that fed those estuaries. The plaintiffs were initially successful in obtaining an injunction prohibiting TCEQ from issuing new permits to withdraw water from the rivers but the Fifth Circuit Court of Appeals reversed the district court's decision and ruled that "proximate cause was lacking as a matter of law." 775 F.3d at 660. It also found that the district court's ruling was based on an erroneous view of proximate cause standards because it overlooked "the concepts of direct relationship and foreseeability" because the district court failed to "explain why the remote connection between water licensing, decisions to draw river water by hundreds of users, whooping crane habitat, and crane deaths that occurred during a year of extraordinary drought compels ESA liability." 775 F.3d at 658-659.

In *Strahan v. Coxe,* a First Circuit case, the district court had granted injunctive relief to the environmentalist plaintiffs who sued Massachusetts officials for allegedly violating the ESA by issuing licenses and permits authorizing gillnet and lobster pot fishing. 127 F.3d 155 (1st Cir. 1997). The Plaintiffs in *Strahan* claimed that Northern Right whales became entangled in fishing gear used in Massachusetts coastal waters. The First Circuit affirmed the granting of the injunctive relief and held that "a governmental third party, pursuant to whose authority an actor directly exacts a taking of an endangered species, may be deemed to have violated the provisions of the ESA." *Id.* at 165. The court also found that "*indirect* causation" of a taking by the state through its licensing scheme fell within normal boundaries of legal causation. 127 F.3d at 163 (emphasis added).

In the instant case, State Defendants do not take issue with the causation requirement for ESA violations. Instead, they argue the trappers are independent intervening actors whose conduct breaks the chain of causation or renders it too remote to impute liability on the state. Thus, in adopting that position, State Defendants do not argue that the state simply cannot be held liable, but rather that causation does not exist in this case. However, the success of an "independent intervening actor" defense requires more of a factual record than is before the Court at this point. For example, in *Animal Protection Inst. v. Holsten,* a District of Minnesota case, the parties' cross-motions for summary judgment were before the court. 541 F.Supp.2d at 1076. *Holsten* involved a challenge to hunting and trapping regulations promulgated by the Minnesota Department of Natural Resources ("DNR"), which established trapping seasons for animals including bobcats, fisher, and pine marten. *Id.* The plaintiffs alleged that the state-authorized trapping and snaring resulted in a take of Canadian lynx, an endangered species under the ESA. *Id.* The DNR argued that the conduct of the trappers was an independent intervening cause,[3] but the court disagreed and found that there was "ample opportunity for trappers to trap while complying with [state and federal laws and recommendations]"). *Id.* at 1079 ("Thus, where government regulation leaves private parties free to act in ways that do not pose a threat to endangered and threatened species, other courts have not held the governmental agency liable.").

As the First Circuit did in *Strahan,* the court in *Holsten* held that a state licensing scheme can in fact be a proximate cause of a taking in violation of the ESA. The First Circuit's decision in *Strahan* followed defendants' appeal of the district court's preliminary injunction order following a ruling on defendants' motion for summary judgment. Thus, *Strahan's* analysis of defendants' independent intervening actor defense also took into account a more complete record

---

[3] An independent intervening cause "is one the operation of which is not stimulated by a situation created by the actor's conduct." *Holsten*, 541 F. Supp. 2d at 1079.

of the case. *See Strahan,* 127 F.3d at 164 ("Thus, the state's licensure of gillnet and lobster pot fishing does not involve the intervening independent actor that is a necessary component of the other licensure schemes which it argues are comparable."). The First Circuit noted the distinction between (a) a state licensing an automobile driver to use that automobile where the driver makes an independent decision to disregard or go beyond the licensed purposes of automobile use, and (b) commercial fishing operations that use gillnets and lobster pots "in specifically the manner that is likely to result in a violation of federal law." 127 F.3d at 164. The court found that the causation "while indirect, is not so removed that it extends outside the realm of causation as it is understood in the common law." *Id.*

Defendants rely on two cases from the Middle District of Florida: *Loggerhead Turtle v. County Council of Volusia County, Florida* 92 F.Supp.2d 1296, 1298 (M.D.Fla. 2000) (*Loggerhead Turtle II*) and *Florida Panthers v. Collier Cty., Florida*. 2016 WL 1394328, *1 (M.D. Fla. Apr. 8, 2016). In both cases, the county had taken measures to protect endangered species (hatchling turtles in *Loggerhead Turtle II* and red-cockaded woodpeckers in *Florida Panthers*). In both cases, the court approved defendants' "independent intervening actor" defense and soundly rejected plaintiffs' theory that the county was liable for injury or death to these animals because the county could not be made to assume liability for acts of private citizens. *Loggerhead Turtle II,* 92 F.Supp. at 1305. More importantly, the court found that harm to the particular endangered animal "can only result from an intervening independent actor . . . who did not comply with [the county's requirements]." *Florida Panthers,* 2016 WL 1394328, at *21-22.

In other words, in both of these Florida cases relied on by State Defendants, the courts found that harm resulted only when the county's citizens—the independent intervening actors—

7

did *not* comply with the county's ordinances and regulations which had been enacted to protect the endangered species. In this case, however, Plaintiffs are alleging that there is an increased risk of injury or killing of Mexican wolves *even where trappers comply with the Cougar Rule and the accompanying regulations and requirements. See Compl.,* ¶¶101-105, 109. Also, in each of the Florida cases, the court's consideration was based on a record presented on summary judgment, which is not available to this Court at this point in the litigation. It may be that a more complete record, based on the parties' cross-motions for summary judgment (which are being briefed), will indicate that State Defendants' independent intervenor theory has merit, but it is premature to consider the defense at this time.

### III. Liability of State Officials

State Defendants contend that the state is clearly not authorizing and encouraging illegal activity and so should not be held liable for any conduct by trappers that results in harm to Mexican wolves. They point to state law which expressly prohibits take of Mexican wolves, stating that "it is unlawful for any person to take, possess, transport, export, process, sell or offer for sale or ship any species of wildlife. . . determined to be endangered within the state as set forth by regulations of the commission . . . ." N.M. Stat. Ann. §17-2-41(C)(1) and (2); N.M. Admin. Code § 19.33.6.8(A)(1)(f) (listing the gray wolf as an endangered species). They also describe specific conditions and restrictions that are in place regarding cougar hunting and trapping, including trap specification and inspection and cougar removal, and the requirement that prospective trappers complete a mandatory cougar identification course. Trapping limits exist in each of the nineteen cougar management zones established by the State Defendants, and trapping is only permitted on certain lands for only six months of the year (November 1 to March 31); it is *not* authorized on federal lands or on lands owned by New Mexico but not designated as

8

state trust lands. Thus, State Defendants argue that they cannot be held liable for actions by trappers.

However, there is relevant law (although not precedential) that says otherwise. To start with, the cases discussed earlier in this discussion are all against government actors and agencies, and there is nothing in those cases—including *Strahan*—suggesting that these defendants cannot be sued for alleged ESA violations, while there is clear instruction to the contrary. In *Holsten,* for example, the court held that a state licensing scheme can in fact be a proximate cause of a taking in violation of the ESA, citing not only to *Strahan* but also to other courts which also found that a state's authorizing regulations can cause a taking violation of the ESA when causation and foreseeability exists, based on the circumstances in that case. 541 F.Supp.2d 1073 (D.Minn. 2008).[4] Even the two Middle District of Florida cases relied on by State Defendants, *Loggerhead Turtles II* and *Florida Panthers,* were lawsuits—albeit unsuccessful—brought against the county.

State Defendants rely on New Mexico's prohibition on the take of Mexican wolves to distinguish this case from *Strahan*, where there was no discussion of a state prohibition on the particular endangered species. This argument does not go far. The fact that there was no discussion of whether such a prohibition existed in *Strahan* did not factor into either the court's discussion or conclusion. *Holsten* did include the state's regulatory scheme when considering the "independent intervening actor" theory, and concluded that Minnesota's licensure and trapping regulations was the "stimulus" for the trappers' conduct that resulted in incidental

---

[4] *See Holsten,* 541 F.Supp.2d at 1078 (citing to *Seattle Audubon Society v. Sutherland*, No. 06-1608MJP, 2007 WL 1577756 at *2 (W.D.Wash. May 30, 2007) (by regulating logging on private lands, the State has injected itself into a position in which it may be the proximate cause of an ESA take); *Pacific Rivers Council v. Oregon Forest Indus. Council*, No. 02-243-BR, 2002 WL 32356431 at *11 (D.Or. Dec. 23, 2002) (finding that state forester's authorization of logging operations that are likely to result in a take is itself a cause of a take);*Defs. of Wildlife v. Adm'r, E.P.A*., 882 F.2d 1294 (8th Cir. 1989) (holding that government agencies cause a taking under ESA if such agency authorizes activities that result in said taking in case where continued registration of the strychnine pesticides effected a "taking" of endangered species).

9

takings. 541 F.Supp.2d at 1079. The *Holsten* court went a step further and observed that trappers were "not even required to read the state agency handbook on hunting and trapping, and that the agency had not enacted regulations to assistance in the avoidance of lynx but rather had "simply issued *recommendations*." 541 F.Supp.2d at 1080 (emphasis in original). As a result, the state could not shield itself from liability based on "discretionary, unenforceable recommendation" included in a handbook that trappers were not required to read. *Id.* While *Holsten* can be distinguished from the instant case based on the New Mexico's prohibition on the take of Mexican wolves, a detailed examination of the issue in *Holsten* was possible because the record before the court there was based on the parties' cross-motions for summary judgment. In contrast, the record thus far in this case is based on the pleadings.

Plaintiffs cite to two cases where the state was found to have violated the ESA even though state prohibitions existed. In *Center for Biological Diversity v. Otter*, the District of Idaho held that the state agency violated the ESA by authorizing trapping in the habitat of threatened Canada lynx, notwithstanding the fact that the state *did* list the lynx as a threatened species under state law. 2016 WL 233193 (D.Idaho Jan. 8, 2016). The court found that the conduct of licensed trappers resulting in the taking of lynx was not an independent intervening cause that breaks the chain of causation between the state and the incidental takings of lnyx. In the other case, *Red Wolf Coalition v. North Carolina Wildlife Resources Comm'n,* the Eastern District of North Carolina granted plaintiffs an injunction against the North Carolina Wildlife Resources Commission, et al. ("NCWRC"). 2014 WL 1922234 (E.D.N.C. 2014). Here again, a state prohibition was in place: shooting a red wolf was otherwise illegal under North Carolina statutes, yet the court found that defendants violated §9 of the ESA by authorizing nighttime

10

hunting of coyotes which resulted in an increased risk of incidental killing of members of an experimental population of red wolves.

In short, the mere existence of a state prohibition on the take of endangered species does not appear to have much impact on whether state actors can be held liable for ESA violations. Evidence of regulations and policies may indeed turn out to be relevant in the final analysis and on a more complete record, but what is before the Court is a pleadings-based attack. *See Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 810 F.3d 1161, 1171 (10th Cir. 2016) (Rule 12(c) motions are decided "under the same standard of review applicable to a Rule 12(b)(6) motion to dismiss"); *Barany-Snyder v. Weiner,* 539 F.3d 327, 332 (6th Cir. 2008) (in a 12(c) analysis, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account" although the court's determination rests primarily upon the allegations of the complaint.

In trying to stave off liability at this stage, State Defendants approach the issue from yet another angle, arguing that state governments may not be commandeered into enforcing federal prohibitions—but this argument falls flat since New Mexico already prohibits the take of Mexican wolves.[5] State Defendants also claim that *Strahan* is an outlier, based on a footnote in *Aransas Project* which references other appellate opinions maintaining that state governments may not be required to enforce federal prohibitions. *See Aransas Project*, 775 F.3d at 656, n.9. However, none of those cited cases in footnote 9 are relevant because none of them involve an alleged violation of the ESA, which authorizes citizen suits to enjoin acts in violation of the ESA. *See Strahan,* 127 F.3d at 170 (rejecting defendants' separation of powers challenge based

---

[5] State Defendants claim that *Strahan* is an outlier, based on a footnote in *Aransas Project* which references other appellate opinions maintaining that state governments may not be required to enforce federal prohibitions. *See Aransas Project,* 775 F.3d at 656, n.9. However, none of those cited cases in footnote 9 involve an alleged violation of the ESA, which authorizes citizen suits to enjoin acts in violation of the ESA.

on Tenth Amendment and finding that situation at bar fell "squarely within the permissible balance of federal and state authority. . . ." ); *see also Holsten,* 541 F. Supp. 2d at 1081) (rejecting defendant's Tenth Amendment argument that "nothing in ESA indicates that Congress intended to impose a duty upon the states to take specific actions to assure that third parties do not take a listed species) (citing *Strahan,* 127 F.3d at 167-170 and finding reasoning therein to be "directly applicable").

As a final thrust, State Defendants cite to a Tenth Circuit case for the same proposition: that Congress lacks the power to compel states to commandeer state governments to enforce federal prohibitions. *See The Wilderness Soc'y v. Kane Cnty., Utah*, 581 F.3d 1198, 1237 (10th Cir. 2009), *on reh'g en banc sub nom. The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162 (10th Cir. 2011). However, this case does not help State Defendants either, because the *Kane Cty* plaintiffs were not suing under the ESA or any other federal statutory right, and the issue addressed in that case was *standing,* not whether the state could be commandeered to enforce a federal right.

## CONCLUSION

In sum, the Court finds and concludes that a state licensing scheme can be a proximate cause of a taking in violation of the ESA. However, whether the Cougar Rule in this case has in fact authorized and encouraged the illegal harm and taking of Mexican wolves—or whether the trappers are independent intervening actors whose conduct breaks the chain of causation or renders it too remote to impute liability on State Defendants—is a matter to be determined on a more complete record.

Based on the pleadings, and pursuant to the standard under Fed.R.Civ.P. 12(c), Plaintiffs have sufficiently alleged that the regulations that authorize cougar trapping by state-licensed

trappers increase the risk of harm to Mexican wolves.  State Defendants Motion for Judgment on the Pleadings is therefore denied for the reasons described in this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE