# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

HUMANE SOCIETY OF THE UNITED STATES,
ANIMAL PROTECTION OF NEW MEXICO,
JEAN OSSORIO, and PETER OSSORIO,

        Plaintiffs,

        v.                                   No. 16-cv-0724 WJ/SMV

PAUL M. KIENZLE, III; WILLIAM MONTOYA;
ROBERT ESPINOZA, SR.; RALPH RAMOS;
BOB RICKLEFS; ELIZABETH ATKINSON RYAN;
THOMAS SALOPEK; and ALEXANDRA
SANDOVAL;

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## and
## DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon the following motions following oral argument:

Defendants' Motion for Summary Judgment, filed October 27, 2017 **(Doc. 79);**
and
Plaintiffs' Motion for Summary Judgment, filed December 8, 2017 **(Doc. 88)**.

Having reviewed and considered the parties' cross-motions and the applicable law, the Court is denying Plaintiffs' motion and granting Defendants' motion.

## BACKGROUND

The relevant entities in this lawsuit are:

*Plaintiffs:*               Humane Society of the United States
                         Animal Protection of New Mexico
                         Jean Ossorio

Peter Ossorio

| | |
|---|---|
| *Defendants:* | Individual Commissioners of the New Mexico State Game Commission; |
| *New Mexico State Game Commission:* | "Commission" |
| *New Mexico Department Of Game and Fish* | "Department" |
| *United States Fish And Wildlife* | "FWS" |

Plaintiffs in this case allege that the Defendants, who are the Commissioners of the New Mexico State Game Commission, have adopted regulations that authorize trapping of cougars and that by so doing, will cause "take" of Mexican gray wolves in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§1531-1544 ("ESA"), in particular, §9 and §10(j), and its relevant federal regulations. Plaintiffs seek a Court order enjoining the state trapping regulations.[1]

The New Mexico Department of Game and Fish ("Department) reviews and proposes updates to hunting and trapping regulations, including those that apply to trapping of cougars. The New Mexico State Game Commission ("Commission") has ultimate authority to adopt such hunting and trapping regulations. N.M.A.C. § 19.31.11.3.   In 2016, Defendants authorized recreational trapping and snaring for cougars on state trust land and private deeded lands throughout the state, making New Mexico the only state that authorizes the recreational trapping and snaring of cougars.   (Hereinafter, the rules and regulations relating to the trapping and

---

[1] 16 U.S.C. §1538 is the enforcement provision of the ESA and § 1539(j), which describes experimental populations, are frequently referred to simply as "Section 9" and "Section 10(j)" of the ESA, respectively. See Doc. 28 at 3, n.2.  The Court previously dismissed Count III of the complaint which alleged illegal take of jaguar on the basis of lack of standing. *See* Doc. 28 at 28-29.

snaring of cougars will be referred to as the "Cougar Rule").  Plaintiffs allege the adoption of the Cougar Rule threatens Mexican wolves and that it will cause cougar trappers to trap and snare Mexican wolves without due care because it is impossible to modify cougar traps to avoid harming wolves.  Plaintiffs contend that because the state has licensed the trapping activity, it is liable for the conduct of the trappers.

Parties anticipate that this case can be resolved at the summary judgment stage, based on their cross-motions.   Doc. 108, ¶2.  Both sides have presented voluminous amounts of material as evidence, including numerous Declarations by individuals who have not been designated as experts, according to the parties' own representations.   Doc. 108, ¶6.  The Court considers all of these statements and weighs them as opinion testimony based solely on the personal experience of these individuals. *See* Fed.R.Evid. 701.

## I.     Relevant Law

### A.     The Endangered Species Act

Congress enacted the ESA in 1973 to "provide for the conservation, protection, restoration, and propagation of species of fish, wildlife, and plants facing extinction." *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) ("*Wyo. Farm Bureau*") (quoting S. Rep. No. 93-307, at 1 (1973), reprinted in 1982 U.S.C.C.A.N. 2989). The ESA provides various levels of protection depending upon how a species is classified. The three ESA classifications are: (1) endangered, (2) threatened, and (3) experimental populations. *See* 16 U.S.C. §§ 1538(a), 1539(j). "Endangered" species are entitled to the highest level of protection. *See Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 97-98 (D. Me. 2008) (internal citation omitted).

When a species is listed as endangered, ESA § 9(a)(1)(B) prohibits all take of the species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19The ESA does not expressly prohibit take of threatened species although it allows the United States Fish and Wildlife Service ("FWS") to promulgate protective regulations for threatened species. *Id.* 16 U.S.C. § 1533(d). Plaintiffs emphasize the broad scope of activities included in the ESA's definition of "take," arguing that even if no wolf has been caught in traps set for cougars, Defendants' conduct still constitutes a take because it is an "attempt" at a "take." However, an "attempt to take" implies an intent that is directed at wolves and would not include those instances where wolves may be caught in traps that were meant for cougars. There is no evidence in this case of any specific intent to trap Mexican wolves, and so the Court finds the use of "attempt" inapplicable.

The FWS has promulgated a rule applying the ESA § 9 take prohibition to all threatened species, subject to certain exceptions. 50 C.F.R. §§ 17.31, 17.40–17.48. Experimental populations authorized for release under ESA section 10(j) are "treated as if . . . listed as a threatened species for purposes of establishing protective regulations under section 4(d). . . ." 50 C.F.R. § 17.82; *see also* 16 U.S.C. § 1539(j).

The designation of an animal is pertinent to any analysis where the Department is being challenged on its regulations and policies relative to the ESA. Special rules have been promulgated relating to experimental populations, such as the Mexican wolf population, which provide an exception to §9's take prohibition under the ESA. One of these rules is 50 CFR §17.84(k) which addresses "unavoidable and unintentional take." The regulation states that a violation of the ESA does not occur when take is incidental to a legal activity and is not a result

of negligent conduct lacking reasonable due care, and when due care was exercised to avoid the taking. In a fairly recent unpublished District of New Mexico case, the court contrasted the taking of an animal under the special rules applied to experimental populations, with taking of an animal on the endangered species list:

> Under the special rules applied to experimental populations, the taking of a wolf with a trap or other type of capture device within occupied wolf range would not be considered unavoidable, accidental, or unintentional, but no violation occurs if "due care was exercised to avoid taking a wolf." *Id.* Thus, a trapper engaged in lawful trapping of furbearer animals, who was careful and sought to avoid capturing a wolf, would not violate the law. In contrast, under the § 9 prohibition on taking, it matters not if a trapper exercised due care to avoid taking a listed animal. Any taking of a listed animal under § 9 is a violation of law, and indeed, ESA § 9 does not contemplate any type of trapping of a threatened or endangered species that is not an experimental population.

*WildEarth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 6019306, at *21 (D.N.M. Dec. 3, 2012), *as amended* (Dec. 4, 2012). Thus, the designation of the Mexican gray wolf is not altogether irrelevant when considering measures taken by the Department in trying to minimize risk of injury to wolves when enacting the Cougar Rule.

The FWS promulgated a rule relating to the experimental population of the Mexican gray wolf in 1998, designating the population as "nonessential" under the ESA. 50 C.F.R. § 17.84(k). The rule was amended in 2015 to modify the geographic boundaries in which Mexican gray wolves are managed, to modify certain other provisions to facilitate management activities, and to revise the "due care" criteria to "allow for trapping to occur in a way that reduces harm to Mexican wolves." Revision to the Regulations for the Nonessential Experimental Population of the Mexican gray wolf, 80 Fed. Reg. 2512, 2534, 2548 (Jan. 16, 2015) ("10(j) Rule").

B.      The Cougar Rule

Under the Cougar Rule, hunters who possess both a valid cougar license and a valid furbearer license may use traps or foot snares to harvest cougars on state trust land, or private deeded land with written permission from the landowner. N.M. Admin. Code § 19.31.11.10(O).

Hunters must comply with the "regulations on methods, trap specification, trap inspection, and cougar removal as defined in 19.32.2.10 NMAC (Manner and Method of Taking Furbearers), and 19.32.2.11 NMAC (Trap Inspection and Furbearer Removal"). *Id*. These provisions include limitations on the size and type of traps. *See, e.g.,* N.M. Admin. Code § 19.32.2.10.B(2). Further, it is unlawful to hunt cougars without completing a mandatory cougar identification course. N.M. Admin. Code § 19.31.11.9(G). The extent to which cougar trapping in New Mexico is authorized is limited in a number of other respects. For example, trapping is only permitted on certain lands, N.M. Admin. Code § 19.31.11.10(O)-(P), and where trapping is authorized, the season is limited from November 1 through March 31, or until the total mortality limit, or female sub-limit, is met, whichever comes first. N.M. Admin. Code § 19.31.11.12(B).

The Complaint asserts three claims, with Counts One and Two alleging claims for relief for illegal take of Mexican wolves and Count III for illegal take of jaguar. Count III was dismissed by the Court on standing grounds, Doc. 28 at 28-29, and so the only remaining claims for relief are Counts I and II which allege take of Mexican wolves. Plaintiffs seek declaratory and injunctive relief to bar Defendants from implementing those parts of the Cougar Rule that authorize cougar trapping or snaring, and specifically preventing the Department from authorizing the opening of a cougar trapping and snaring season. The Court recently denied Defendants' motion to dismiss under Fed.R.Civ.P.12(c) and found that Plaintiffs had sufficiently alleged that the regulations that authorize cougar trapping by state-licensed trappers increase the risk of harm to Mexican wolves. Doc. 86. There is now a more complete record upon which the Court can resolve the issues in this case.

C.     <u>Summary Judgment Standard</u>

Both parties have moved for summary judgment. A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co*., 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

The fact that both parties have moved for summary judgment does not permit the entry of a summary judgment if disputes remain as to material facts. *See Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir.1979). Cross-motions for summary judgments, however, do authorize a court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties. *See Harrison W. Corp. v. Gulf Oil Co.,* 662 F.2d 690, 692 (10th Cir.1981) (citations omitted).

## II.    Facts[2]

The Mexican Gray Wolf Experimental Population Area ("MWEPA") includes the area south of Interstate 40 in New Mexico and establishes special protections for Mexican wolves in that area. 80 Fed. Reg. 2,512 (Jan. 16, 2015); 50 C.F.R. § 17.84(k). Within the MWEPA, federal

---

[2] The facts set forth here are supported by evidence presented by the parties in their briefs and because of the large number of exhibits, the Court avoids specific reference to exhibits except where helpful or necessary. Also, the Court presents the facts here according their context rather than according to each party's statement of facts.

law prohibits "[t]aking a Mexican gray wolf with a trap, snare, or other type of capture device . . . unless due care was exercised to avoid injury or death to a wolf." *Id.* §17.84(k)(5)(iii) (emphases added). Mexican wolves *outside* the MWEPA are treated as endangered species, meaning that the take of a wolf through trapping or snaring is per se unlawful. *Id.* §§ 17.11, 17.21.

According to FWS, Mexican wolves currently occupy an area identified in the "Mexican gray wolf Occupied Range Map," which is updated biweekly based on the location of radio-collared Mexican wolves. In other words, much of the land open to cougar trapping overlaps with the MWEPA, and much of the land classified by the Defendants as prime cougar habitat within New Mexico also lies in key Mexican gray wolf habitat all within the MWEPA. *See* Arrivo Decl. (Doc. 97) & att. Exs. B & P (under seal) (maps showing occupied Mexican wolf range).

The Cougar Rule allows trapping and snaring within the MWEPA and the known current range of Mexican wolves in New Mexico. Individuals with a Cougar License and Trapping Permit may set an unlimited number of traps and snares for cougars.

The Department's "Cougar Density Model" from 2010 represents Defendants' official estimate of the location and abundance of cougars in the state. Arrivo Dec, Ex. C (Department Cougar Zone Map and Habitat Model).[3] The Cougar Rule relied on this model to develop recreational hunting and trapping harvest limits or "quotas," such that areas of higher estimated density correspond to higher quotas. Arrivo Dec. (Doc. 97), Ex. D (Department Cougar Population and Harvest Management Matrix).

---

[3] Nicholas Arrivo is an attorney admitted to practice in California and represents The Humane Society pro hac vice in this action. His declaration statements serve to authenticate certain documents, including FWS documents obtained in discovery. Doc. 97.

The Cougar Rule has now been in effect for two full trapping seasons, from November 1, 2016 to March 31, 2017. Goldstein Decl., (Doc. 79-1), ¶ 4; Goldstein Decl. (Doc. 111), Reply, ¶¶4 & 5.[4] There are records of Mexican wolves being caught in traps, but there is not a single record evidencing that a Mexican gray wolf has ever been caught in a trap set for cougars. Ngo Decl. & Exs. A-R; Pachelli Decl. (Docs. 79-3 and 79-22); Goldstein Decl. (Doc. 111), Reply, ¶¶4 & 5). Plaintiffs admit that they are "unaware of any instance" in which a Mexican gray wolf has been caught in "a trap or snare set for cougars" either inside or outside the MWEPA after the Cougar Rule went into effect. Plaintiffs minimize this statement by noting that in the 2016-17 cougar trapping season, only four cougar trappings were reported. Ngo Declaration (Doc. 79-3). Exs. A-D. In a number of instances, the records of Mexican wolves being caught in traps specify the species that was targeted by the trapper, and in every instance where records specify the species that was targeted by a trapper who caught a Mexican gray wolf, the species targeted was not a cougar. Ngo Declaration (Doc. 79-3) Exs. F-K; *see also* Pachelli Declaration, ¶ 6.

The Department has supplied staff time and contracted with persons to trap cougars in order to protect and manage bighorn sheep (Ovis canadensis) populations. This program is referred to as the "Bighorn Sheep Restoration Program." Pursuant to direction from the Department, contractors hired for the course of the program have set traps for cougars on more than 60,000 trap nights (defined as the number of traps set multiplied by the number of nights during which they were set) for 420,000 hours over the past 15 years, from July 2002 to June 2017. These individuals have trapped 156 cougars, but they have never caught a Mexican gray wolf. Declaration of Elise Goldstein ("Goldstein Declaration"), ¶ 5.

---

[4] Elise Goldstein is the Assistant Chief of the Wildlife Management Division for the Department, and a custodian of records for the purposes of authenticating the records obtained from the agency. Ms. Goldstein filed an initial Declaration (Doc. 79-1) and a supplemental Declaration (Doc. 99-2). After briefing was completed she filed an additional supplemental declaration providing an update on statistics concerning the Cougar Rule. Doc. 111.

The Department has applied for and received federal grants to perform big game surveys, inventories, and management, including the Department's cougar trapping program. Pursuant to section 7 of the ESA, the FWS has evaluated whether the cougar trapping program will adversely affect Mexican wolves. It has concluded that the Department's cougar trapping program is not likely to adversely affect Mexican wolves. Deft's Fact 3; Goldstein Declaration (Doc. 79-1), ¶ 6; Ex. A.; *see also* WS and National Marine Fisheries Service, Consultation Handbook (1998) at 3-12, Doc. 79-2 at 5; (explaining that an action that "is not likely to adversely affect" a species means that "effects on listed species are expected to be discountable, or insignificant, or completely beneficial").[5] Plaintiffs do not dispute the fact that the FWS came to the "not likely to adversely affect" conclusion, but nevertheless object to it because it purportedly pertains to professional cougar removal outside of the MWEPA and because it is not based on an independent FWS analysis of the Cougar Rule. Plaintiffs may not like the conclusions made by the Department regarding the Bighorn Sheep Restoration Program, but their objections do not create a material issue of fact about this program.[6]

In Fact 5, Plaintiffs claim that under the Cougar Rule, the same rules that apply to the types of traps permitted for the trapping of other furbearers also apply to the setting of traps or snares for cougars within the MWEPA or currently occupied Mexican gray wolf range. They contend that these rules allow trappers to use laminated leghold traps with an inside jaw spread of up to seven inches, and nonlaminated leghold traps of *any* jaw spread, for trapping cougars. N.M. Admin. Code § 19.32.2.10. Pltffs' Fact 5. Plaintiffs' Fact 8 states that Mexican wolves

---

[5] Defendants' Fact 3 does not list the "Consultation Handbook" as an exhibit. However, Plaintiffs do not dispute the definition of "not likely to adversely affect." However, by resorting to online research, the Court has confirmed the accuracy of that definition.

[6] There is some doublespeak occurring here on the part of Plaintiffs with respect to the significance of Mexican wolf presence inside and outside the MWEPA, which the Court will address later.

caught in leghold traps or snares of the size authorized by the Cougar Rule may suffer injury or death. Arrivo Dec., Exs. G, H & K; Niemeyer Dec., ¶¶ 29-39; Hopkins Dec., ¶ 30.[7]

Defendants dispute Plaintiffs' Fact 5 and 8 because under the New Mexico Administrative Code, all traps which have an outside jaw spread greater than seven (7) inches (including possible lamination) are not legal in New Mexico. NMAC §19.32.2.10. If the inside jaw spread is greater than five and on-half (5.5) inches, the trap jaws must be offset and padded. *Id.,* Griego Decl., Doc. 99-1, ¶¶4-8.[8] The actual language of the regulation states:

> No foot-hold trap with an outside spread larger than 7 inches if laminated above the jaw surfaces or tooth-jawed traps, shall be used in making a land set. All foot-hold traps with an inside jaw spread equal to or greater than 5.5 inches shall be offset unless they have padded jaws.

NMAC §§19.32.2.10(B)(2). Plaintiffs claim that the provision, by its express language, prohibits the use only of *laminated* traps with jaw spreads larger than seven inches and by default allows the use of *nonlaminated* traps that are over seven inches of jaw spread. *See* Niemeyer Decl., ¶15; Arrivo Decl., Exs. L & O (traps available for purchase generally).[9] Based solely on his own review of the regulation, and without any other evidentiary support, Mr. Niemeyer stated that traps with jaw spreads that exceed 7 inches may be used for trapping cougars, and that these traps would meet the New Mexico trapping regulation requirements "because their jaws are not laminated." Doc. 89, ¶15. At the hearing, the Court questioned the basis for Plaintiffs' reading of the rule because it just did not make sense to prohibit the use of smaller laminated traps while allowing larger nonlaminated ones. In his Declaration, Mr. Griego stated:

---

[7] Rick Hopkins is a wildlife ecologist and researcher focusing on endangered wildlife species. He holds a Ph.D. in Wildlands Resource Science, and holds degrees in biology and wildlife zoology. Doc. 94.

[8] Robert Griego is Colonel of Field Operations Division for the Department. His duties have made him very familiar with trapping and the laws governing trapping in New Mexico, and he has inspected hundreds of traps for compliance across the areas of New Mexico to which he is assigned.

[9] Carter Niemeyer is a "lifetime hunter and trapper" who has worked for 26 years for Wildlife Services in Montana as district supervisor, trapper and Western wolf management specialist. Doc. 89.

> The intent of the rule, as well as how it has historically been enforced, is that even if one or both of the jaws are laminated, the outside jaw spread cannot exceed seven (7) inches. If the inside jaw spread is greater than five and one-half (5.5) inches, the trap jaws shall be offset or padded. The maximum outside jaw spread size of seven (7) inches includes any possible lamination. Therefore, all traps which have an outside jaw spread greater than seven (7) inches are not legal in New Mexico.

Griego Decl., ¶¶6-7 (citing N.M. Admin. Code §§ 19.32.2.10(B)(2)). The Court clarified this issue at the hearing, where defense counsel explained that laminated traps were "more humane," and meant to trap rather than kill, but the rule ensures that the thickness of the lamination is taken into account and included in the total size of the jaw so that larger traps are not used simply by disregarding the width of the lamination. Based on the Court's reading of this administrative code provision and the other evidence on this point presented at the hearing, the Court is convinced that Plaintiffs' gloss of the provision is incorrect and that Defendants' reading of the rule is more in line with the purpose behind the administrative code. The only reasonable interpretation of the provision is that the New Mexico Administrative Code (and by extension, the Cougar Rule) does not allow use of foot-hold traps that are larger than 7 inches in diameter, taking into account the thickness of lamination. The Court therefore considers Plaintiffs' Facts 5 and 8 to be disputed as well as unsupported by evidence.

## DISCUSSION

Defendants contend that Plaintiffs can neither establish standing nor succeed on the merits because since the Cougar Rule took effect, there is no evidence that a single Mexican gray wolf has been caught in a trap set for cougars. Further, since the Cougar Rule took effect, there are only two instances of a Mexican gray wolf being caught in any trap and in both instances, the traps were set for coyotes. Defendants also point out that even prior to the effective date of the Cougar Rule, there is no record of a Mexican gray wolf *ever* being caught in a trap set for cougars. Plaintiffs respond that a one-year season provides insufficient statistical evidence that wolves will not be caught in cougar traps; and

that because there is no way to modify these traps to minimize or avoid capturing wolves, Mexican gray wolves will be harmed by the Cougar Rule.

## I.     Standing (Injury-In-Fact)

Defendants contend that Plaintiffs have failed to establish injury-in-fact as part of the requirements for standing.  For standing purposes, a plaintiff must meet three elements.  First, the plaintiff must have suffered an "injury-in-fact" that is both: (a) "concrete and particularized"; and (b) "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Second, the plaintiff must establish a "causal connection" between the injury and the defendant's acts.  Third, the injury must be "likely to be redressed by a favorable decision." *Id.*. A failure to meet any one of these three criteria constitutes a lack of Article III standing and requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See League of United Latin Am. Citizens, N.M. (LULAC) v. Ferrera*, 792 F. Supp. 2d 1222, 1229 (D.N.M. 2011).

Defendants argue that Plaintiffs fail to show evidence of injury-in-fact.  They contend that at this summary judgment juncture, Plaintiffs offer only bare assertions of perceived injury to Mexican wolves which are insufficient to confer standing.  *See Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1128 (D.N.M. 2011) (no standing where plaintiffs' allegations were conjectural and hypothetical and where plaintiffs offered only inadmissible non-expert opinions as a basis for their standing in case). Defendants rely on the lack of any evidence that Mexican wolves have been trapped in traps intended for cougars either within or outside of the MWEPA.

The Court has addressed the standing issue once before in the context of Defendants' motion to dismiss, and finds it unnecessary to do so again.  Doc. 28 at 20 (finding that Plaintiffs had "adequately

pled that imminent harm to the wolves . . . is "fairly traceable" to Defendants' actions").[10]   It is true

that something more is expected in a summary judgment context in that Plaintiffs must now present

sufficient *evidence*—not just allegations—in order to survive the standing inquiry.  *See Utah Ass'n of*

*Ctys. v. Bush*, 455 F.3d 1094, 1100 (10th Cir. 2006) (plaintiff must "set forth" by affidavit or other

evidence "specific facts," which for purposes of the summary judgment motion will be taken to be

true") (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)); *Comm. to Save the Rio Hondo*

*v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996) ("*Rio Hondo*") (at the summary judgment stage, injury in

fact requires "a factual showing of perceptible harm" (citing *Defenders of Wildlife,* 504 U.S. at 566).

However, as it turns out, the standard for showing an injury-in-fact for a standing analysis mirrors the

inquiry used later on the merits question when determining whether Plaintiffs have shown the existence

of the "harm" required for injunctive relief.  The Court sees no need to do the same thing twice, and

will not venture further into the standing question because (1) it has already been determined favorably

to Plaintiffs and (2) the Court will take up the issue of whether injury or harm occurred when

discussing the causation issue within the merits analysis.

## II.     Liability of State Agencies

In their cross-motion for summary judgment, Plaintiffs argue that state agencies are liable for

authorizing and permitting conduct that is likely to cause take of endangered species.  *See* Doc. 88 at 7.

The  Court has already passed on this issue, concluding that "a state licensing scheme can be a

proximate cause of a taking in violation of the ESA." Doc. 86 at 12 (Mem. Opin. & Order on Defts'

Judgment on Pleadings).  The Court need not make further findings on the issue.

## III.    Standard for Showing of Harm: "Actual" or "Reasonably Certain"?

Injunctive relief is available for a violation Section 9 of ESA. *Defenders of Wildlife,* 882 F.2d

1294, 1301 (8th Cir. 2015); *Strahan v. Coxe,* 127 F.3d 155, 166 (1st Cir. 1997); 16 U.S.C. §

---

[10] United States Magistrate Judge Lourdes A. Martinez ruled on that motion by consent of the parties.

1540(g)(1).  However, parties disagree on the appropriate standard for an injunction to ensue. Defendants insist that in order to obtain injunctive relief, Plaintiffs must show that actual harm to Mexican wolves has *already* occurred in violation of §9 and the 10(j) Rule; but Plaintiffs claim that harm need not have actually occurred and the correct standard is whether the authorization of cougar trapping under the Cougar Rule causes "a reasonable likelihood of actual future harm" to the Mexican gray wolf.  Based on an analysis of the available case law, the Court finds that Plaintiffs are correct on the standard to be used.

The starting point is the complaint, which alleges a violation of ESA Section 9.  ¶¶98-110. Plaintiffs specifically allege that Defendants will cause the unlawful take of Mexican wolves to be committed by authorizing cougar trapping and snaring within the MWEPA through the Cougar Rule and subsequent licensing and implementation, in violation of the Revised 10(j) Rule and Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(G), (g).  Compl., ¶104.  The term "take" is defined in Section 3(19) of the ESA to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The statute does not further define any of the terms found in this definition, but through regulation the FWS has further defined the terms "harass" and "harm." "Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such acts may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.   50 C.F.R. § 17.3.   The FWS has defined the term **"harass"** to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3 (1997).[11]

---

[11]  These definitions apply to both sections 7 and 9 of the ESA. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 1999 WL 33722331, at *10 (D. Ariz. Dec. 14, 1999).

Defendants rely on two First Circuit cases: *Am. Bald Eagle v. Bhatti* and *Strahan v. Linnon*, which cites *Bhatti.* Relying on the ESA's definition of a "taking," the court in *Bhatti* concluded that the standard for establishing taking of species under the Act required **showing of actual harm**, rather than any numerical probability of harm:

> Clearly, then, for there to be "harm" under the ESA, there must be actual injury to the listed species. **Accordingly, courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species.** *See Defenders of Wildlife v. Administrators,* 882 F.2d 1294 (8th Cir.1988) (enjoining the EPA from continuing its registration of strychnine after finding that continued registration of the substance resulted in poisonings of protected species); *Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir.1991) (enjoining the United States Forest Service from even-aged lumbering following documentation by scientists of a dramatic decline in active Red Cockaded Woodpecker colonies and findings by the court tracing the decline directly to Service's lumbering practices).

*Bhatti,* 9 F.3d 163, 166 (1st Cir. 1993) (emphasis added). While the plaintiffs in *Bhatti* presented evidence that No. 4 lead *shot* caused harm to bald eagles, there was "no evidence in the record that . . . any eagles . . . actually ingested lead slug" and "no studies showing that the use of lead slugs in deer hunts was scientifically proven to cause harm to bald eagles." 9 F.3d at 168, n.3. The court found that plaintiffs had not shown that hunting deer resulted in any harm to bald eagles.

In *Strahan v. Linnon,* the other First Circuit case cited by Defendants, the court affirmed the denial of injunctive relief to a pro se plaintiff who alleged that the Coast Guard's activities jeopardized the existence of Northern Right whales. The court found it "plain" that the threat of a Coast Guard vessel strike was a "mere possibility" and affirmed summary judgment for federal defendants, citing *Bhatti* in a footnote:

> Under our case law, a risk of harm to endangered species-**even a significant risk of harm—**does not support an injunction under the ESA. *American Bald Eagle v. Bhatti,* 9 F.3d 163, 167 n. 5 (1st Cir.1993). Rather, we have required a showing that the activity, if continued, will actually, as opposed to potentially, cause harm to the species. *Id.* at 166.

187 F.3d 623 (1st Cir. 1998) (*"Linnon"*) (emphasis added).  Defendants would argue that, based on both *Bhatti* and *Linnon,* a plaintiff needs to show that *actual* injury has already occurred to obtain injunctive relief, but the Court finds that reading too broad.  The court's reference to "actual" harm in *Bhatti's*  use of the phrase did not necessarily mean that the harm must have *already* occurred, but rather that the threatened harm must be "actual" and not just "potential." *Bhatti*, 9 F.3d 163 at 166 ("courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species *or* **if continued will actually, as opposed to potentially, cause harm to the species**") (emphasis added).

At the hearing, the parties referred to a Tenth Circuit case, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096 (10th Cir. 2010).  Defendants argue that the *Silvery Minnow* case indicates that the Tenth Circuit requires evidence of past or present injury is required to sustain a violation under §9 of the ESA, but the Court does not read the case to support this position.  The *Silvery Minnow* case says only that "a plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured [by the defendant] in the future."  Id. at 1112.  The court in that case did not answer the specific question of whether "actual past injury" or "a reasonable certainty of future injury" is sufficient for injunctive relief.  Defendants also mention cases which contain factual scenarios where harm had actually occurred prior to the request for injunctive relief, but because there was no discussion in those cases about whether such past harm was a requirement for injunctive relief, the Court does not find those cases helpful.

Plaintiffs offer their own cases which purportedly require only a reasonable likelihood of actual future harm.   In some of these cases, however, actual harm had already occurred somewhere in the past, for example:

- *Animal Prot. Inst. v. Holsten,* 541 F.Supp.2d 1073, 1081 (D.Minn. 2008) ("While it is true that no takings were reported for the winter of 2006, and no data has been received concerning this past winter, the Court is not persuaded that the risk of incidental takings of lynx has disappeared." The fact is that takings had in fact been reported in previous years, thus sufficiently showing that the alleged activity, if continued would actually (not potentially) cause harm to the species.

- *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla*., 896 F. Supp. 1170, 1180 (M.D. Fla. 1995). Plaintiffs sued the county alleging that the county's permitting beach driving "results in and will continue to result in the death and injury of sea turtles [hatchlings]" and that the county's beachfront lighting ordinance was ineffective in minimizing that harm. Here again though, past "actual" harm had already occurred, thus almost guaranteeing that vehicles on the county's beaches "will likely continue to destroy emergent and pre-emergent sea turtle hatchlings." 896 F.Supp. at 1181. There was also sufficient evidence before the court that efforts by volunteers to discover the sea turtle nests were not very effective so that drivers on the county's beaches may be running over nests without any awareness of what they are doing. *Id*. at 1175, n.3.

These cases are less analogous to the instant case where it is undisputed that no Mexican wolf has yet been reported as caught in traps that have been set for cougars. Other cases cited by Plaintiffs, however, support their position that harm need not actually have occurred in order to obtain injunctive relief, for example:

- *Marbled Murrelet v. Babbit,* 83 F.3d 1060 (9th Cir. 1996). Here, the court Expressly rejected the argument that no injunction may issue until the death or injury of a protected species has actually occurred—effectively undermining Defendants' position in the case at bar. 85 F.3d at 1066 (courts enjoin "activities that are reasonably certain to harm a protected species"). In *Marbled Murrelet,* the court affirmed the district court's conclusion that there was a reasonable certainty of imminent harm to marbled murrelets from an intended logging operation because they were nesting in that area. The court also made the important distinction that while harm must be shown by actual evidence to establish a "taking" under the ESA, actual evidence was not necessary for an injunction to ensue. *See House v. U.S. Forest Serv., et al*., 974 F.Supp. 1022, 1029 (E.D.Ky. 1997) (citing *Bhatti,* 9 F.3d at 164 and *Marbled Murrelet*, 83 F.3d at 1060).[12]

- *House v. U.S. Forest Service*, 974 F. Supp. 1022, 1029 (E.D. Ky. 1997) (*"House"*) (enjoining a pending timber sale The court found that while "actual" harm is enough to

---

[12] The *Marbled Murrelet* court noted that in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, the United States Supreme Court stated that "harm" under §9 of the ESA occurs only when an animal has actually been killed or injured. 515 U.S. 687, 703 (1995). However, the facts of *Sweet Home* did not require the Supreme Court to address the question of whether a showing of a threat of future harm was sufficient for an injunction, because the issuance of an injunction was not before the court. 83 F.3d at 1064.

demonstrate a taking under the ESA, it is not necessary for an injunction to ensue. The court also distinguished between the actual harm required to constitute a "taking" under the ESA (including the definitions of "harass," "harm," "pursue" and "hunt") and the showing required for issuance of an injunctive. 974 F.Supp. at 1029 ("[I]n order for the Court to issue an injunction, the ESA does not require that the harm to the endangered species have already occurred"). The court concluded that the "objective scientific evidence in the administrative record" supported plaintiffs' position that the timber sale would adversely affect the Indiana bat's foraging habitat, in violation of the ESA.

- *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978). The court in this case enjoined completion of a dam because operation of the dam would either eradicate known population of the snail darter or destroy its critical habitat. 437 U.S. at 184 (snail darter "lives only in that portion of the Little Tennessee River that would be completely inundated by the impoundment of the reservoir created as a consequence of the completion of the dam"). The court made clear that any future harm had to be sufficiently certain to occur, and in the case of the snail darter, would be actual and certain rather than potential. *Id.* at 184, n.30 ("We do not understand how TVA intends to operate Tellico Dam without 'harming' the snail darter.").

- *Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1511-12 (9th Cir. 1994). In this case, the court held that the plaintiff had failed to establish reasonable likelihood of irreparable future injury to grizzly bears from the railroad's possible future grain spills so as to warrant injunctive relief. While harm had occurred at one time, no bears had been hit by trains in the area of the corn spills in more than three years. *Id.* at 1511. The court required future injury to be "sufficiently likely," if not absolutely certain. *See* 23 F.3d at 1511 ("While we do not require that future harm be shown with certainty before an injunction may issue, we do require that a future injury be sufficiently likely").

The last case worth mentioning in this portion of the discussion is *National Wildlife Fed'n v. National Park Serv.,* 669 F.Supp. 384 (D.Wyo.1987) in which the District Court of Wyoming found that the National Park Service's decision to keep a campground open at a reduced level during an environmental review period did not result in a "taking" under the ESA, and denied plaintiffs injunctive relief. Defendant in that case had designed a plan to reduce conflicts between humans and the grizzly bear and the court noted that in the first season of operation under the plan, there were no bear mortalities. The only threat to the bears was created by visitors who chose to disregard the park's rules

and regulations, and so the National Park Service could not be liable for harm that occurred as a result of the visitors' conduct. *See* 669 F.Supp. at 392 (" . . . it is not the campground that presents the greatest threats to the grizzly bear; rather, it is those people who, for whatever reason, blatantly choose to disregard the National Park Service's rules and regulations"). Plaintiffs find the *Nat'l Wildlife* case distinguishable and irrelevant because of the careful measures taken by defendant in that case to protect bears, inferring that Defendants here have not taken the same measures to prevent harm to Mexican wolves in enacting the Cougar Rule. *See* Doc. 88 at 17, n.7. The Court does not necessarily agree with Plaintiffs' comparison of the case with the case at bar, and includes the *Nat'l Wildlife* case in this discussion only to point out that measures taken by defendant to mitigate potential risk to the at-risk species should be considered in the analysis to determine whether an injunction should be granted.

The standard suggested by the parties lie at both extremes, with Defendants urging the Court that actual harm must have occurred in order to obtain injunctive relief, and Plaintiffs claiming that the mere potential for future harm is enough. The correct standard is somewhere in-between. Absolute certainty of harm is not required. *See Animal Welfare Inst. v. Beech Ridge Energy, LLC,* 675 F.Supp.2d 540, 563-64 (D.Md. 2009) ("absolute certainty . . . would frustrate the purpose of the ESA"). However, mere likelihood of injury is insufficient as well. Based on the case law discussed above, the Court finds that the standard to apply when considering the appropriateness of injunctive relief is whether there is a reasonable likelihood or reasonable certainty of actual future harm to the Mexican gray wolf.

In the case before this Court, the "actual harm" present in some of the above cases has not yet occurred. No Mexican wolves were trapped in traps set for cougars for the two trapping seasons that the Cougar Rule has been enacted. Goldstein Decl., ¶4; Goldstein Suppl. Decl., ¶¶4-5.[13] In addition, during the 420,000 hours over the past 15 years of the Bighorn Sheep Restoration Project, from July

---

[13] Four Mexican wolves were caught in traps in New Mexico, but in all four instances, the traps were set for coyotes. Suppl. Goldstein Decl. (Doc 111), ¶5.

2002 to June 2017, government contractors trapped 156 cougars, but they never caught a Mexican gray wolf.  Goldstein Decl. ¶ 5.   Thus, the question is whether the Cougar Rule poses a reasonable likelihood or reasonable certainty of harm to that species and with the standard having been established, the Court now turns to the merits of this case.

## IV.    Merits of the Case

Both parties seek summary judgment on the merits. Defendants' position is that there is no evidence that Mexican gray wolves will be caught in traps set for cougars, since available records indicate that not a single Mexican gray wolf was caught in a trap set for cougars since the Cougar Rule went into effect two years ago. Plaintiffs contend that illegal take of wolves in cougar traps is unavoidable, since the traps are set in areas where Mexican wolves range and these traps will illegally take wolves who step in them.  Plaintiffs describe the injuries resulting from Mexican wolves getting caught in traps:

- Wolves caught in traps or snares may get also deadly capture myopathies. Capture myopathy is an actual disease complex in which a captured animal reacts to its condition. In captured animals, it is a stress reaction to being captured and can often be fatal, sometimes even weeks after the initial incident, from the effects of the myopathy. . .

- Wolves may also engage in painful or even fatal self-mutilation if they are helplessly injured in a trap. A part of a wolf's foot may become numb after some time in a trap, and they will chew off that numb part of their foot, leading to significant additional injuries.

- Dehydration may occur in trapped animals, and one of the most prevalent problems with trapped animals is dangerous rises in temperature that can cause muscle or brain damage as well as death.

- A wolf caught in a snare set for a cougar would likely sustain serious injuries and could die.

Niemeyer Decl., ¶¶30-33.

Because there are hundreds of pages of exhibits as well as considerable overlap in the evidence and arguments, the Court organizes the parties' arguments according to the general categories of evidence relating to the issues, referencing the most salient pieces of evidence in order to avoid cumulative discussion.

A.    Argument #1: Cougar traps/snares are likely to capture Mexican wolves because traps for cougars are larger than formerly used traps for smaller furbearers

Plaintiffs argue that take of Mexican wolves is bound to occur because trappers use the same kind of traps for cougars and because the trapping is occurring in areas where Mexican wolves range.  Plaintiffs also contend that nothing can be done to minimize the risk of injury to Mexican gray wolves. Plaintiffs' evidence includes the following:

- Even though the size and style of traps that would most likely be used for trapping cougars were legal for trappers to use before the Cougar Rule, trappers would have had no reason to use them when trapping smaller furbearers, all of which are significantly smaller than cougars and Mexican wolves.  Niemeyer Decl., ¶17.[14]

- Larger, more powerful traps with jaw spreads that exceed 7 inches may also be used for trapping cougars, such as the McBride traps sold by Livestock Protection Company, which have very powerful nonlaminated traps that have outside jaw spreads of up to 8 inches, which creates an increased potential for harm to trapped animals . . . Niemeyer Decl., ¶15; Arrivo Decl., Exs. L & O (traps available for purchase generally).[15]

- The paw sizes of cougars and Mexican wolves, according to the NMDGF website, are nearly identical: 3.5" wide for the wolf and between 3.5 and 5" wide for the cougar. Hopkins Decl., ¶24;[16]

- A wolf caught in a leghold trap set for a cougar would likely sustain serious injuries and could die. Traps that are commonly used for cougar are powerful enough to cause serious tissue and bone damage to a wolf from the force of the jaws closing. A wolf is also likely

---

[14]   Carter Niemeyer is a lifetime hunter and trapper who has trapped roughly 300 wolves.  He has worked for 26 years for the Montana Wildlife Services as trapper, district supervisor, and Western wolf management specialist.

[15]   Nicholas Arrivo is an attorney admitted to practice in California and represents The Humane Society *pro hac vice* in this action. His declaration statements serve to authenticate certain documents, including U.S. Fish and Wildlife documents obtained in discovery.

[16]   Rick Hopkins is a wildlife ecologist and researcher focusing on endangered wildlife species. He holds a Ph.D. in Wildlands Resource Science, and holds degrees in biology and wildlife zoology.

to be injured during the time it is caught in the trap as it struggles violently to get free and is exposed to the harsh elements without shelter." Niemeyer Dec., ¶28.

- It is extremely difficult to release a wolf caught in a trap in a manner that is safe for the person releasing the animal, or for the wolf. It is not uncommon for trappers to shoot and kill non-target animals caught in traps, rather than risk injury by freeing the animals while they are alive. Hopkins Decl., ¶36.

- Trappers generally use larger and more powerful equipment for trapping cougars than for trapping other furbearing species, and these larger traps are more likely to capture wolves. Traps that are permitted under the Cougar Rule and which trappers will most likely use, could also trap Mexican wolves. Niemeyer Dec., ¶¶15-26.

- Three out of the four management zones which have the highest cougar quotas in the state lie within currently occupied Mexican gray wolf range. Menke Dec. Ex. A (High Risk Map); Hopkins Decl., ¶13.

- Cougar traps are the same size and style as wolf traps. J. Ossorio Dec ¶24;[17]

- Foothold traps and snares permitted for use for trapping cougars under the new Cougar Rule could "just as easily trap Mexican wolves" and foothold traps "cannot be designed in a way to avoid capturing one species or the other." Hopkins Decl., ¶6.

- It would be nearly impossible to modify a trap or snare that is highly selective to cougars and that would make it not just as likely to catch a wolf or other non-targeted species. Hopkins Decl., ¶19.

- When setting leghold traps for cougars in an area where Mexican wolves range, it would be impossible to set them in a way that would avoid capturing Mexican wolves. Any trap sufficiently large and powerful to capture a cougar would therefore present an unavoidable risk of capturing Mexican wolves in the area. Niemeyer Decl. ¶24.

In response to Plaintiffs' arguments above, Defendants present evidence that it is *illegal* in New Mexico to use traps larger than 7 inches. As discussed above in the section setting out the facts of the case, this evidence is based on a reasonable reading of the New Mexico Administrative Code:

- The change in the regulations (allowing cougars to be trapped as an additional means of harvest) did not change the size of traps that were already previously allowed for trapping of certain other forbearers. Griego Decl. (Doc. 99-1), ¶11.

---

[17] Jean Ossorio is a New Mexico resident and a retired elementary school teacher. She is an active hiker and advocate for Mexican gray wolves.

- Pursuant to New Mexico Administrative Code Section 19.32.2.10, traps with an outside jaw spread larger than seven (7) inches are illegal for trapping of furbearers and cougars.

  . . .

- The intent of the rule, as well as how it has historically been enforced, is that even if one or both of the jaws are laminated, the outside jaw spread cannot exceed seven (7) inches. If the inside jaw spread is greater than five and one-half (5.5) inches, the trap jaws shall be offset or padded. N.M. Admin. Code § 19.32.2.10(B)(2). The maximum outside jaw spread size of seven (7) inches includes any possible lamination. Therefore, all traps which have an outside jaw spread greater than seven (7) inches are not legal in New Mexico.

  Griego Decl., ¶¶6-7 (citing N.M. Admin. Code §§ 19.32.2.10(B)(2).

Plaintiffs contend that larger traps for cougars increase the risk of using the same traps for wolves, thus increasing risk of harm to wolves. They also argue that prior to the Cougar Rule, trappers would have had no reason to use the larger traps when hunting smaller furbearers. However, at the hearing, Defendants emphasized that the Cougar Rule did not change the size of traps allowed for cougar hunting. Larger traps (although under 7 inches) were previously allowed for cougar trapping. The Rule opened up certain land areas to cougar trapping, such as state trust land and private deeded land, and this essentially allows recreational trapping of cougars which was not allowed prior to the Cougar Rule.

Plaintiffs cite to studies from FWS documents obtained via a FOIA request ("Freedom of Information Act," 5 U.S.C. § 552) and which catalog prior known incidents where Mexican wolves were accidentally caught in traps set by private parties. *See* N. Arrivo Decl., ¶¶ 12-14. They also refer to the "Logan Study" where two researchers in New Mexico "discovered early on" that standard leghold traps and snares, like the ones that are authorized and most likely will be used by trappers pursuant to the Cougar Rule posed an "unacceptable risk of injury" to the "target cougars and an unacceptable rate of capture of non-target animals." N. Arrivo. Decl., ¶28.

However, Defendants note that where records are available that identify the species targeted by a trapper who trapped a wolf, in all cases they specify that the target species was coyote. Plaintiffs have not offered any evidence challenging the fact that no wolves were caught in traps set for cougars, and this fact remains undisputed. Defendants also note that the traps used in the Logan study were larger than seven inches and thus illegal for licensed trapping in New Mexico—which makes the Logan study immaterial and irrelevant. Finally, Defendants observe that many of the studies cited by Plaintiffs are older studies (see N. Arrivo Decl., ¶8) which were based on hunting practices no longer used, such as the use of "double longspring traps." See Griego Decl. ¶15.

B. <u>Argument #2: Trappers are not required to make any modifications to their traps in order to minimize the risk of injury to Mexican wolves as long as the Cougar Rule is allowed to stand.</u>

Plaintiffs argue that there is nothing that can be done to alleviate the chances of a Mexican wolf getting caught in a trap set for a cougar, as trappers are not required to follow any procedures or make any modifications that would decrease this risk:

- The Cougar Rule does not require trappers of cougar to modify their traps, chains, drags and stakes in a way that would allow a Mexican gray wolf caught in a trap set for a cougar from either breaking the chain or escaping. Ossorio Decl., ¶17.[18]

- The Cougar Rule does not require trappers of cougar to modify their traps, chains, drags, and stakes in any way. Niemeyer Decl., ¶45.

- Nothing requires trappers to modify their traps, chains, drags and stakes in any way; to use traps that provide a reasonable expectation that a Mexican gray wolf will be prevented from either breaking the chain or escaping with the trap on the wolf (Hopkins Decl., ¶16-17) or to use sufficiently small traps which allow a wolf to pull free from the trap or span the jaw spread of the trap if it steps into the trap. Niemeyer Decl., ¶¶45-47.

- One method of trapping is to use attractants (such as baits, lures or scents) to improve success rates when trapping and snaring large carnivores [such as cougars]. Usually this is done by setting several leghold traps or snares in an area around an attractant such as a

---

[18] Peter Ossorio is a wildlife ecologist and researcher whose work has focused on population ecology for endangered species. He holds a Ph.D. in Wildlands Resource Science, His "areas of expertise" include population ecology, mammalogy, predator ecology, survey techniques, wildlife/habitat relationships, conservation biology and threatened and endangered species. Doc. 94, ¶¶1 & 2.

carcass. This practice is legal under New Mexico regulations. Many types of attractants that would attract a cougar would also attract Mexican wolves, further increasing the likelihood that a Mexican gray wolf is captured in a trap or snare set for cougar. Niemeyer Decl., ¶ 27.

- It is extremely difficult to release a wolf caught in a trap in a manner that is safe for the person releasing the animal, or for the wolf. It is not uncommon for trappers to shoot and kill non-target animals caught in traps, rather than risk injury by freeing the animals while they are alive. Hopkins Decl., ¶36.

Defendants rebut Plaintiffs' statements, describing policies and procedures that trappers are required to follow under penalty of law:

- Snares and foot hold traps for cougars can be set to make the probability of capturing a wolf unlikely. For example, the design of the set for cougars will cause wolves and coyotes to avoid the trap, and "pan tension" can be adjusted upward on traps set for cougars, so that smaller animals that weigh less will have trouble setting the trap off if they step on the pan. Griego Decl., ¶10.

- Regarding the "harm" attested to by Plaintiffs (their ability to enjoy viewing wolves, see e.g., P. Ossorio Decl., Doc. 92, ¶9; and J. Ossorio Decl., Doc. 91, ¶26), Defendants note that the majority of wolves were caught in traps set for coyotes and none were caught in traps set for cougars. D's Fact ¶7.

- The practice of using a carcass as an attractant is illegal in New Mexico. Griego Decl., ¶18.

- It is illegal for a person to shoot a wolf caught in a trap. Griego Decl., ¶12. (This is Defendants' response to Hopkins' statement that a hunter would commonly choose to shoot and kill non-target animals caught in traps rather than risk injury to themselves or the animal in the process of trying to release it).[19]

Defendants also present evidence of regulations and policies that, if followed, are in place to minimize or avoid risk of injury to Mexican wolves, and which describe the consequences to trappers who do not follow these regulations and policies. See, e.g., Doc. 97-6 (Resp. to Interrog.):

- "Hunting Rules & Info" handbook, 2017-2018 issued by the Department.[20] Page 127 lists "Recommended techniques to reduce potential injury to Mexican gray wolves"

---

[19] The Court recognizes that even harming or trapping an endangered animal can constitute an ESA violation under ESA regulations, but includes these declaration statements in the interest of thoroughness.

[20] The handbook can be found at www.wildlife.state.nm.us/download/publications/rib/2017/hunting/2017_18-New-Mexico-Hunting-Rules-and-Info.pdf.

including specifications for stakes and chains so a wolf would be unable to pull free (attempts to pull free could injure the wolf), recommendation of laminated, offset or padded jaws on foot-hold traps. The handbook also recommends scouting the area before setting traps, and avoid the area or "use only No. 1.75 or smaller traps." Id. at 127. Plaintiffs presented evidence that wolves are not injured in traps where they cannot pull free and that injury is minimized or avoided where laminated or padded traps are used. *See* Arrivo Decl, Ex. H (Doc. 97-8). Assuming these statements are true, Defendants present evidence here that hunters are indeed required to follow procedures that avoid these risks, presented material factual disputes to Plaintiffs' evidence.[21]

- Plaintiffs contend that there are no consequences to trappers who don't follow these policies and regulations, because they are not legally binding. However, the "Hunting Rules & Info" handbook advises of the penalties for an ESA violation (see p. 127), which is a $50,000 with additional state penalties.

- Due care exception: Trappers can qualify for a "due care" exception to the take prohibition which is described in the "Revision to Regulations to Nonessential Experimental Population of Mexican gray wolf, 80 Fed. Reg., 2512, 2560 (1/16/15) (Doc. 97-6 at 4) and states that "[t]aking a Mexican gray wolf with a trap, snare, or other type of capture device . . . will not be considered unintentional take, unless due care was exercised to avoid injury or death to a wolf." Trappers are otherwise exposed to state and federal criminal and civil penalties (federal penalties for taking a wolf can include a year in jail and a $50,000 fine) unless they have taken "due care."

- These revised regulations also describes and lists what "due care" includes: modifying or using appropriately sizes traps, chains, drags and stakes that provide a reasonable expectation that the wolf will be prevented from either breaking the chain or escaping with the trap on the wolf, or using sufficiently small traps (less than or equal to a Victor 1B2 trap) that "allow a reasonable expectation that the wolf will either immediately pull free from the trap or span the jaw spread when stepping on the trap." 80 Fed.Reg. at 2560.

- State administrative regulations set out restrictions on traps and snares, including size of trap jaws and placement of traps, although these regulations are not necessarily specific to avoid injury to Mexican wolves. See NMAC 19-32.2.10.

This evidence also indicates, without contradiction by Plaintiffs, that if a trapper catches a wolf

in a cougar trap and has failed to follow the above recommendations, that the trapper would be exposed

---

[21] *See* Doc. 97-8 at 2 (2011 Geological Survey Report for Evaluating Trapping Techniques to Reduce Potential for Injury to Mexican Wolves," referenced in the Arvizo Decl., Doc. 97, ¶9 (". . . most of the uninjured wolves were caught in traps in which the anchoring mechanism remained secure." The report also stated that:

> There were some definite differences in the level of risk presented to Mexican wolves by trapping devices legal for use in New Mexico. Unpadded, smooth-jawed steel traps, even if laminated or offset, generally presented the highest potential for injury to all species targeted in the studies."

to penalties of an intentional take under the ESA. Defendants' evidence here pointedly controverts Plaintiffs' statements that trappers are not required to take any measures to minimize or avoid the risk of injury to Mexican wolves and that no measures can be taken to set traps in a way that would be highly selective to cougars but not as likely to catch a wolf or other non-target species.

C. Habitat Differences in Reducing Risk to Mexican Gray Wolves

Plaintiffs contend that harm to Mexican gray wolves is nearly inevitable because of the overlap in location and habitat preferences between wolves and cougars. *See* Hopkins Decl. (Doc. 94), ¶7. They argue that the Cougar Rule authorizes trapping in areas where wolves and cougars live and range and harm to wolves is inevitable because of this overlap. *See, e.g.,* Dec. (Doc. 96), ¶10 (declarant stating that she photographed a wolf "in the same area" where she has seen signs of cougars); Gray Decl. (Doc. 93), ¶¶5-8 (seeing a line of wolf tracks on a forest service road in an area where declarant saw a cougar). At the same time, however, Plaintiffs abandon the "overlap" theory by arguing that virtually all cougar trapping—including the Bighorn Sheep program—occurs outside wolf range, thus minimizing the significance of any data resulting from the program.

As mentioned earlier, it is undisputed that the land open to cougar trapping overlaps with MWEPA. Much of the land classified by the Defendants as prime cougar habitat within New Mexico also lies within key Mexican gray wolf habitat within the MWEPA. *See* Doc. 99-2 (Goldstein Decl., Reply), ¶7 (parts of bighorn sheep range are within the MWEPA and are located in occupied wolf range). Plaintiffs' claim that most cougar trapping occurs outside wolf territory is not supported by the evidence, as the counties involved in the program are located within the MWEPA and within wolf territory. Doc. 97-9 at 2 (program inter-agency documents listing counties involved in the program, such as Catron, Dona Ana, Grant and Hidalgo); Goldstein Decl., Doc. 99-2 (Reply), ¶6 (describing these counties as lying within the MWEPA); Doc. 99-2, ¶7 (parts of bighorn sheep range are within the

MWEPA and is occupied wolf range). The Court agrees with Defendants that Plaintiffs' arguments are internally inconsistent. If habitats overlap geographically (and they do), then the Bighorn Sheep Restoration Project was conducted in areas within wolf range, and the data collected from the program over the last 15 years is both relevant and material.

Defendants offer persuasive evidence that despite the habitat overlap, an understanding of habitat use can help eliminate the likelihood that Mexican wolves would be caught in non-target traps and snares. Species behave differently:

Differences in behavioral characteristics between cougars and wolves (and how these animals use the landscape differently) make it unlikely that a trap set for cougar would catch a wolf. Reply Goldstein Decl. ¶¶9-12.

- Different animal species use the landscape in different ways and have different behavioral characteristics. Frequently, closely related species (such coyotes and wolves) use the landscape and behave in ways that are more similar than more distantly related species (such as cougars and wolves) despite the fact that their home ranges overlap. These differences make it unlikely that a trap set for cougar would catch a coyote or wolf.

- Wolves and coyotes typically use habitat with an open understory where they can give chase to their prey. On the contrary, cougars typically hunt in heavy vegetative cover which allows cougars to hide while stalking or waiting to ambush prey, and travel in canyon bottoms and across rocky terrain often through tight, narrow passageways, where they are protected from other cougars and wolves. Although cougar home ranges may overlap with coyotes and wolves, cougars typically spend their time in different locations within the home range. This means that trapping locations for cougars are not trapping locations for wolves or coyotes.

- Wolves and coyotes behave differently than cougars when confronted with lures or disturbances (such as the area a trap is placed). Wolves and coyotes are attracted to certain scents but are naturally distrustful of new ground disturbance (such as modifying a site to attract them) and visual lures such as flagging which often repel them. In contrast, cougars are less attracted to scents but are attracted to flagging and because they are not wary of new ground disturbances, the site around the trap site is heavily modified to attract cougar while discouraging canines from approaching.

- The differences between how cougars and wolves use the landscape, their natural behavior, and their response to attractants are evidenced by the fact that documented instances of Mexican wolves getting caught in traps in New Mexico are generally related to coyote trapping, and never related to cougar trapping.

-- Goldstein Decl., (Doc. 99-2, Reply), ¶¶9-12.

This evidence presented by Defendants regarding habitat use creates material disputes of fact on Plaintiffs' contention that harm to wolves is nearly inevitable because of the overlap of geographical boundaries. Plaintiffs, on the other hand, offer no evidence disputing Defendants' evidence of different habitat use by cougars and wolves which would reduce the risk of catching a wolf in a trap set for a cougar. Further, results from the Bighorn Sheep Restoration program suggest that harm to wolves is not reasonably certain or likely simply because of geographic overlap between cougars and wolves.

C.    Argument #3: Irrelevance of Data

Plaintiffs do not dispute the fact that no wolves were caught in cougar traps during the 15 years of the Bighorn Sheep Restoration project, presented as Defendants' Fact 2. However, they minimize the significance of these facts by claiming that this data is insufficient because the program was conducted where there are almost no Mexican wolves. Thus, they argue, the data from that program sheds no light on the safety of cougar snares for Mexican wolves where they actually do exist. Doc. 102 at 20-21.

*(1)    Data from Bighorn Sheep Restoration Project*

Plaintiffs first take issue with Defendant's Fact 2, although they do not dispute it. According to Fact 2, no Mexican wolves have been caught in traps set for cougars over the past 15 years from July 2002 to June 2017 as part of the Department's efforts to trap cougars to protect and manage bighorn sheep populations. While 156 cougars were caught during these efforts, not a single Mexican gray wolf has been caught. Plaintiffs argue that the contractors in 15-year bighorn sheep Restoration Program

used special precautions not required by the Cougar Rule for recreational trapping. The problem with this argument is that it completely ignores any of the hunting policies and recommendations issued by the Department as well as trapping regulations proposed by the Department and adopted by the Commission. These policies and regulations constitute the "due care" that hunters must use in order to avoid any penalty for the taking of a Mexican gray wolf.

Plaintiffs also contend that the statistics from this program are irrelevant because the program was conducted almost entirely *outside of Mexican gray wolf range*, and so Defendants cannot rely on this as evidence of the safety of cougar traps for wolves. *See* Doc. 88 at 25; Arrivo Decl. (Doc. 97), Exs. I & J. There are two problems with this argument. First, as mentioned earlier in this discussion, the evidence indicates that areas covered by the program were in counties within the MWEPA and where wolves were known to roam. Second, even if the Bighorn Restoration Program took place outside of the MWEPA, Plaintiffs should be estopped from claiming that statistics concerning wolf trappings outside of the MWEPA are not relevant, because Plaintiffs also have alleged in part, that the Cougar Rule will "also cause the death, injury and harassment of Mexican wolves that range *outside* the MWEPA by exposing them to leghold traps and snares." Compl., Doc. 1 at 20, ¶88 (emphasis added). Plaintiffs cannot have it both ways by alleging that EPA violations occur *outside* of the MWEPA, and then claim that evidence relating to taking of wolves *outside* of the MWEPA is not relevant. Third, Plaintiffs downplay the data from the Bighorn Sheep project because while the project was conducted within MWEPA where wolves were known to exist, it was not carried out in actual wolf habitat. However, as the Court discussed previously, this contention is not borne out by the evidence, which shows that the project took place in counties that are located in the MWEPA and which are in wolf range.

None of Plaintiffs' arguments abate the significance of Defendants' Fact 2. While the evidence in this fact is not necessarily entirely dispositive of the issues before the Court in this case, it is certainly relevant and material and weighs heavily in Defendants' favor.

<em>(2)	Records Since Cougar Rule Went Into Effect</em>

Plaintiffs do not dispute Defendants' Facts 4, 5 and 9. They admit they are unaware of any instance in which a Mexican wolf has been caught in a trap or snare set for cougars inside or outside the MWEPA either before or after the Cougar Rule went into effect, and they do not dispute that since November 2016 when the Cougar Rule went into effect, available records indicate that not a single Mexican wolf was caught in a trap set for cougars.

Plaintiffs suggest, however, that this data is insufficient because it represents only one year of trapping under the Cougar Rule. Hopkins Decl., ¶8 (one season is "not nearly enough data" from which to draw the conclusion that cougar trapping is safe for wolves). At the time of briefing, the Rule was in effect for only one year. However, since then Defendants have submitted a supplemental declaration by Ms. Goldstein providing an update for a second year of data: during the trapping season from November 2017 to March 2018, 34 cougars were trapped in New Mexico, but no Mexican wolves were trapped in traps set for cougars. Further, while four Mexican wolves were caught in traps in New Mexico, in all four instances, the traps were set for coyotes, not cougars. Goldstein Decl. (Doc. 111), Reply, ¶¶4 & 5; *see also* Ngo Decl. & Exs. A-R; Pachelli Decl. (Docs. 79-3 and 79-22) (no record of Mexican wolves being caught in traps set for cougars). Thus, this data becomes less "insufficient" as Plaintiffs claim, and the Court finds this information material and relevant, if not solely dispositive.

## V.	Whether Defendants' Actions Will Cause Illegal Take of Mexican Wolves

The ultimate question in this case is whether it is reasonably certain or likely that the Cougar Rule will cause injury or the take of the Mexican gray wolf. The next discussion focuses on that question in light of the evidence presented.

A.    Whether Cougar Rule Authorizes Trapping and Snaring of Cougars Where Mexican Wolves Range

The Cougar Rule has been in effect for two one full trapping seasons, from November 1, 2016 to March 31, 2018, and no Mexican gray wolf has been caught in a trap set for a cougar. The Department has trapped cougars for 15-plus years in its Bighorn Sheep Restoration project without a single trapping of a Mexican gray wolf. Plaintiffs do not dispute these facts, but instead note that wolves have in fact been caught in traps meant for animals other than cougars, for example: references to sixteen mountain lions that were caught in traps that were set for wolves—in areas where wolf-trapping is legal. Doc. 102 at 17; Hopkins Decl. (Doc. 94), ¶31; Arrivo Decl. (Doc. 97), Ex. O (Doc. 97-15) (traps set for wolves may hold bears, mountain lions and other large animals). Defendants do not deny that there are records of Mexican wolves being caught in traps. Ngo Decl. (Doc. 79-3), Exs. E-R. However, these records specify the targeted species, and in every one of these instances, the species targeted was not a cougar. Ngo Decl. (Doc. 79-3), Exs. F-K; Pachelli Decl. (Doc. 79-22), ¶6. The Court fails to see the relevance evidence showing that wolves get caught in traps that are set for target animals other than cougars, when Plaintiffs are challenging the Cougar Rule rather than New Mexico's general hunting practices. Such evidence and related arguments are outside the scope of a challenge to the Cougar Rule.

Information from other available records also supports Defendants' position. In its evaluation of the Department's cougar trapping program, the FWS concluded that it was not likely to adversely affect Mexican wolves. This "Intra-Service Section 7 Biological Evaluation" was part of an interagency mandate carried out by the Department pursuant to section 7 of the ESA (addressing interagency

consultation). The evaluation states that the Cougar Rule either "may effect" or "is not likely to adversely affect" the jaguar or the Mexican gray wolf. The phrase "is not likely to adversely affect" is defined to mean that effects on wolves "are expected to be discountable, or insignificant, or completely beneficial." Doc. 79-2 at 5; Defts' Fact 3; Goldstein Decl. (Doc. 79-1) at 3, 5 (noting the FWS' conclusion that cougar trapping program is not likely to adversely affect Mexican wolves).

Plaintiffs minimize this evidence as well as the FWS' conclusion because it pertains to professional cougar removal outside of the MWEPA (which is not evident from the documents) and because the evaluation is not based on an independent FWS analysis of the Cougar Rule. Plaintiffs offer no sensible reason to suspect the conclusions made in the Biological Evaluation other than the mere fact that the evaluation was done by cooperative government agencies rather than a private outside company, and they make no substantive challenges to the accuracy, thoroughness or integrity of the evaluation. As a result, Plaintiffs fail to rebut this evidence.

Plaintiffs also argue that the risk of harm to Mexican wolves will increase as the species grows, making it even more reasonably certain that wolves will get caught in cougar traps. The observation and argument seems plausible, but does not meet the reasonably certain standard to obtain an injunction. Moreover, as Defendants point out, because the Cougar Rule expires after two years, the argument becomes more speculative than plausible; there may be no trapping if the Rule is not renewed.

B.      Evidence of "Due Care" Under the 10(j) Rule

Any discussion of causation must also include the policies and regulations in place which affect cougar trapping under the Cougar Rule.

Any *unintentional* trapping of a Mexican gray wolf in the MWEPA is a violation of the 10(j) Rule (and therefore the ESA), only if it is done without the exercise of "due care." 50 C.F.R §

17.84(k)(5)(iii). Thus, "if a trapper was careful or exercised due care in seeking to avoid capturing a wolf within a known wolf range, but nonetheless took a wolf, there would be no violation of law." *WildEarth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 6019306, at *6 (D.N.M. Dec. 3, 2012) (noting that the 10(j) rule "clearly contemplates lawful trapping of animals in occupied wolf territory, provided the trapper meets certain requirements").

Relying on declaration statements, Plaintiffs claim that "due care" simply cannot be exercised and there is nothing one can do to avoid the take of Mexican wolves as long as the Cougar Rule is in effect. *See* Niemeyer Decl. (Doc. 89), ¶¶ 23-24; First Hopkins Dec. (Doc. 94), ¶¶27-30. However, these statements are conclusory because they have no real evidentiary support other than an individual's non-expert opinion. The type of harm required to obtain injunctive relief must be demonstrated by actual evidence, which may be in the form of scientific studies. *House v. U.S. Forest Serv., U.S. Dep't of Agric.*, 974 F. Supp. 1022, 1029 (E.D. Ky. 1997) (citing *American Bald Eagle v. Bhatti,* 9 F.3d 163, 165 (1st Cir.1993) ("the proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, has been unequivocally defined as a showing of 'actual harm.'"). Plaintiffs have not presented such evidence. In contrast, Defendants have presented evidence showing that harm to wolves is not reasonably certain to occur:

- First, the Cougar Rule does continue to permit the use of traps which could trap Mexican wolves just as easily, but prohibits traps with jawspreads larger than seven inches;

- Second, regulations and policies are in place which either avoid or minimize harm to wolves the choice of equipment, for example, the use of sufficiently small traps that "allow a reasonable expectation that the wolf will either immediately pull free from the trap or span the jaw spread when stepping on the trap." 80 Fed.Reg. at 2560. Snares and foot hold traps for cougars can be set to make the probability of capturing a wolf unlikely. For example, the design of the set for cougars will cause wolves and coyotes to avoid the trap, and "pan tension" can be adjusted upward on traps set for cougars. Griego Decl., ¶ 10;

- Third, in addition to trap modification and design, differences in behavioral characteristics between cougars and wolves and habitat use make it unlikely that a trap set for cougar would catch a wolf, despite the fact that their home ranges overlap. A trapper's consideration of a cougar's use of habitat (as opposed to a wolf's) is part of the "due care" that can be followed to minimize the possibility of trapping a wolf in a trap that is set for a cougar. Defendants provide a detailed explanation of the differences in the use of habitat between wolves and cougars, including reaction to visual lures and attractants; how they hunt and where these species typically spend their time within their habitat. *See* Goldstein Decl,, Doc. 99-2 (Reply).

- Fourth, while the Department's hunting rules and regulations may not have a binding legal effect, they are nevertheless designed to mitigate the possibility of a wolf being caught in a cougar trap, which the Court finds extremely relevant to an analysis of whether an injunction is appropriate. *See, e.g., National Wildlife Fed'n v. National Park Serv.,* 669 F.Supp. 384 (D.Wyo.1987) (no "taking" where a plan was designed to reduce conflicts between man and the grizzly bear and in the first season of operation under the plan, there were no bear mortalities). These policies sand regulations also effectively deter noncompliance because a hunter is exposed to civil and criminal liability under the ESA and under state law. Such negative consequences would reasonably motivate a hunter/trapper to exercise all aspects of due care under the 10(j) rule.

## CONCLUSION

In sum, the Court finds and concludes that the evidence presented by Defendants substantially and materially disputes Plaintiffs' statements that measures cannot be taken to avoid trapping wolves in traps set for cougars; overlap of species habitat will mean increased harm to wolves; and that any data collected by the FWS or the Department is irrelevant or insufficient. In contrast, Plaintiffs have failed to create factual disputes to this evidence presented by Defendants, and so Defendants are entitled to summary judgment.

Plaintiffs have argued that use of larger traps and overlapping territory will make it nearly inevitable that wolves will be caught in traps set for cougars, but they fail to rebut the facts and evidence presented by Defendants showing that measures can be taken either by use of habitat or compliance with trapping policies and regulations, to minimize any risk of harm to Mexican wolves.

For purposes of this discussion, it worth mentioning an unpublished District of New Mexico case, *WildEarth Guardians v. Lane*, in which plaintiffs were challenging the rules addressing special exceptions of "unavoidable and unintentional" taking of Mexican gray wolves. Plaintiffs in that case contended that the defendants, by regulation or lack of regulation, caused others to take Mexican gray wolves through activities of trapping. No. CIV 12-118 LFG/KBM, 2012 WL 6019306, at *1 (D.N.M. Dec. 3, 2012), *as amended* (Dec. 4, 2012). The court in that case found that plaintiffs had raised no genuine issues of material fact demonstrating that Defendants' regulation or non-regulation of trapping actually caused trappings of Mexican gray wolves:

> The Court observes that not many trappings of wolves occurred in the New Mexico occupied wolf range over the last 7 to 12 years. While not determinative of the issues before it, the Court notes that over a 12–year period, only a very small percentage of wolf mortalities is attributed to non-project personnel's trapping. Between 2002 and 2009, only 10 to 13 wolves were trapped in the pertinent recovery areas. Of those, not all were killed or injured.

*Lane,* 2012 WL 6019306, at *23 (D.N.M. Dec. 3, 2012), *as amended* (Dec. 4, 2012). Here too, the fact that no wolf has been caught in a cougar trap since the Cougar Rule has been in effect is strong evidence, even if it is not dispositive, that the rule is not causing take of the Mexican gray wolf, by any definition of the word "take" under the ESA statute. In *Nat'l Wildlife v. Burlington,* the Ninth Circuit found that the plaintiff failed to establish reasonable likelihood of irreparable future injury to grizzly bears from a railroad's possible future grain spills so as to warrant a preliminary injunction. The court in that case noted that following completion of major cleanup effort by the railroad, no bears had been hit by trains in the area of the corn spills in more than three years. 23 F.3d 1508, 1511 (9th Cir. 1994) ("While we do not require that future harm be shown with certainty before an injunction may issue, we do require that a future injury be sufficiently likely"). Plaintiffs have not met the required threshold and have not presented evidence that future harm to the wolf is reasonably certain to occur.

**THEREFORE,** for the reasons stated in this Memorandum Opinion and Order,

**IT IS ORDERED** that:

(1)  Defendants' Motion for Summary Judgment **(Doc. 79)** is hereby GRANTED; and

(2) Plaintiffs' Motion for Summary Judgment is hereby DENIED **(Doc. 88)**.

A Rule 58 Judgment shall issue separately.

CHIEF UNITED STATES DISTRICT JUDGE